# 26-1130

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

BOYSING SAMUEL, JR., LAURA PINCAY, CHRISTOPHER MONTEAGUDO, KEANNA KOVOS,

*Plaintiffs - Appellants,*

SHAWNICE BETTIS,

*Plaintiff,*

v.

AMAZON.COM SERVICES, LLC, FKA AMAZON SERVICES.COM, INC.,

*Defendant - Appellee.*

*On appeal from Order and Judgment of the U.S. District Court for the Eastern District of New York Case No. 24-cv-7563 [DeArcy Hall, J.]*

**APPELLANTS' APPENDIX**

**VOL. II of II**
**pp. A.107-A.206**

**ROBERT WISNIEWSKI P.C.**
17 State Street, Suite 820
New York, New York 10004
(212) 267-2101
rw@rwapc.com

**LEON GREENBERG, ATTORNEY AT LAW**
1811 S. Rainbow Boulevard, Suite 210
Las Vegas, Nevada 89146
(702) 383-6086
leongreenberg@overtimelaw.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS – APPENDIX

Table of Contents ........................................................................................i

Civil Docket, Bettis et. al. v. Amazon Services, LLC, United States District Court, Eastern District of New York, Case # 1:24-cv-07563-LDH JAM........................................................................................A1

Second Amended Complaint filed May 30, 2025 ......................................A9

Declaration in Opposition to Motion to Dismiss with Exhibits “1” through “7” filed September 1, 2025.......................................................A37

Memorandum and Order granting motion to dismiss [DeArcy Hall, J.] filed March 31, 2026 ..........................................................................A172

Judgment filed March 31, 2026...........................................................A191

Declaration of Robert Wisniewski, Esq., in support of motion to vacate judgment and reconsider, with Exhibits “3” and “4” filed April 13, 2026 ..........................................................................................A192

Notice of Appeal filed April 27, 2026...................................................A201

Docket Text Order denying motion to vacate judgment and reconsider [DeArcy Hall, J.] filed April 28, 2026...................................................A203

Amended Notice of Appeal filed May 11, 2026 ...................................A206

y of the provisions of Minimum Wage Order No.
Regulations issued by the Department of Labor
picuous place where employees can read it.

'ustry" includes any establishment which, as a
isiness activities offers lodging accommodations
employees, or to members or guests of members,
on therewith or incidental thereto.
s but is not limited to commercial hotels, apart-
els, lodging houses, boarding houses, furnished
camps, adult camps, tourist camps, tourist homes,
lubs, membership clubs, dude ranches, Turkish
s.
stry" excludes:
places customarily offering lodging accommoda-
rooms to the public, to employees, or to members

vhich lodging accommodation is not available to
ers or to guests of members, but is incidental to
ire, religious observance, or to the care of handi-
rsons or other public charges.
"resort hotel" (see definition of "hotel indus-
lodging accommodations of a vacational nature
ibers or guests of members and which
ot more than seven months in any calendar

n a rural community or in a city or village of
lation, increased its number of employee work
males) during any consecutive four-week period
over the number of employee work days (includ-
ny other consecutive four-week period within
year, or
a rural community or in a city or village of
tion, increased its number of guest days during
week period by at least 100 percent over the
in any other consecutive four-week period in
year.

ntinuation of Minimum Wage Order No. 6-c.
'All-year hotels" shall be all other hotels not
els" under the foregoing definition.
els, cabins, tourist homes and other establish-
rposes shall be classified as all-year hotels un-
lify as a resort hotel in accordance with the
of.

' shall mean a woman 21 years of age and over
x under the age of 21 years employed in the
tor of the establishment or by any other em-
ears of age or over may be paid less than the
minors; other requirements of this order

hall be excluded from this definition. This ex-
d to exclude caddies from another minimum
such employees.



(2) *Camp counselors and employers in children's camps.* Camp counselors and employees in children's camps who assist in guidance or instruction of campers and who themselves receive supervision and training from a camp counselor as part of their compensation whether called junior aide or by some other title, shall be excluded from this definition. This exclusion shall not be deemed to exclude camp counselors and employees in children's camps who assist camp counselors from another minimum wage order which covers such employees.

(3) A camper who works no more than four hours a day for a children's camp and at all other times enjoys the same privileges, facilities and accommodations as regular campers in such camp, shall be known as a "camper-worker" for the purpose of the order and shall not be deemed an employee within the meaning of the order.

(4) A person while a regularly enrolled student in a department of hotel administration in a recognized college, university, junior college or institute and is required by it to acquire experience in hotel problems by accepting employment in a hotel, shall be exempt from this definition. Such college or university shall submit a list each year of such students and their places of employment and the probable duration of their employment to the Division of Industrial Relations, Women in Industry and Minimum Wage. Thereupon, the division shall issue a special certificate of exemption for each such student. Such certificate shall be delivered to the student who shall turn it over to the employer. The employer shall keep such certificate on file.

(5) A person who while a regularly enrolled student in a vocational high school or other high school is required by such high school to acquire experience in hotel problems by accepting employment in a hotel, shall be known as a student worker for a period of employment not to exceed a total of three months. Such vocational high school shall submit a list of such and their places of employment and the probable duration of their employment to the Division of Industrial Relations, Women in Industry and Minimum Wage. Thereupon, the division shall issue a special certificate of exemption for each such student. Such certificate shall be delivered to the student who shall turn it over to the employer. The employer shall keep such certificate on file.

(6) Turkish bath employees employed by hotels are to be considered employees under this order. This order is not intended to cover Turkish bath workers employed by concessionaires in hotels or by Turkish baths operated independently of hotels, except that employees of such Turkish baths shall be considered employees under this order if they are employed in connection with the lodging facilities of the establishment.

c. *Minors.* "*Minors*" shall mean all male and female workers under 21 years of age.

d. *Chambermaid.* "*Chambermaid*" means any employee whose duties relate solely to the cleaning and servicing of guest rooms.

e. *Service employee.* "*Service employee*" shall mean any employee, regardless of sex who customarily receives gratuities in excess of the difference between the service and non-service rates of pay. It shall be presumed that employees whose duties relate solely to any of the following services are "service employees":

(1) The service of food or beverage to patrons seated at tables and the performance of duties incidental thereto.
(2) Bellmen.
(3) Baggage porters.
(4) Package-room messengers or delivery boys.

(5) Doormen and footmen.
(6) Busboys in resort hotels.
(7) Page boys.

It shall be presumed that all employees other than those mentioned above are "non-service employees". Substantial proof must be presented to the Department of Labor to rebut this presumption.

f. *Non-service employee.* (1) *"Non-service employee"* means all employees except service employees.

In resort hotels a chambermaid shall not be deemed a non-service employee unless she fails to receive gratuities in excess of the difference between the chambermaid and non-service rates.

g. *Camp counselor.* A *"camp counselor"* is one who has personal charge of a bungalow, tent, or other structure used by campers or who is responsible for the activity of a group of campers, or for their care, guidance or instruction in a camp catering exclusively to children.

h. *Residential employee. "Residential employee"* shall mean an employee who receives lodging accommodations from his or her employer as part of his or her wage and for whom such accommodations are regularly available at all times. This provision shall apply to all-year hotels and resort hotels.

i. *Working time. "Working time"* means actual service or time of permitted attendance at the establishment, and time spent in traveling at the request of the employer from one of his establishments to another. This does not apply to residential employees.

j. *Split shift.* (1) A *"split shift"* is a schedule of daily hours in which the hours of work required or permitted are not consecutive. Interruption of working hours for any meal period of one hour or less does not constitute a split shift.

(2) An *"interval off duty"* is time during the work day other than working time, waiting time, travel time, and time off duty for any meal period of one hour or less.

k. *Spread of hours.* The *"spread of hours"* is the interval between the beginning and end of the work day. The spread of hours for any day shall include working time plus time off for meals plus time off duty.

l. *Uniform.* The term *"uniform"* includes any garment such as dress, apron, collar, cuffs, or headdress, which is worn by the employer either at the direction of the employer or as a condition of employment. It shall be a presumption that the employer has required his employee to wear uniforms if such garments are of a similar design, color or material or form part of the decorative pattern of the establishment. However, items of clothing that usually and commonly are worn by a person as part of a normal wardrobe are not to be considered part of a uniform.

m. *Meal.* A *"meal"* shall provide adequate portions of a variety of wholesome, nutritious foods. As a standard it should include at least one of the types of foods from all four of the following groups:

(1) Fruits or vegetables;
(2) Cereals, bread or potatoes;
(3) Eggs, meat, fish or poultry;
(4) Milk, tea or coffee;

except that for breakfast group (3) may be omitted if both cereal and bread are offered in group (2).

A meal shall be deemed to be furnished by an employer to an employee whose compensation is predicated on the inclusion of meals, or who is entitled to meals under this regulation, when the meal is made available to the employee during reasonable meal periods.

ootmen.
ort hotels.

all employees other than those mentioned above
es". Substantial proof must be presented to the
ebut this presumption.
e. (1) "*Non-service employee*" means all em-
ployees.
hambermaid shall not be deemed a non-service
is to receive gratuities in excess of the difference
aid and non-service rates.
*camp counselor*" is one who has personal charge
er structure used by campers or who is responsi-
roup of campers, or for their care, guidance or
ring exclusively to children.
"*Residential employee*" shall mean an employee
mmodations from his or her employer as part
for whom such accommodations are regularly
is provision shall apply to all-year hotels and

*king time*" means actual service or time of per-
stablishment, and time spent in traveling at the
om one of his establishments to another. This
ial employees.
*lit shift*" is a schedule of daily hours in which
or permitted are not consecutive. Interruption
eal period of one hour or less does not constitute

*luty*" is time during the work day other than
ne, travel time, and time off duty for any meal
s.

"*spread of hours*" is the interval between the
ork day. The spread of hours for any day shall
time off for meals plus time off duty.
*niform*" includes any garment such as dress,
ldress, which is worn by the employer either
oyer or as a condition of employment. It shall
employer has required his employee to wear
are of a similar design, color or material or
pattern of the establishment. However, items
commonly are worn by a person as part of a
be considered part of a uniform.
rovide adequate portions of a variety of whole-
standard it should include at least one of the
of the following groups:
s;
otatoes;
poultry;

oup (3) may be omitted if both cereal and
).
be furnished by an employer to an employee
ated on the inclusion of meals, or who is en-
gulation, when the meal is made available to
ble meal periods.



n. *Lodging.* "*Lodging*" means living accommodations which are adequate, decent, and sanitary according to usual and customary standards.

o. *Diversified employment.* The term "*diversified employment*" means employment in an all-year hotel of any employee who is required or permitted to perform the duties of a service employee, as well as those of a non-service employee and the employment in a resort hotel of an employee who is required or permitted to perform either the duties of a service employee as well as those of a chambermaid or the duties of a chambermaid as well as those of a non-service employee, or the duties of a service employee as well as those of a non-service employee.

p. *Voluntary absence.* "*Voluntary absence*" means an absence which is not designed or planned by the employee and the employer to evade the minimum wage standards. Recurrent or periodic absence is not voluntary absence except for medical treatment under a doctor's care.

**Effective date.** This order shall take effect January 13, 1958.

## Minimum Wage Order No. 6-e—Governing Minimum Wage Standards in the Hotel Industry*

*Provisions relating to all-year hotels are a continuation of Minimum Wage Order No. 6-d.

(Adopted April 21, 1958; effective June 20, 1958; filed April 28, 1958. Statutory authority article 19, Labor Law.)

**1. The following minimum wage standards shall apply to all-year hotels:**

a. *Nonresidential employees.*

(1) *Minimum full-time hourly rate.*

(a) *New York City.* The minimum full-time hourly rate for employees whose working time is more than 30 hours but not more than 40 hours in any week shall be as follows:

| | |
|---|---|
| (1) Non-service employees | $1.00 an hour |
| (2) Service employees | .70 an hour |

(b) *Remainder of the state.* The minimum full-time hourly rate for employees whose working time is more than 30 hours but not more than 42 hours in any week shall be as follows:

| | |
|---|---|
| (1) Non-service employees: | |
| From June 20, 1958 through July 12, 1958 | $ .85 an hour |
| From July 13, 1958 through October 15, 1958 | .90 an hour |
| On October 16, 1958 and thereafter | 1.00 an hour |
| (2) Service employees | .70 an hour |

(2) *Minimum part-time hourly rate.* (a) Any employee whose working time is 30 hours or less in any week at the direction of the employer, shall receive five cents per hour more than the minimum full-time hourly rate for each hour worked up to and including 30 hours.

(b) In no event shall the earnings for hours worked totaling more than 30 hours in any week be less than the total amount that may be earned at the part-time rate for 30 hours in any such week.

(c) The part-time hourly rate shall not apply to full-time employees who voluntarily absent themselves for any period during a week.

(3) *Minimum overtime hourly rate.* The minimum overtime hourly rate for employees in (a) *New York City* for work in excess of 40 hours in any week, and (b) *the remainder of the state* for work in excess of

42 hours in any week shall be one and one-half times the minimum full-time hourly rate applicable to the classification of the employee taking into account the number of meals received.

(4) *Additional rate—split shift and spread of hours.* On any day (a) in which the spread of hours exceeds 10, or (b) in which there is more than one interval off duty, excluding any meal period of one hour or less, or in which both situations occur, an employee shall receive $1 in addition to the hourly wages earned.

(5) *Minimum daily rates.* (a) An employee who, by request or permission of the employer, reports for duty on any day, whether or not assigned to actual work, shall be paid for at least three hours, at the rate applicable to the classification of the employee for the time actually worked and at the non-service rate for the balance of the three hours.

(b) An employee who, by request or permission of the employer, reports for duty twice on any day, whether or not assigned to actual work, shall be paid for at least six hours, at the rate applicable to the classification of the employee for the time actually worked and at the non-service rate for the balance of the six hours.

(c) An employee who, by request or permission of the employer reports for duty three times on any day, whether or not assigned to actual work, shall be paid for at least eight hours, at the rate applicable to the classification of the employee for the time actually worked and at the non-service rate for the balance of the eight hours.

(d) Payment shall be made at the minimum hourly rate applicable to the number of meals received and the total number of hours of working time for that week.

(e) This regulation shall not apply to an employee who is a student under 18 years of age, on a work day when he or she is required to attend school, but such an employee shall be paid for each hour or fraction thereof of actual work or permitted attendance, not less than the minimum hourly rate applicable to such an employee.

(6) *Meals.* The following deductions may be made from the full-time or part-time hourly rate for employees who receive meals furnished by the employer:

| | |
|---|---|
| Employees who receive one meal per day | 6 cents per hour |
| Employees who receive two meals per day | 12 cents per hour |

Where an employee who works five or more hours on any day receives a third meal on such day, the employer may be allowed an additional credit of 40 cents for such day but with no effect upon the wage rate.

(7) *Rate for waiting time.* Waiting time, other than time off duty for split shift, during which an employee is required or permitted to wait during the work day while no work is provided by the employer, shall be counted as working time. Such waiting time shall be paid for at not less than the minimum hourly non-service rate applicable to the number of meals received, and the total number of hours of working time for that week.

b. *Residential employees.*

(1) *Minimum weekly rate.* The minimum weekly rate for residential employees who work 44 hours or less in any week shall be as follows:

| | |
|---|---|
| Employees who receive lodging but no meals | $35 per week |
| Employees who receive lodging and meals | $27 per week |

(2) *Exceptions to weekly rates.* (a) The minimum weekly rate shall be prorated during the first week of employment of new employees who

have been hi
employment
who volunta
who are pre
rendering se
breakdown
(b) Ar
call" at ot
the perfo
ployee fo
than the
(3) *Ove*
44 hours ir
of the mini
**2. The foll
ards in all-y
provided:**
a. *Uniform*
tain uniform
nished such
condition of
the cost ther
forms or th
and regardle
period or no
bursed for t
elect to pay
lieu of laun
b. *Lodgi*
lodging or
compensati
as herein in
less than fi
than the h
(2) A
per day
shall the
Nothing
the emp
times or
c. *Trav*
hotel requ
of the sam
ing day sh
shall be r
**3. The
hotels:**
a. *Mini*
ployees in
than thre

hall be one and one-half times the minimum full
able to the classification of the employee taking
ier of meals received.

—*split shift and spread of hours.* On any day
d of hours exceeds 10, or (b) in which there is
off duty, excluding any meal period of one hour
h situations occur, an employee shall receive $1
wages earned.

*ates.* (a) An employee who, by request or per-
, reports for duty on any day, whether or not
, shall be paid for at least three hours, at the
ssification of the employee for the time actually
service rate for the balance of the three hours.
ho, by request or permission of the employer,
on any day, whether or not assigned to actual
r at least six hours, at the rate applicable to
e employee for the time actually worked and
for the balance of the six hours.
io, by request or permission of the employer
times on any day, whether or not assigned to
aid for at least eight hours, at the rate appli-
n of the employee for the time actually worked
rate for the balance of the eight hours.
made at the minimum hourly rate applicable
received and the total number of hours of
veek.

hall not apply to an employee who is a student
n a work day when he or she is required to
an employee shall be paid for each hour or
l work or permitted attendance, not less than
applicable to such an employee.

g deductions may be made from the full-time
r employees who receive meals furnished by

| | |
|---|---|
| one meal per day | 6 cents per hour |
| two meals per day | 12 cents per hour |

rks five or more hours on any day receives
he employer may be allowed an additional
day but with no effect upon the wage rate.

*e.* Waiting time, other than time off duty
n an employee is required or permitted to
hile no work is provided by the employer,
time. Such waiting time shall be paid for
n hourly non-service rate applicable to the
nd the total number of hours of working

The minimum weekly rate for residential
or less in any week shall be as follows:

| | |
|---|---|
| dging but no meals | $35 per week |
| dging and meals | $27 per week |

*tes.* (a) The minimum weekly rate shall
ek of employment of new employees who



have been hired after the beginning of such week; for employees whose employment has terminated before the end of the week; for employees who voluntarily absent themselves during such week; and for employees who are prevented for more than six successive hours in any week from rendering service because of riot, act of God, or stoppage due to general breakdown of equipment.

(b) An employee working 14 hours or less per week and not "on call" at other times, whose lodging on the premises is not necessary to the performance of his duties, shall not be deemed a residential employee for the purposes of this classification and shall be paid not less than the applicable nonresidential rate.

(3) *Overtime rate.* The minimum hourly rate for work in excess of 44 hours in any week shall be one and one-half times one-forty-fourth of the minimum weekly rate applicable to the employee.

**2. The following regulations to safeguard these minimum wage standards in all-year hotels shall apply to all employees, except as otherwise provided:**

a. *Uniforms.* The employer is to furnish and to launder, clean and maintain uniforms for all employees. However, if the employer shall have furnished such uniforms at the request or direction of the employer, or as a condition of employment, the employer shall reimburse the employee for the cost thereof not later than one week after the furnishing of such uniforms or the time of the next payment of wages, whichever comes later and regardless of whether the employee leaves his employment within such period or not. If the employee leaves within such period he shall be reimbursed for the cost of the uniform at or before leaving. The employer may elect to pay regularly to employees an additional five cents per hour in lieu of laundering, cleaning and maintaining uniforms.

b. *Lodging and meals.* (1) No charge shall be made by an employer for lodging or for any meal furnished by the employer to an employee whose compensation is predicated on the inclusion or lodging and meals except as herein indicated. A nonresidential employee in an all-year hotel, working less than five hours on any day and receiving meals, shall be paid not less than the hourly rate for employees who receive one meal per day.

(2) A residential employee receiving meals shall receive three meals per day for six days a week and lodging for the entire week. In no event shall the employer charge for meals if supplied on the seventh day. Nothing herein contained shall prevent such employees purchasing from the employer, or the employer selling to the employee, meals at other times or places than those provided as part of their compensation.

c. *Travel time and expense.* Any nonresidential employee in an all-year hotel required or permitted to travel from one establishment to another of the same employer after the beginning or before the close of the working day shall be compensated for travel time at the non-service rate and shall be reimbursed for carfare.

**3. The following minimum wage standards shall apply to resort hotels:**

a. *Minimum full-time weekly rate.* The minimum weekly rate for employees in resort hotels who work 48 hours or less in any week but more than three days or 24 hours shall be as follows:

(1) *Service employees.*

| | |
|---|---|
| Employees who receive three meals per day and lodging | $12 per week |
| Employees who receive three meals per day but no lodging | 17 per week |
| Employees who receive lodging but no meals | 20 per week |
| Employees who receive neither meals nor lodging | 25 per week |

(2) *Chambermaids.*

| | |
|---|---|
| Employees who receive three meals per day and lodging | $17 per week |
| Employees who receive three meals per day but no lodging | 22 per week |
| Employees who receive lodging but no meals | 25 per week |
| Employees who receive neither meals nor lodging | 30 per week |

(3) *Non-service employees.*

| | |
|---|---|
| Employees who receive three meals per day and lodging | $22 per week |
| Employees who receive three meals per day but no lodging | 27 per week |
| Employees who receive lodging but no meals | 30 per week |
| Employees who receive neither meals nor lodging | 35 per week |

b. *Exception to weekly rate.* The minimum weekly rate shall be pro-rated during the first week of employment of new employees who have been hired after the beginning of the week; for employees who have been dismissed as unsatisfactory or whose employment has terminated before the end of the week; for employees who voluntarily absent themselves, and for employees who are prevented from rendering service for more than six successive hours because of riot, act of God, or stoppage due to general breakdown of equipment.

c. *Part-time hourly rate.* The minimum hourly rate for employees who work three days or less or 24 hours or less in any week shall be one-fortieth of the applicable weekly rate.

d. *Overtime rate.* The minimum hourly rate for employees who work in excess of 48 hours in any week shall be time and one-half the basic minimum rate applicable to the classification of the employee based on a 48-hour week. The minimum hourly rate for employees who work on the seventh consecutive day in any week shall be time and one-half of the basic minimum rate applicable to the classification of the employee for the hours worked on such seventh consecutive day.

e. *Minimum daily rate.* An employee employed at the part-time hourly rate who, by request or permission of the employer, reports for duty at the beginning of his or her work shift, regardless of whether he or she is assigned to actual work for the full three hours, shall be paid for at least three hours on any shift at the minimum hourly non-service rate applicable to that employee.

f. *Rate for waiting time.* Waiting time (other than time off duty for split shift) during which an employee, employed at the part-time hourly rate, is required or permitted to wait during the work day while no work is provided by the employer, shall be counted as working time. Such waiting time shall be paid for at not less than the minimum hourly non-service rate applicable to that employee.

**4. The follo**
ards in resort
provided:
a. *Uniform*
maintain unif
furnished suc
as a condition
for the cost t
uniforms or t
and regardles
period or not
bursed for t
(2) The
tional five
of launder
b. *Lodgin*
lodging or f
compensatio
as herein ir
is employed
hours on an
ing five hou
any case su
meal for ea
(2) N
ing from
in additi
**5. The**
ards in all
a. *Grat*
considered
b. *Dedu*
whatsoeve
c. *Appr*
less than
capped wo
colleges, j
this orde
d. *Han*
impaired
issued in
has been
tions, W
e. *Div*
ploymen
at whic
this ord
paid occ
f. *Em*
hotel est
tion or i
order, s
by such
**6. T**
hotels

ees.
o receive three meals per day and lodging $12 per week
o receive three meals per day but no lodging 17 per week
receive lodging but no meals 20 per week
o receive neither meals nor lodging 25 per week

receive three meals per day and lodging $17 per week
receive three meals per day but no lodging 22 per week
receive lodging but no meals 25 per week
receive neither meals nor lodging 30 per week

oyees.
receive three meals per day and lodging $22 per week
receive three meals per day but no lodging 27 per week
receive lodging but no meals 30 per week
receive neither meals nor lodging 35 per week

ate. The minimum weekly rate shall be pro-
k of employment of new employees who have
ing of the week; for employees who have been
or whose employment has terminated before
ployees who voluntarily absent themselves, and
vented from rendering service for more than
of riot, act of God, or stoppage due to general

The minimum hourly rate for employees who
hours or less in any week shall be one-fortieth
e.

nimum hourly rate for employees who work in
eek shall be time and one-half the basic mini-
assification of the employee based on a 48-hour
rate for employees who work on the seventh
shall be time and one-half of the basic mini-
classification of the employee for the hours
ecutive day.

n employee employed at the part-time hourly
mission of the employer, reports for duty at
vork shift, regardless of whether he or she is
he full three hours, shall be paid for at least
e minimum hourly non-service rate applicable

Waiting time (other than time off duty for
employee, employed at the part-time hourly
to wait during the work day while no work
hall be counted as working time. Such waiting
less than the minimum hourly non-service
yee.



**4. The following regulations to safeguard these minimum wage standards in resort hotels shall apply to all employees, except as otherwise provided:**

a. *Uniforms.* (1) The employer is to furnish and to launder, clean and maintain uniforms for all employees. However, if the employee shall have furnished such uniforms at the request or direction of the employer, or as a condition of employment, the employer shall reimburse the employee for the cost thereof not later than one week after the furnishing of such uniforms or the time of the next payment of wages, whichever comes later and regardless of whether the employee leaves his employment within such period or not. If the employee leaves within such period he shall be reimbursed for the cost of the uniform at or before leaving.

(2) The employer may elect to pay regularly to employees an additional five cents per hour, but not to exceed $2.40 in any week, in lieu of laundering, cleaning and maintaining uniforms.

b. *Lodging and meals.* (1) No charge shall be made by an employer for lodging or for any meal furnished by the employer to an employee whose compensation is predicated on the inclusion of lodging and meals except as herein indicated. An employee in a resort hotel receiving meals, who is employed at the part-time hourly rate and who works less than five hours on any day shall receive one meal on such day. Such employee working five hours or more on any day shall receive two meals on such day. In any case such employee working on split shift on any day shall receive one meal for each consecutive period of hours worked on that day.

(2) Nothing herein contained shall prevent such employees purchasing from the employer, or the employer selling to the employee, food in addition to meals provided as part of their compensation.

**5. The following regulations to safeguard the minimum wage standards in all-year and resort hotels shall apply to all employees:**

a. *Gratuities.* In no event shall gratuities from patrons or others be considered as part of the minimum wage.

b. *Deductions.* The minimum wage shall be subject to no deductions whatsoever except as authorized by statute.

c. *Apprentices and learners.* Learners and apprentices shall be paid not less than the minimum wage. This provision has no application to handicapped workers or students in hotel administration courses in universities, colleges, junior colleges, high schools or institutes as elsewhere covered in this order.

d. *Handicapped workers.* No employee whose earning capacity has been impaired may be paid less than the minimum wage, until a special license, issued in accordance with the provisions of section 658 of the Labor Law, has been obtained by the employer from the Division of Industrial Relations, Women in Industry and Minimum Wage.

e. *Diversified employment.* An employee who works at diversified employment shall be paid the minimum rate for the highest paid occupation at which she works for each day of such diversified employment under this order, provided that she works for two hours or more at the higher paid occupation.

f. *Employment under other minimum wage orders.* An employee of a hotel establishment who works for a period of one week solely at an occupation or in an industry governed by another New York State minimum wage order, shall not be covered by this order, but shall for that week be covered by such other minimum wage order.

**6. The following administrative regulations shall apply to all-year hotels and resort hotels:**

a. *Statement to employee.* With every wage payment to each employee subject to Minimum Wage Order No. 6-e, there shall be given a statement specifying the rates, earnings (gross and net), deductions, and hours worked.

b. *Records.* (1) Every employer shall keep and make available for inspection at each establishment and branch of the establishment for at least two years a record of each employee, including the name, address, age of male under 21, social security number, occupational classification, cash wages paid, and daily and weekly hours worked, including the exact time of arrival and departure on each shift on any day in which a split shift is worked or in which the spread of hours exceeds 10. The records shall also indicate whether employees receive meals and have uniforms laundered, cleaned or maintained by the employer.

(2) Such records shall be kept on the premises in each establishment for a period of at least two years, and the employer shall on demand submit a sworn copy of such records to the commissioner or his representative together with such information as the commissioner in his discretion may deem necessary.

(3) Time cards, time sheets, or other original time records, where used, shall be kept for at least two years.

c. *Posting.* A summary of the provisions of Minimum Wage Order No. 6-e and administrative regulations issued by the Department of Labor shall be posted in a conspicuous place where employees can read it.

**7. Definitions.**

a. *Hotel industry.*

The term *"hotel industry"* includes any establishment which, as a whole or part of its business activities offers lodging accommodations for hire to the public, to employees, or to members or guest of members, and services in connection therewith or incidental thereto.

The industry includes but is not limited to commercial hotels, apartment hotels, resort hotels, lodging houses, boarding houses, furnished room houses, children's camps, adult camps, tourist camps, tourist homes, auto camps, residence clubs, membership clubs, dude ranches, Turkish baths and Russian baths.

The term *"hotel industry"* excludes:

Eating or drinking places customarily offering lodging accommodations of less than five rooms to the public, to employees, or to members or guests of members.

Establishments in which lodging accommodation is not available to the public, or to members or to guests of members, but is incidental to instruction, medical care, religious observance, or to the care of handicapped or destitute persons or other public charges.

(1) *Resort hotel.* A *"resort hotel"* is one which offers lodging accommodations of a vacational nature to the public or to members or guests of members and which

(a) operates for not more than seven months in any calendar year, or

(b) being located in a rural community or in a city or village of less than 15,000 population, increased its number of employee work days (including adult males) during any consecutive four-week period by at least 100 percent over the number of employee work days (including adult males) in any other consecutive four-week period within the preceding calendar year, or

(c) being located in a rural community or in a city or village of less than 15,000 population, increased its number of guest days during

. With every wage payment to each employee Order No. 6-e, there shall be given a statement ngs (gross and net), deductions, and hours

mployer shall keep and make available for in- nt and branch of the establishment for at least employee, including the name, address, age of rity number, occupational classification, cash veekly hours worked, including the exact time each shift on any day in which a split shift is ad of hours exceeds 10. The records shall also receive meals and have uniforms laundered, employer.

be kept on the premises in each establishment wo years, and the employer shall on demand ich records to the commissioner or his repre- uch information as the commissioner in his ssary.

heets, or other original time records, where least two years.

the provisions of Minimum Wage Order No. lations issued by the Department of Labor ous place where employees can read it.

y" includes any establishment which, as a ess activities offers lodging accommodations nployees, or to members or guest of members, therewith or incidental thereto.

t is not limited to commercial hotels, apart- lodging houses, boarding houses, furnished ps, adult camps, tourist camps, tourist homes, s, membership clubs, dude ranches, Turkish

" excludes:

s customarily offering lodging accommoda- s to the public, to employees, or to members

lodging accommodation is not available to r to guests of members, but is incidental to ligious observance, or to the care of handi- r other public charges.

rt hotel" is one which offers lodging accom- ature to the public or to members or guests

nore than seven months in any calendar

rural community or in a city or village of lation, increased its number of employee adult males) during any consecutive four- t 100 percent over the number of employee adult males) in any other consecutive four- e preceding calendar year, or

ral community or in a city or village of less , increased its number of guest days during



any consecutive four-week period by at least 100 percent over the number of guest days in any other consecutive four-week period in the preceding calendar year.

(2) *All-year hotels.* "*All-year hotels*" shall be all other hotels not qualifying as resort hotels under the foregoing definition.

(3) *Motor courts, motels, cabins, tourist homes and other establishments* serving similar purposes shall be classified as all-year hotels unless they specifically qualify as a resort hotel in accordance with the foregoing definition thereof.

b. *Employee.* "*Employee*" shall mean a woman 21 years of age and over and all workers of either sex under the age of 21 years employed in the hotel industry by the operator of the establishment or by any other employer.

(1) *Caddies.* Caddies shall be excluded from this definition. This exclusion shall not be deemed to exclude caddies from another minimum wage order which covers such employees.

(2) *Camp counselors and employees in children's camps.* Camp counselors and employees in children's camps who assist in guidance or instruction of campers and who themselves receive supervision and training from a camp counselor as part of their compensation whether called junior aide or by some other title, shall be excluded from this definition. This exclusion shall not be deemed to exclude camp counselors and employees in children's camps who assist camp counselors from another minimum wage order which covers such employees.

(3) A camper who works no more than four hours a day for a children's camp and at all other times enjoys the same privileges, facilities and accommodations as regular campers in such camp, shall be known as a "camper-worker" for the purpose of the order and shall not be deemed an employee within the meaning of the order.

(4) A person while a regularly enrolled student in a department of hotel administration in a recognized college, university, junior college or institute and is required by it to acquire experience in hotel problems by accepting employment in a hotel, shall be exempt from this definition. Such college or university shall submit a list each year of such students and their places of employment and the probable duration of their employment to the Division of Industrial Relations, Women in Industry and Minimum Wage. Thereupon, the division shall issue a special certificate of exemption for each such student. Such certificate shall be delivered to the student who shall turn it over to the employer. The employer shall keep such certificate on file.

(5) A person who while a regularly enrolled student in a vocational high school or other high school is required by such high school to acquire experience in hotel problems by accepting employment in a hotel, shall be known as a student worker for a period of employment not to exceed a total of three months. Such vocational high school shall submit a list of such students and their places of employment and the probable duration of their employment to the Division of Industrial Relations, Women in Industry and Minimum Wage. Thereupon, the division shall issue a special certificate of exemption for each such student. Such certificate shall be delivered to the student who shall turn it over to the employer. The employer shall keep such certificate on file.

(6) Turkish bath employees employed by hotels are to be considered employees under this order. This order is not intended to cover Turkish bath workers employed by concessionaires in hotels or by Turkish baths operated independently of hotels, except that employees of such Turkish

baths shall be considered employees under this order if they are employed in connection with the lodging facilities of the establishment.

c. *Minors.* "*Minors*" shall mean all male and female workers under 21 years of age.

d. *Chambermaid.* "*Chambermaid*" means any employee whose duties relate solely to the cleaning and servicing of guest rooms.

e. *Service employee.* "*Service employee*" shall mean any employee, regardless of sex who customarily receives gratuities in excess of the difference between the service and non-service rates of pay. It shall be presumed that employees whose duties relate solely to any of the following services are "service employees":

(1) The service of food or beverage to patrons seated at tables and the performance of duties incidental thereto.
(2) Bellmen.
(3) Baggage porters.
(4) Package-room messengers or delivery boys.
(5) Doormen and footmen.
(6) Busboys in resort hotels.
(7) Page boys.

It shall be presumed that all employees other than those mentioned above are "non-service employees". Substantial proof must be presented to the Department of Labor to rebut this presumption.

f. *Non-service employee.* "*Non-service employee*" means all employees except service employees.

In resort hotels a chambermaid shall not be deemed a non-service employee unless she fails to receive gratuities in excess of the difference between the chambermaid and non-service rates.

g. *Camp counselor.* A "*camp counselor*" is one who has personal charge of a bungalow, tent, or other structure used by campers or who is responsible for the activity of a group of campers, or for their care, guidance or instruction in a camp catering exclusively to children.

h. *Residential employee.* "*Residential employee*" shall mean an employee who receives lodging accommodations from his or her employer as part of his or her wage and for whom such accommodations are regularly available at all times. This provision shall apply to all-year hotels and resort hotels.

i. *Working time.* "*Working time*" means actual service or time of permitted attendance at the establishment, and time spent in traveling at the request of the employer from one of his establishments to another. This does not apply to residential employees.

j. *Split shift.* (1) A "*split shift*" is a schedule of daily hours in which the hours of work required or permitted are not consecutive. Interruption of working hours for any meal period of one hour or less does not constitute a split shift.

(2) An "*interval off duty*" is time during the work day other than working time, waiting time, travel time, and time off duty for any meal period of one hour or less.

k. *Spread of hours.* The "*spread of hours*" is the interval between the beginning and end of the work day. The spread of hours for any day shall include working time plus time off for meals plus time off duty.

l. *Uniform.* The term "*uniform*" includes any garment such as dress, apron, collar, cuffs or headdress, which is worn by the employee either at the direction of the employer or as a condition of employment. It shall be a presumption that the employer has required his employee to wear uni-

employees under this order if they are employed
dging facilities of the establishment.
ıll mean all male and female workers under 21

*nbermaid*" means any employee whose duties
g and servicing of guest rooms.
*ervice employee*" shall mean any employee, re-
arily receives gratuities in excess of the differ-
d non-service rates of pay. It shall be presumed
es relate solely to any of the following services

food or beverage to patrons seated at
he performance of duties incidental

s.
nessengers or delivery boys.
ootmen.
rt hotels.

ll employees other than those mentioned above
". Substantial proof must be presented to the
but this presumption.
"*Non-service employee*" means all employees

ermaid shall not be deemed a non-service em-
ceive gratuities in excess of the difference be-
l non-service rates.
*mp counselor*" is one who has personal charge
r structure used by campers or who is respon-
oup of campers, or for their care, guidance or
ring exclusively to children.
"*Residential employee*" shall mean an em-
accommodations from his or her employer as
for whom such accommodations are regularly
provision shall apply to all-year hotels and

*ng time*" means actual service or time of per-
ablishment, and time spent in traveling at the
m one of his establishments to another. This
al employees.
*lit shift*" is a schedule of daily hours in which
or permitted are not consecutive. Interruption
neal period of one hour or less does not con-

*uty*" is time during the work day other than
ne, travel time, and time off duty for any meal

"*spread of hours*" is the interval between the
rk day. The spread of hours for any day shall
ime off for meals plus time off duty.
*niform*" includes any garment such as dress,
ress, which is worn by the employee either at
r or as a condition of employment. It shall be
loyer has required his employee to wear uni-



forms if such garments are of a similar design, color or material or form part of the decorative pattern of the establishment. However, items of clothing that usually and commonly are worn by a person as part of a normal wardrobe are not to be considered part of a uniform.

m. *Meal.* A "*meal*" shall provide adequate portions of a variety of wholesome, nutritious foods. As a standard it should include at least one of the types of food from all four of the following groups:

(1) Fruits or vegetables;
(2) Cereals, bread or potatoes;
(3) Eggs, meat, fish or poultry;
(4) Milk, tea or coffee;

except that for breakfast group (3) may be omitted if both cereal and bread are offered in group (2).

A meal shall be deemed to be furnished by an employer to an employee whose compensation is predicated on the inclusion of meals, or who is entitled to meals under this regulation, when the meal is made available to the employee during reasonable meal periods.

n. *Lodging.* "*Lodging*" means living accommodations which are adequate, decent, and sanitary according to usual and customary standards.

o. *Diversified employment.* The term "*diversified employment*" means employment in an all-year hotel of any employee who is required or permitted to perform the duties of a service employee, as well as those of a non-service employee and the employment in a resort hotel of an employee who is required or permitted to perform either the duties of a service employee as well as those of a chambermaid or the duties of a chambermaid as well as those of a non-service employee, or the duties of a service employee as well as those of a non-service employee.

p. *Voluntary absence.* "*Voluntary absence*" means an absence which is not designed or planned by the employee and the employer to evade the minimum wage standards. Recurrent or periodic absence is not voluntary absence except for medical treatment under a doctor's care.

**Effective date.** This order shall take effect June 20, 1958.

## Minimum Wage Order No. 7-b—Governing Minimum Wage Standards in the Retail Trade Industry

(Adopted December 21, 1956; effective February 15, 1957; filed March 13, 1957. Statutory authority article 19, Labor Law.)

**1. Minimum wage standards.**

a. *Zones.* The minimum wage rates prescribed herein shall be based upon the geographical location of the establishment in which the worker is employed.

*Zone 1.* All cities, villages, and unincorporated communities, having a population of 10,000 or more according to the latest United States census; and the counties of Nassau, Suffolk and Westchester.

*Zone 2.* The remainder of the state. Zone 2 shall continue until January 1, 1958, and thereafter the rates established for Zone 1 shall be paid throughout the state.

b. *Minimum wage rates.*

(1) *Minimum hourly rate.*

Zone 1—$1.00
Zone 2—$ .90

At least the basic minimum hourly rate shall be paid whenever the minimum weekly wage, minimum call-in pay, or the overtime rate is not required to be paid.

(2) *Minimum weekly wage.* For each week in which the working time is more than 30 hours but not more than 37½ hours, except in cases of voluntary absence:

Zone 1—$37.50
Zone 2—$33.75

(3) *Minimum overtime rate.* The minimum overtime rate shall be time and one-half of the minimum hourly rate as follows:

Zone 1—$1.50 after 40 hours
Zone 2—$1.35 after 45 hours

(4) *Minimum call-in pay.* An employee who by request or permission of the employer reports for duty on any day shall be paid for at least four hours at the applicable minimum wage rate, except

(a) students who regularly attend a full time school, on days of required school attendance;

(b) employees of an establishment open for fewer than four hours on any day; provided, that they shall be paid not less than the applicable minimum wage rate for the total number of hours that the establishment is open on such day.

(5) *Additional rate for split shift and spread of hours.* An employee shall be paid for one additional hour at the applicable minimum hourly rate, in addition to the minimum wages otherwise required herein, for any day in which (a) the spread of hours exceeds 10, or (b) in which there is a split shift, or (c) in which both situations occur.

This provision shall not apply to a student who regularly attends a full time school on any day when hours of school attendance intervene between work shifts.

**2. Regulations to safeguard minimum wage standards.**

a. *Voluntary absence.* In case of voluntary absence, the minimum hourly rate shall be paid for all hours of actual work by the employee.

b. *Required uniforms.* The employer shall supply, maintain, and launder required uniforms except that (1) where an employee purchases a required uniform he shall be reimbursed by the employer for the cost thereof not later than the time of the next payment of wages; and (2) where the employer does not provide for the laundering or maintenance of any employee's required uniform, he shall pay such an employee $1.50 per week if he works more than 30 hours weekly or $1 per week if he works 30 hours or less per week, in addition to the minimum wage prescribed herein.

c. *Payment of wages.* Each employee shall be paid for each week not less than the applicable minimum wage, regardless of the basis of payment, whether commission, bonus, or otherwise.

d. *Allowances for meals and lodging.* Meals and lodging actually furnished by an employer to an employee may be considered a part of the minimum wage, but shall be valued at not more than:

| | | |
|---|---|---|
| Meals | —25 cents per meal, | $5.25 per week |
| Lodging | —40 cents per day, | $2.50 per week |
| Meals and lodging, | | $7.75 per week |

e. *Travel expenses.* An employee who is required by the employer to travel as part of his duties shall be reimbursed for actual travel expenses incurred.

f. *Deductions.* The minimum wage of employees shall be subject to no deductions other than those authorized or required by law.

ıum hourly rate shall be paid whenever the
ninimum call-in pay, or the overtime rate is

*age.* For each week in which the working time
t not more than 37½ hours, except in cases

-$37.50
-$33.75

*rate.* The minimum overtime rate shall be
minimum hourly rate as follows:

-$1.50 after 40 hours
-$1.35 after 45 hours

*y.* An employee who by request or permission
›r duty on any day shall be paid for at least
le minimum wage rate, except
:ularly attend a full time school, on days of
ıce;
:stablishment open for fewer than four hours
ıat they shall be paid not less than the appli-
ıte for the total number of hours that the
n such day.

*split shift and spread of hours.* An employee
ional hour at the applicable minimum hourly
nimum wages otherwise required herein, for
spread of hours exceeds 10, or (b) in which
) in which both situations occur.
: apply to a student who regularly attends
.y when hours of school attendance intervene

**rd minimum wage standards.**
ıse of voluntary absence, the minimum hourly
rs of actual work by the employee.
employer shall supply, maintain, and launder
(1) where an employee purchases a required
ed by the employer for the cost thereof not
ext payment of wages; and (2) where the
r the laundering or maintenance of any em-
shall pay such an employee $1.50 per week
ıurs weekly or $1 per week if he works 30
tion to the minimum wage prescribed herein.
h employee shall be paid for each week not
um wage, regardless of the basis of payment,
r otherwise.
*d lodging.* Meals and lodging actually furn-
ployee may be considered a part of the mini-
.d at not more than:

ıer meal, $5.25 per week
ıer day, $2.50 per week
$7.75 per week

ployee who is required by the employer to
ıll be reimbursed for actual travel expenses

m wage of employees shall be subject to no
ıthorized or required by law.



g. *Tips.* Tips or gratuities shall not be counted as part of the minimum wage.

h. *Diversified employment.*

(1) An employee of the retail trade industry who works at an occupation governed by another New York State minimum wage order: (a) for one hour or more during any one day, or (b) for six or more hours in any one week shall be paid for all his hours of working time for that day or week at the rates contained in the minimum wage order for such other industry or the retail trade industry, whichever are greater. Such employee shall be entitled to all of the benefits for such day or week period provided by the minimum wage order of either the retail trade industry or of the other applicable industry, whichever are greater.

(2) An employee of the retail trade industry who works in any week solely at an occupation or in an industry governed by another New York State minimum wage order shall be covered by such order for such week.

i. *Learner of apprentice rates.* No learners or apprentices shall be paid less than the minimum rates prescribed herein.

**3. Administrative regulations.**

a. *Required records.* Every employer subject to this order shall establish, maintain, and make available for inspection at the place of employment for not less than two years, weekly payroll records which shall include for each employee: name; address; social security account number; age of males under 21; the number of hours worked daily and weekly, including the times of arrival and departure of each employee working a split shift or spread of hours exceeding 10; gross wages, including allocated commissions and bonuses; itemized deductions from gross wages including value of meals and lodging, if provided; money paid in cash.

Each employer shall also make available for inspection such other records as may be kept by the employer to determine the employee's wages or income.

Time cards, time sheets, and other original time records, if any, shall be kept for at least two years and be made available for inspection.

b. *Statement to employee.* Every employer subject to this order shall furnish a statement to each of his employees with every weekly payment of wages listing hours worked, rates paid, and total earnings.

c. *Posting.* A notice issued by the Department of Labor, setting forth the provisions and regulations of this order, shall be posted in every establishment in the retail trade industry in a conspicuous place where employees can read it.

**4. Definitions.**

a. *Industry.* The "*retail trade industry*" includes selling or offering for sale at retail and/or wholesale any goods, wares, merchandise, articles or things, and all occupations, operations and services in connection therewith or incidental thereto.

The "retail trade industry" does not include an establishment which is engaged solely in the wholesale trade; or employment exclusively at wholesale in an establishment engaged in both wholesale and retail trade, which realizes less than 25 percent of its gross annual receipts from its retail sales.

b. *Employee.* "*Employee*" means a woman 21 years of age and over, and any person under the age of 21 years employed in the retail trade industry. "Employee" does not include outside salesmen employed on a commission basis, at a place other than a fixed location, whose working time, efforts, activities, mode of operation and process of effecting sales are not in a material manner managed, regulated, supervised, directed, controlled or prescribed by the employer.

c. *Working time.* "*Working time*" means time worked or time of permitted attendance, including waiting time, whether or not work is provided, and time spent in traveling as part of the duties of the employee.

d. *Voluntary absence.* "*Voluntary absence*" includes any absence from work not directed by the employer or his agent and not designed or planned by the employer or the employee to evade minimum wage standards. "Voluntary absence" does not include any absence contemplated in the employment contract; or incurred as a condition of continued employment; or at the direction or suggestion of the employer or his agent; or recurrent or periodic absence, except such absence for medical treatment under a doctor's care.

e. *Split shift.* A "*split shift*" is a schedule of daily hours in which the required or permitted working hours of an employee are not consecutive. No meal period of one and one-half hours or less shall be considered an interruption of consecutive hours.

f. *Spread of hours.* The "*spread of hours*" is the interval between the beginning and end of an employee's workday. The spread of hours for any day includes working time plus time off for meals plus intervals off duty.

g. *Required uniform.* A "*required uniform*" shall include any item of clothing, decoration, or ornament that an employee wears at work at the suggestion, request, or direction of the employer or his agent, or to comply with any state, city, or local law, rule, or regulation, and which is not ordinarily worn by a person as part of a normal wardrobe.

**Effective date.** This order shall take effect February 15, 1957.

## Minimum Wage Order No. 8-a—Governing Minimum Wage Standards in the Amusement and Recreation Industry

(Adopted December 31, 1958; effective March 1, 1959; filed January 2, 1959. Statutory authority article 19, Labor Law.)

**1. Minimum wage standards.**

a. *Minimum hourly rate.*

(1) All employees, except as indicated below:

$1 an hour, through September 30, 1959

$1.05 an hour, effective October 1, 1959

(2) Occupations in motion-picture theatres:

(a) Cashiers, cleaners, porters, and matrons (other than children's matrons) in motion-picture theatres:

*Effective through February 29, 1960:*

90 cents an hour throughout the state.

*Effective March 1, 1960:*

$1 an hour throughout the state.

(b) Ticket-takers and doormen in motion-picture theatres:

*Effective through February 29, 1960:*

85 cents an hour throughout the state.

*Effective March 1, 1960:*

$1 an hour throughout the state.

(c) Ushers, children's matrons, ramp and checkroom attendants, other unclassified service staff workers, and messengers in motion-picture theatres:

75 cents an hour throughout the state.

(3) Beach chair and umbrella attendants, cabana boys, and locker-room attendants at beaches and pools:

75 cents an hour throughout the state.

ɔrking time" means time worked or time of per-
ing waiting time, whether or not work is provided,
ng as part of the duties of the employee.
"*Voluntary absence*" includes any absence from
mployer or his agent and not designed or planned
ɪployee to evade minimum wage standards. "Vol-
include any absence contemplated in the employ-
d as a condition of continued employment; or at
n of the employer or his agent; or recurrent or
uch absence for medical treatment under a doc-

*shift*" is a schedule of daily hours in which the
king hours of an employee are not consecutive.
d one-half hours or less shall be considered an
e hours.
e "*spread of hours*" is the interval between the
nployee's workday. The spread of hours for any
plus time off for meals plus intervals off duty.
"*required uniform*" shall include any item of
ɪament that an employee wears at work at the
ction of the employer or his agent, or to comply
cal law, rule, or regulation, and which is not
n as part of a normal wardrobe.

der shall take effect February 15, 1957.

**No. 8-a—Governing Minimum Wage**
**nusement and Recreation Industry**

31, 1958; effective March 1, 1959; filed
utory authority article 19, Labor Law.)

**ırds.**

ɜpt as indicated below:
through September 30, 1959
ur, effective October 1, 1959
ion-picture theatres:
ers, porters, and matrons (other than chil-
tion-picture theatres:
*gh February 29, 1960:*
our throughout the state.
*ı 1, 1960:*
hroughout the state.
nd doormen in motion-picture theatres:
*ɪh February 29, 1960:*
ur throughout the state.
*1, 1960:*
roughout the state.
's matrons, ramp and checkroom attendants,
ce staff workers, and messengers in motion-

ur throughout the state.
brella attendants, cabana boys, and locker-
and pools:
ur throughout the state.



(4) Pinsetters:
13 cents a line throughout the state.

(5) Ushers at sports exhibitions:
$4 per event throughout the state.

(6) Golf caddies:
$1.25 per bag for each round of nine holes or less throughout the state.
$2.25 per bag for each round of 10 to 18 holes throughout the state.

b. *Minimum call-in pay.* Motion picture theatre ushers required to report for duty on any day, whether or not assigned to actual work, shall be paid for at least four hours, except that the guarantee shall be two hours on those days on which a theatre is open only in the evenings from 6 P.M. on.

c. *Additional rate for spread of hours.* An employee shall be paid for one additional hour at time and a half the applicable minimum hourly rate, in addition to the minimum wages otherwise required herein, for any day in which the spread of hours exceeds 11.

The "*spread of hours*" is the interval between the beginning and end of an employee's workday. The spread of hours for any day includes working time plus time off for meals plus intervals off duty.

**2. Regulations.**

a. *Uniforms.* The employer shall supply, maintain, and launder required uniforms except that (1) where an employee purchases a required uniform he shall be reimbursed by the employer for the cost thereof not later than the time of the next payment of wages; and (2) where the employer does not provide for the laundering or maintenance of any employee's required uniform, he shall pay such an employee $1.50 per week if he works more than 30 hours weekly or $1 per week if he works 30 hours or less per week, in addition to the minimum wage prescribed therein.

A "*required uniform*" shall include any item of clothing, decoration, or ornament that an employee wears at work at the suggestion, request, or direction of the employer or his agent, or to comply with any state, city or local law, rule, or regulation, and which is not ordinarily worn by a person as part of a normal wordrobe.

b. *Lodging and meals.* Meals and lodging actually furnished by an employer to an employee may be considered a part of the minimum wage, but shall be valued at not more than:

Meals—25 cents per meal, $5.25 per week
Lodging—40 cents per day, $2.50 per week
Meals and lodging—$7.75 per week

A "*meal*" shall provide adequate portions of a variety of wholesome, nutritious foods and shall include at least one of the types of foods from all four of the following groups: (1) fruits or vegetables; (2) cereals, bread or potatoes; (3) eggs, meat, fish or poultry; or (4) milk, tea or coffee, except that for breakfast, group (3) may be omitted if both cereal and bread are offered in group (2).

c. *Travel expenses.* An employee who is required by the employer to travel as part of his duties shall be reimbursed for actual travel expenses incurred.

d. *Wage payment.* Each employee shall be paid for each week not less than the applicable minimum wage, regardless of the basis of payment, whether commission, bonus, piece rate, or any other basis.

e. *No deductions.* The minimum wage of employees shall be subject to no deductions other than those authorized or required by law.

f. *Tips.* Tips or gratuities or compulsory service charges shall not be counted as part of the minimum wage.

g. *Diversified employment.* (1) An employee in the amusement and recreation industry who works at an occupation governed by another New York State minimum wage order (a) for one hour or more during any one day, or (b) for six or more hours in any one week shall be paid for all his hours of working time for that day or week at the rates contained in the minimum wage order for such other industry or the amusement and recreation industry, whichever is greater. Such employee shall be entitled to all of the benefits under any minimum wage order of either the amusement and recreation industry or the other applicable industry covering the said date period, whichever is greater.

(2) An employee in the amusement and recreation industry who works in any week solely at an occupation or in an industry governed by another New York State minimum wage order shall be covered by such order for such week.

(3) An employee who works at two or more amusement and recreation occupations for which different minimum wage rates have been prescribed (a) for one hour or more during any one day, or (b) for 10 or more hours in any one week shall be paid for all his hours of working time for that day or week at the higher paid occupation.

h. *Learner or apprentice rates.* Learners and apprentices shall be paid at not less than the minimum wage herein provided.

i. *Required records.* Every employer subject to this order shall establish, maintain, and make available for inspection at the place of employment for not less than two years, weekly payroll records which shall include for each employee: name, address, social security account number, age of males under 21, occupational classification, cash wages paid, and daily and weekly hours worked, including the exact time of arrival and departure on any day in which the spread of hours exceeds 11. In the case of pinsetters, caddies, and ushers at sports exhibitions, a record of the number of lines set, or the number of rounds caddied, or the number of events worked, shall be kept in place of the records of hours worked.

Each employer shall also make available for inspection such other records as may be kept by the employer to determine the employee's wages or income.

Time cards, time sheets, and other original time records, if any, shall be kept for at least two years and made available for inspection.

j. *Statement to employee.* Every employer subject to this order shall furnish a statement to each of his employees with every weekly payment of wages listing hours worked, rates paid, and total earnings. In the case of pinsetters, caddies, and ushers at sports events the number of lines set, or the number of rounds caddied, or the number of events worked shall be recorded in place of hours worked.

k. *Posting.* A notice issued by the Department of Labor, setting forth the provisions and regulations of this order, shall be posted in every establishment in the amusement and recreation industry in a conspicuous place where employees can read it.

**3. Definitions.**

a. *Amusement and recreation industry.* The "*amusement and recreation industry*" is defined to include all establishments whose primary service is to provide amusement, entertainment, or recreation, including establishments which produce and distribute motion pictures and services allied to this such as casting and rental or motion picture film or equipment. The industry also includes owners, lessees, and concessionaires whose business

ities or compulsory service charges shall not be
inimum wage.
*ient.* (1) An employee in the amusement and
vorks at an occupation governed by another New
ge order (a) for one hour or more during any
more hours in any one week shall be paid for all
e for that day or week at the rates contained in
for such other industry or the amusement and
never is greater. Such employee shall be entitled
r any minimum wage order of either the amuse-
try or the other applicable industry covering the
er is greater.

1e amusement and recreation industry who works
occupation or in an industry governed by another
im wage order shall be covered by such order for

works at two or more amusement and recreation
different minimum wage rates have been pre-
r or more during any one day, or (b) for 10 or
veek shall be paid for all his hours of working
ek at the higher paid occupation.

*rates.* Learners and apprentices shall be paid
ium wage herein provided.
ery employer subject to this order shall estab-
ailable for inspection at the place of employment
s, weekly payroll records which shall include
address, social security account number, age of
l classification, cash wages paid, and daily and
ling the exact time of arrival and departure on
l of hours exceeds 11. In the case of pinsetters,
ts exhibitions, a record of the number of lines
caddied, or the number of events worked, shall
ds of hours worked.
nake available for inspection such other records
ployer to determine the employee's wages or

and other original time records, if any, shall
rs and made available for inspection.
Every employer subject to this order shall
of his employees with every weekly payment
ed, rates paid, and total earnings. In the case
ishers at sports events the number of lines
caddied, or the number of events worked shall
s worked.
d by the Department of Labor, setting forth
s of this order, shall be posted in every estab-
nd recreation industry in a conspicuous place
.

*on industry.* The "*amusement and recreation*
le all establishments whose primary service
tertainment, or recreation, including estab-
distribute motion pictures and services allied
ital or motion picture film or equipment. The
, lessees, and concessionaires whose business



s incidental thereto or in connection therewith, or a part thereof, and such services as are allied therewith.

The industry includes but is not limited to motion picture and other theatres, dance halls and studios, ballrooms, bowling alleys, billiard parlors, skating rinks, riding academies, race tracks and stables, amusement parks and centers, penny arcades and other coin-operated amusement-device parlors, athletic fields, arenas, ball parks and stadiums, swimming pools, beaches, gymnasiums and slenderizing salons, golf courses, tennis courts, carnivals, circuses, boathouses, card clubs, and other similar establishments, as well as play-producing or other entertainment-producing companies, theatrical agents, ticket brokers, and professional sports promoters. The industry also includes allied services operated in connection with amusement and recreation establishments, such as check rooms and parking lots.

The industry excludes (1) establishments engaged in the operation of radio and television broadcasting stations, and, (2) nonprofit organizations organized exclusively for religious, charitable, or educational purposes.

b. *Employee.* "*Employee*" means a woman 21 years of age and over, and any person under the age of 21 years employed in the amusement and recreation industry. Summer theatre apprentice actors, actors employed in New York City theatres with less than 300 seats, and rolling chair pushers shall be excluded from this definition. (Pursuant to section 663-a of article 19 of the Labor Law all of the provisions of a minimum wage order apply also to males 21 years of age and over.)

c. *Working time.* "*Working time*" means time worked or time of required attendance, including waiting time, whether or not work is provided, and time spent in traveling as part of the duties of the employee. This provision shall not apply to pinsetters, caddies, and ushers at sports exhibitions.

d. *Motion picture service staff employee.* An employee in a motion picture theatre whose duties involve the performance of services for patrons and require direct contact with patrons.

**Effective date.** This order shall take effect March 1, 1959.

---

# EXHIBIT "4"

# PART 142

## MISCELLANEOUS INDUSTRIES AND OCCUPATIONS

(Statutory authority: Labor Law, art. 19)

**Subpart 142-1** **Coverage**

**Subpart 142-2** **Provisions Applicable to All Employees Subject to This Order, Except Employees in Nonprofitmaking Institutions Covered by the Provisions of Subpart 142-3**

**Subpart 142-3** **Provisions Applicable to Employees in Nonprofitmaking Institutions Which Have Not Elected to be Exempt from Coverage under a Minimum Wage Order**

**Historical Note**

Part (Subparts 142-1—142-3) repealed, new (Subparts 142-1—142-3) added, filed Dec. 23, 1966; amd. filed Aug. 21, 1968 eff. Oct. 1, 1968. Deleted footnote relating to Part.

## SUBPART 142-1

### COVERAGE

Sec.
142-1.1 Coverage of order

**Historical Note**

Subpart (§§ 142-1.1—142-1.5, 142-1.15) repealed, new (§ 142-1.1) added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**Section 142-1.1** **Coverage of order.** This order shall apply to all employees, as such term is defined herein, except:

(a) employees who are covered by minimum wage standards in any other minimum wage order promulgated by the commissioner, and

(b) employees of a nonprofitmaking institution which has elected to be exempt from coverage under a minimum wage order, pursuant to subdivision 4 of section 652 of the Minimum Wage Act.

**Historical Note**

Sec. repealed, new added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-1.2** **Hourly rate.**

**Historical Note**

Sec. repealed, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-1.3** **Nonhourly rates.**

**Historical Note**

Sec. repealed, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-1.4** **Call-in pay.**

**Historical Note**

Sec. repealed, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-1.5** **Additional rate for spread of hours.**

**Historical Note**

Sec. repealed, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-1.15** **Allowances.**

**Historical Note**

Sec. repealed, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

## SUBPART 142-2

### PROVISIONS APPLICABLE TO ALL EMPLOYEES SUBJECT TO THIS ORDER, EXCEPT EMPLOYEES IN NONPROFITMAKING INSTITUTIONS COVERED BY THE PROVISIONS OF SUBPART 142-3

Sec.
142-2.1 Minimum wage and allowances
142-2.2 Overtime rate
142-2.3 Allowances

REGULATIONS
142-2.4 Employer records
142-2.5 Statement to employee
142-2.6 Posting
142-2.7 Basis of wage payment
142-2.8 Deductions and expenses
142-2.9 Learner
142-2.10 Apprentice
142-2.11 Student

Sec.
142-2.12 Impairment of earning capacity
142-2.13 Minimum wage for youth under 18
142-2.14 Seasonal workers in the establishment of a canner or freezer between January 1, 1967 and January 31, 1968

DEFINITIONS
142-2.15 Employee
142-2.16 Impairment of earning capacity
142-2.17 Required uniforms and protective garments
142-2.18 Tips
142-2.19 Student

**Historical Note**

Subpart (§§ 142-2.1—142-2.8) repealed, new (§§ 142-2.1—142-2.19) added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**Section 142-2.1** **Minimum wage and allowances.** (a) The minimum wage shall be:

On and after January 1, 1967.............$1.50 an hour;
On and after February 1, 1968............. 1.60 an hour.

(b) The minimum wage shall be paid for the time an employee is permitted to work, or is required to be available for work at a place prescribed by the employer, and shall include time spent in traveling to the extent that such traveling is part of the duties of the employee. However, a residential employee—one who lives on the premises of the employer—shall not be deemed to be permitted to work or required to be available for work: (1) during his normal sleeping hours solely because he is required to be on call during such hours; (2) at any other time when he is free to leave the place of employment.

**Historical Note**

Sec. repealed, new added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.2** **Overtime rate.** The overtime rate for all employees shall be one and one-half times the basic minimum hourly rate before allowances for meals and lodging but after allowance, if any, for tips. It shall be applied:

| | *Nonresidential employees* | *Residential employees* |
|---|---|---|
| On and after January 1, 1967 for working time over .............. | 44 hours | 48 hours |
| On and after February 1, 1968 for working time over .............. | 42 hours | 46 hours |
| On and after February 1, 1969 for working time over .............. | 40 hours | 44 hours |

**Historical Note**

Sec. repealed, new added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.3 Allowances.**

(a) *Allowances for meals, lodging and utilities.* (1) Meals and lodging furnished by an employer to an employee may be considered a part of the minimum wage, but shall be valued at not more than:

Meals .....................55 cents per meal;
Lodging ...................65 cents per day.

(2) *Lodging* means living accommodations which meet generally accepted standards of adequacy and sanitation.

(3) When an apartment and utilities are furnished by an employer to an employee, a fair and reasonable amount may be allowed for such facilities. The amount allowed for an apartment shall not exceed either the value of prevailing rentals in the locality for comparable facilities, or $1.30 a day, whichever is lower.

(b) *Allowances for tips.* (1) Tips, or gratuities, may be considered a part of the minimum wage, subject to the following conditions:

(i) the particular occupation in which the employee is engaged is one in which tips have customarily and usually constituted a part of the employee's remuneration; and

(ii) substantial evidence is provided that the employee received in tips at least the amount of the allowance claimed. An example of substantial evidence is a statement signed by the employee that he actually received in tips the amount of the allowance claimed; and

(iii) the allowance claimed by the employer is recorded on a weekly basis as a separate item in the wage record.

(2) *Allowance for tips.* (i) On and after January 1, 1967 allowance for tips shall not exceed:

20 cents an hour for an employee whose weekly average of tips received is between 20 and 35 cents per hour, and
35 cents per hour for an employee whose weekly average of tips received is 35 cents per hour or more.

(ii) On and after February 1, 1968 allowance for tips shall not exceed:
25 cents an hour for an employee whose weekly average of tips received is between 25 and 40 cents per hour, and
40 cents per hour for an employee whose weekly average of tips received is 40 cents per hour or more.

(iii) No allowance for tips or gratuities shall be permitted for an employee whose weekly average of tips is less than 20 cents an hour until February 1, 1968 and 25 cents an hour thereafter.

(c) *Required uniforms.* No allowance for the supply, maintenance, or laundering of required uniforms shall be permitted as part of the minimum wage. Where

an employee purchases a required uniform he shall be reimbursed by the employer for the cost thereof not later than the time of the next payment of wages. Where the employer fails to launder or maintain required uniforms for any employee, he shall pay such employee in addition to the minimum wage prescribed herein:

(1) $2.00 per week if the employee works more than 30 hours weekly;

(2) $1.50 per week if the employee works more than 20 but not more than 30 hours weekly;

(3) $1.00 per week if the employee works 20 hours or less weekly.

**Historical Note**

Sec. repealed, new added, filed Dec. 23, 1966; amd., filed June 14, 1967 to be eff. June 20, 1967. Substituted "not more" for "less" in (c) (2).

**REGULATIONS**

**142-2.4 Employer records.** (a) Every employer shall establish, maintain, and preserve for not less than six years weekly payroll records which shall show for each employee:

(1) name and address;

(2) social security number;

(3) the number of hours worked daily and weekly;

(4) the amount of gross wages;

(5) deductions from gross wages,

(6) allowances, if any, claimed as part of the minimum wage;

(7) money paid in cash;

(8) student classification for individuals employed at the student rate.

(b) In addition, for each individual permitted to work as a staff counselor in a children's camp, or in an executive, administrative, or professional capacity, an employer's records shall show:

(1) name and address;

(2) social security number;

(3) description of occupation;

(4) for individuals working in an executive or administrative capacity, total wages, and value of allowances, if any, for each payroll period.

(c) For each individual for whom student status is claimed, an employer's records shall contain a statement from the school which the student attends indicating whether or not:

(1) he is a day student and his course of instruction is one leading to a degree, diploma, or certificate; or

(2) he is completing residence requirements for a degree.

(d) Employers, including those who maintain their records containing the information required by this regulation at a place outside of New York State, shall make such records or sworn certified copies thereof available upon request of the commissioner at the place of employment.

**Historical Note**

Sec. repealed, new added, filed Dec. 23, 1966; amd., filed June 14, 1967 to be eff. June 20, 1967. Substituted "this regulation" for "his regulations" in subd. (d).

**142-2.5 Statement to employee.** Every employer covered by this order shall furnish to each of his employees a statement with every payment of wages, listing hours worked, rates paid, gross wages, allowances, if any, claimed as part of the minimum wage, deductions and net wages.

**Historical Note**

Sec. repealed, new added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.6 Posting.** Every employer covered by this order shall post in a conspicuous place in his establishment a notice issued by the Department of Labor setting forth the provisions of this order. An employer also shall so post any certificate issued by the commissioner authorizing the employment of learners at wages lower than the prescribed minimum.

**Historical Note**

Sec. repealed, new added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.7 Basis of wage payment.** The minimum wage provided by this order shall be required for each week of work, regardless of the frequency of payment, whether the wage is on a commission, bonus, piece rate, or any other basis.

**Historical Note**

Sec. repealed, new added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.8 Deductions and expenses.** (a) Wages shall be subject to no deductions, except for allowances authorized in this order, and except for deductions authorized or required by law, such as for social security and income tax. Some examples of prohibited deductions are:

(1) deductions for spoilage or breakage;

(2) deductions for cash shortages or losses;

(3) fines or penalties for lateness, misconduct, or quitting by an employee without notice.

(b) The minimum wage shall not be reduced by expenses incurred by an employee in carrying out duties assigned by his employer.

**Historical Note**

Sec. repealed, new added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.9 Learner.** (a) The term *learner* means a person who is participating in a bona fide training program for an occupation in which he is employed, the required training period for which is recognized to be at least two weeks.

(b) A bona fide training program is one which must involve either formal instruction or on-the-job training during a period when the learner is entrusted with limited responsibility and is under supervison or guidance.

(c) No person shall be deemed a learner at an establishment in an occupation for which he has completed the required training; and in no case may a person be deemed a learner in such an occupation at an establishment after 10 weeks of such training, except that a person may be deemed a learner for a longer period if the commissioner finds after investigation that for the particular occupation a minimum of proficiency cannot be acquired in 10 weeks.

(d) An employer who wishes to employ a learner at less than the prescribed minimum wage must complete an application on a form furnished by the commissioner concerning:

(1) occupations at which learners are to be employed;

(2) duration of learning period during which the employer proposes to pay a wage less than the prescribed minimum;

(3) the nature and extent of the instruction and supervision;

(4) such other information as may be required by the commissioner.

(e) If the commissioner finds, upon investigation, that the requested employment of learners in a given occupation at less than the minimum wage is necessary

in order to prevent curtailment of opportunities for employment, he may issue a certificate to the employer authorizing employment at less than the prescribed minimum wage and specifying the minimum wage which may be paid and the period of such wage payment, but such wage may not be less than 75 per cent of the applicable minimum wage after allowances. The certificate may limit the number and proportion of learners. The wage specified on the certificate shall constitute the minimum wage for learners in the particular occupation at the establishment named therein.

(f) A copy of the learner certificate and evidence that the employee is a learner shall be retained at the place of employment and be made available for inspection by the commissioner for a period of not less than six years after termination of employment of learners.

(g) A learner certificate may be denied, revoked, or rescinded by the commissioner after a hearing, for misrepresentation of facts in the application, for violation of the Minimum Wage Act, or for other good cause shown. A certificate may be modified because of changes in conditions or circumstances.

**Historical Note**

Sec. added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.10 Apprentice.** (a) The term *apprentice* means a person whose work at an establishment (1) is in an apprenticeable trade or occupation, and (2) is part of a bona fide training program leading to qualification as a journeyman in the trade or occupation.

(b) *Requirements for a bona fide apprentice training program.* No such apprentice training program shall be deemed bona fide unless it meets all of the following:

(1) it is for an occupation which is on either the federal or New York State list of apprenticeable trades and occupations or is commonly recognized as such, but shall not include any of the following:

(i) occupations in the distributive field;

(ii) managerial occupations;

(iii) clerical occupations;

(iv) professional or semi-professional occupations (occupations for which entrance requirements customarily include education of college level);

(2) it requires at least two years (4,000 hours) of work experience;

(3) it provides for a schedule of work processes or operations in which experience is to be given the apprentice on the job;

(4) it involves the development of skill sufficiently broad to be applicable in like occupations rather than to be limited to the requirements of one company;

(5) the employer keeps and makes available written evidence of the apprenticeship agreement or a detailed schedule of work processes and wages.

(c) *Certificate of employment of apprentices.* (1) An employer who wishes to employ an apprentice at less than the prescribed minimum wage must complete, on a form furnished by the commissioner, an application concerning:

(i) occupations at which apprentices are to be employed;

(ii) a copy of the agreement, or in lieu thereof:

(*a*) number of hours of work experience required during apprenticeship,

(*b*) a schedule of work processes or operations in which experience is to be given the apprentice on the job,

(*c*) a schedule of wages to be paid at each period of the apprenticeship,

(*d*) the nature and extent of the instructions and supervision,

(*e*) evidence to be kept and made available by the employer concerning the apprenticeship agreement or the detailed schedule of work processes and wages;

(iii) such other information as may be required by the commissioner.

(d) If the commissioner finds, upon investigation, that the requested employment of apprentices in a given occupation at less than the minimum wage is necessary to prevent curtailment of opportunities for employment, he may issue a certificate to the employer authorizing employment at less than the prescribed minimum wage and specifying the minimum wage which may be paid and the period of such wage payment, but the wage to be paid during the period of apprenticeship may at no time be less than 75 per cent of the applicable minimum wage after allowances. The wage specified on the certificate shall constitute the minimum wage for apprentices in the specified occupation at the establishment named therein.

(e) A copy of the apprentice certificate shall be retained at the place of employment and be made available for inspection by the commissioner at all times for a period of not less than six years.

(f) An apprentice certificate may be denied, revoked, or rescinded by the commissioner after a hearing, for misrepresentation of facts in the application, for violation of the Minimum Wage Act, or for other good cause shown. A certificate may be modified because of changes in conditions or circumstances.

**Historical Note**

Sec. added, filed Dec. 23, 1966; amd., filed June 14, 1967 to be eff. June 20, 1967. Substituted new (a) (2) and (d).

### 142-2.11 Student.

(a) *In a camp.* (1) An employer who wishes to employ students in a camp for not more than 17 consecutive weeks in a year at less than the prescribed minimum wage shall complete an application on a form furnished by the commissioner.

(2) If the commissioner finds that the requested employment of students at less than the minimum wage is necessary in order to prevent curtailment of opportunities for employment, he may issue a certificate to the employer authorizing employment at a wage 20 per cent lower than the minimum hourly rate after allowances for tips, meals, and lodging provided by this order. The wage specified on the certificate shall constitute the minimum wage for students employed in the camp named therein.

(3) A copy of the certificate permitting the employment of students at the student rate shall be retained at the place of employment and be made available for inspection by the commissioner for not less than six years.

(4) Such certificate may be denied, revoked, or rescinded by the commissioner after a hearing, for misrepresentation of facts in the application, for violation of the Minimum Wage Act, or for other good cause shown. A certificate may be modified because of changes in conditions or circumstances.

(b) *Obtaining vocational experience.* A student is not deemed to be working or to be permitted to work if, in order to fulfill the curriculum requirements of the nonprofitmaking institution which he attends, he is required to obtain supervised and directed vocational experience in another establishment.

**Historical Note**

Sec. added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.12 Impairment of earning capacity.** (a) If the commissioner finds, upon investigation, that the earning capacity of the worker for the work he is to perform is impaired by age, or by physical or mental deficiency or injury, and that the requested employment of the handicapped worker at less than the minimum wage is necessary to prevent curtailment of opportunities of employment, he may issue a certificate to the employer authorizing employment at less than the prescribed minimum wage and specifying the minimum wage which may be paid, but such wage may not be less than 75 per cent of the applicable minimum wage after allowances. The commissioner may authorize a payment of a lower wage where the employment is part of a bona fide rehabilitation program. The wage specified on the certificate shall constitute the minimum wage for the handicapped person in the specified occupation at the establishment named therein. If a handicapped worker is employed at a sub-minimum wage and is assigned to work on a piece rate basis at an occupation in which non-handicapped workers are working, the handicapped worker must be paid at the same piece rate as the non-handicapped worker, but in no event may the handicapped worker be paid less than the hourly wage specified in the certificate.

(b) For the purposes of this regulation, an individual whose earning capacity is impaired is deemed to be a *handicapped worker*. A certificate to employ a handicapped worker at less than the prescribed minimum wage shall not be issued unless an application, signed by the employer and the employee, concerning the following is filed with the commissioner:

(1) occupation at which handicapped worker is to be employed;

(2) the nature and extent of the handicap;

(3) the reasons why such handicap inpairs the earning capacity of the employee at the work he is assigned to perform and if a temporary disability is involved, the period during which such disability may be expected to continue;

(4) such other information as may be required by the commissioner.

(c) A copy of the handicapped worker certificate shall be retained at the place of employment and be made available for inspection by the commissioner at all times for a period of not less than six years after termination of the period during which the handicapped worker was employed at a sub-minimum wage.

(d) A handicapped worker certificate may be denied, revoked, or rescinded by the commissioner after a hearing, for misrepresentation of facts in the application, for violation of the Minimum Wage Act, or for other good cause shown. A certificate may be modified because of changes in conditions or circumstances.

**Historical Note**

Sec. added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.13 Minimum wage for youth under 18 years of age.** (a) An employer who wishes to employ youth under 18 years of age at less than the prescribed minimum wage shall complete an application on a form furnished by the commissioner.

(b) If the commissioner finds that the requested employment of youth at less than the minimum wage is necessary in order to prevent curtailment of opportunities for their employment, he may issue a certificate to the employer authorizing employment of such youth at a minimum wage which is 25 cents per hour less than the applicable minimum wage specified in this order. Such lower minimum wage shall not apply to an employee for whom another certificate has been issued authorizing payment of less than the minimum wage.

(c) No more than two employees on any day or more than 10 per cent of the total number of employees covered by minimum wage orders on any day, whichever is greater, may be paid at the youth rate.

(d) A copy of the certificate permitting the employment of youth at the lower minimum shall be retained at the place of employment and be made available for inspection by the commissioner.

(e) For each youth so employed proof of age certified by the school of last attendance or in lieu thereof the date of birth and the number which appears on the youth's employment certificate shall be retained at the place of employment and be made available for inspection by the commissioner for not less than six years from the date of issuance.

(f) Such certificate may be denied, revoked, or rescinded by the commissioner after a hearing for misrepresentation of facts in the application, for violation of the Minimum Wage Act, or for other good cause shown.

**Historical Note**

Sec. added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.14 Seasonal workers in the establishment of a canner or freezer between January 1, 1967 and January 31, 1968.** (a) An employer who wishes to employ seasonal workers in the establishment of a canner or freezer during first processing, canning or freezing of perishable fruits or vegetables at less than the statutory minimum wage during the above period shall complete an application on a form furnished by the commissioner for a special certificate indicating the period of his seasonal operation, the occupations of workers to which the certificate shall apply, and describing the product which is to be canned or frozen.

(b) If the commissioner finds that the employees for whom the special certificate is sought are seasonal workers employed at the described employment he shall issue such special certificate authorizing the payment of a minimum wage of $1.40 an hour, but not beyond January 31, 1968. A seasonal worker is one employed for not more than the seven months of the year, beginning with June 1 and ending on December 31.

(c) A copy of the special certificate shall be retained at the place of employment and be made available for inspection by the commissioner.

(d) Such certificate may be denied, revoked, or rescinded by the commissioner after a hearing for misrepresentation of facts in the application, for violation of the Minimum Wage Act, or for other good cause shown.

**Historical Note**

Sec. added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

## DEFINITIONS

**142-2.15 Employee.** (a) *Employee* means any individual permitted to work by an employer, except as provided below.

(b) *Employee* does not include any individual employed by a federal, State, or municipal government or political subdivision thereof.

(c) *Employee* also does not include any individual permitted to work in, or as:

(1) *Domestic service.* The term *domestic service in the home of the employer* means work in or about a domicile for an employer in his capacity as a householder, as distinguished from any work in or about a domicile for such employer in his pursuit of a trade, occupation, profession, enterprise or avocation.

(2) *Labor on a farm.* (i) The term *farm* includes stock, dairy, poultry, fur-bearing animal, fruit, and truck farms, plantations, orchards, nurseries, greenhouses or other similar structures, used primarily for the raising of agricultural or horticultural commodities.

(ii) The term *labor on a farm* includes the service of any person permitted to work on a farm by an employer in connection with:

(*a*) cultivating the soil;

(*b*) raising or harvesting any agricultural or horticultural commodity, including the raising or hatching of poultry; the raising, shearing, feeding, caring for, training, and management of livestock, bees, fur-bearing animals, and wildlife;

(*c*) the production or harvesting of maple syrup or maple sugar;

(*d*) the operation, management, conservation, improvement, or maintenance of a farm and its tools and equipment;

(*e*) the operation or maintenance of ditches, canals, reservoirs, or waterways used exclusively for removing, supplying, and storing water for farming purposes;

(*f*) the handling, planting, drying, packing, packaging, processing, freezing, grading, storing or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity.

(3) *Executive, administrative, or professional capacity.*

(i) *Executive.* Work in a *bona fide executive . . . capacity* means work by an individual:

(*a*) whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and

(*b*) who customarily and regularly directs the work of two or more other employees therein; and

(*c*) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(*d*) who customarily and regularly exercises discretionary powers; and

(*e*) who is paid for his services a salary of not less than $120 per week inclusive of board, lodging, other allowances, and facilities.

(ii) *Administrative.* Work in a *bona fide . . . administrative . . . capacity* means work by an individual:

(*a*) whose primary duty consists of the performance of office or non-manual field work directly related to management policies or general operations of his employer; and

(*b*) who customarily and regularly exercises discretion and independent judgment; and

(*c*) who regularly and directly assists an employer, or an employee employed in a bona fide executive or administrative capacity (e.g. employ-

ment as an administrative assistant), *or* who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; and

(*d*) who is paid for his services a salary of not less than $120 per week inclusive of board, lodging, other allowances, and facilities.

(iii) *Professional.* Work in a *bona fide . . . professional capacity* means work by an individual:

(*a*) whose primary duty consists of the performance of work: requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, *or* original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee; and

(*b*) whose work requires the consistent exercise of discretion and judgment in its performance; or

(*c*) whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(4) *Outside salesman.* The term *outside salesman* means an individual who is customarily and predominantly engaged away from the premises of the employer and not at any fixed site and location for the purpose of:

(i) making sales; or

(ii) selling and delivering articles or goods; or

(iii) obtaining orders or contracts for service or for the use of facilities.

(5) *Taxicab driver.* The term *driver engaged in operating a taxicab* means an individual employed to drive an automobile equipped to carry no more than seven passengers, which is used in the business of carrying or transporting passengers for hire on a zone or meter fare basis, and the use of which is generally limited to a community's local transportation needs and which is not operated over fixed routes, or between fixed terminals, or under contract.

(6) *Student in or for a college or university fraternity, sorority, student association, or faculty association.* A student is not deemed to be an employee if he is permitted to work in or for a college or university fraternity, sorority, student association, or faculty association, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and which is recognized by such college or university.

(7) *Staff counselor in a children's camp.* (i) A *staff counselor* is a person whose duties primarily relate to the guidance, instruction, supervision and care of campers in a children's camp, whether such work involves direct charge of, or responsibility for, such activities, or merely assistance to persons in charge. The term *staff counselor* includes but is not limited to: head counselor, assistant head counselor, specialist counselor or instructor (such as swimming counselor, arts and crafts counselor, etc.), group or division leader, camp mother, supervising counselor, senior counselor, counselor, general coun-

selor, bunk counselor, assistant counselor, co-counselor, junior counselor, and counselor aide.

(ii) *Children's camp* means any establishment which, as a whole or part of its activities, is engaged in offering for children, on a resident or nonresident basis, recreational programs of supervised play or organized activity in such fields as sports, nature lore, and arts and crafts, whether known as camps, play groups, play schools, or by any other name. The term *children's camp* does not include an establishment which is open for a period exceeding 17 consecutive weeks during the year.

**Historical Note**

Sec. added, filed Dec. 23, 1966; amd. filed Aug. 21, 1968 eff. Oct. 1, 1968. New (b) substituted.

**142-2.16 Impairment of earning capacity.** The phrase, *earning capacity is . . . impaired by . . . age, or by physical or mental deficiency or injury,* applies to a person whose earning capacity for the work he is assigned to perform is impaired by age, or by physical or mental deficiency or injury; but a person's earning capacity may not be deemed impaired by age until his 65th birthday.

**Historical Note**

Sec. added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.17 Required uniforms and protective garments.** A *required uniform* shall include any item of clothing, decoration, or ornament that an employee wears at work at the request or direction of the employer, or to comply with any State, city, or local law, rule or regulation, and which is not ordinarily used outside of employment. *Protective garments* include apparel such as gloves, goggles, boots, or aprons necessary to safeguard or prevent injury to the employee or required for sanitary purposes.

**Historical Note**

Sec. added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.18 Tips.** *Tips,* or *gratuities,* shall mean a voluntary contribution received by the employee from a guest, patron, customer, or other person for services rendered. No gratuities or tips shall be deemed received for the purpose of this order if their acceptance is prohibited by the employer or prohibited by law.

**Historical Note**

Sec. added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

**142-2.19 Student.** The term *student* means an individual who is enrolled in and regularly attends during the daytime a course of instruction leading to a degree, certificate, or diploma, offered at an institution of learning, or who is completing residence requirements for a degree. A person is deemed to be a student during the time that school is not in session if he was a student during the preceding semester.

**Historical Note**

Sec. added, filed Dec. 23, 1966 to be eff. Jan. 1, 1967.

# EXHIBIT "5"

# THE NEW YORK STATE register

**October 1, 1986** **Vol. VIII, Issue 39**

OBPRA – NEW REGULATIONS REVIEW REQUIREMENTS

HTLV-III Testing .......... 3
Bad Debt and Charity Care Statewide Assessment Regulations .......... 5
Flexible Rating System; Rating Plans; Tort Reform Refiling Requirements .......... 9
Minimum Wage Orders .......... 10

STATE OF NEW YORK · DEPARTMENT OF STATE

***Action taken:*** Addition of Part 161 to Title 11 NYCRR (Regulation No. 129).
***Statutory authority:*** Insurance Law, sections 201, 301 and 2344; and Art. 23
***Finding of necessity for emergency rule:*** Preservation of the general welfare.
***Specific reasons underlying the finding of necessity:*** On June 28, 1986, Chap. 220, Laws of 1986 established the creation of a flexible-rating system (flex-rating) in regard to rate changes for commercial risk, professional liability and public entity insurance markets not subject to prior approval. This is intended to promote stability and predictability of insurance rate changes in these markets. As mandated by the legislation, the department promptly held hearings to determine which markets would be subject to flex-rating, as well as to develop guidelines and procedures for the implementation of the new flex-rating system. The department is also required to set "flex-bands", which permits rate changes on a file and use basis within such bands. Pursuant to Chap. 220, insurers are also required, by Sept. 26, 1986, to refile rates for insurance markets not exempted from flex-rating, to reflect the likely cost reductive effects reasonable attributable to recent tort reform legislation. This regulation must be promulgated on an emergency basis, because insurers need to understand the specific nature of the flexible rating system and, in particular, need to know the identity of markets exempt from and subject to flex-rating, in order to make meaningful tort reform rate refilings in compliance with the timeframe established by the legislation. The legislative timeframe, as well as the importance of establishing stability in the marketplace as quickly as possible, necessitate emergency action in connection with this regulation.
***Subject:*** Flexible rating system; rating plans; tort reform refiling requirements.
***Purpose:*** To set forth flex rating exemptions, standards and procedures and rules for modifying rating plans in accordance with criteria.
***Substance of emergency/proposed rule:*** This regulation implements Chapter 220 of the Laws of 1986, which establish a flexible rating system ("flex-rating") for commercial risk insurance, professional liability insurance and public entity insurance not subject to prior approval.

Section 161.0 is a preamble, explaining the history and purposes of the legislation.

Section 161.1 defines certain technical terms for the purposes of this regulation.

Section 161.2 describes the tort reform refiling requirements mandated by the recent legislation.

Section 161.3 establishes the markets exempted from flex-rating.

Section 161.4 establishes the flexibility bands for those markets subject to flex-rating.

Section 161.5 establishes flex-rating rules and standards.

Section 161.6 describes the relation and role of rate service organizations.

Section 161.7 establishes rating plan rules and standards.

Section 161.8 provides standards and mandates forms for flex-rating submissions.

***This notice is intended*** to serve as both a notice of emergency adoption and a notice of proposed rule making.
***Text of emergency rule and the regulatory impact statement may be obtained from:*** Kevin Foley, Insurance Department, 160 W. Broadway, New York, NY 10013, (212) 602-0428
***Text of proposed rule and the regulatory impact statement may be obtained from:*** Same as above.
***Data, views or arguments may be submitted to:*** Henry Lauer, Chief, Property and Casualty Insurance Bureau, Insurance Department, 160 W. Broadway, New York, NY 10013, (212) 602-0387
***Regulatory Impact Statement***

1. Statutory Authority.

Sections 201 and 301 and Article 23 of the Insurance Law and, in particular, Section 2344.

2. Legislative Objectives, Needs and Benefits.

Section 2344, signed into law on June 28, 1986 as part of Chapter 220 of the Laws of 1986, mandates the establishment of a flexible rating system ("flex-rating") for commercial risk, professional liability and public entity insurance, and the promulgation of regulations there under, including establishing flex-rating exemptions, standards and procedures. In addition, rates for these property/casualty insurance markets that are not exempted from flex-rating must be refiled by affected insurers to reflect the likely cost reductive effects from recent tort reform contained in Chapter 220 and companion legislation. Standards and procedures are established to accomplish this purpose.

3. Costs.

a. State and local government: No anticipated cost effect.

b. Private regulated parties: Insurers are required to refile rates to reflect the cost reduction of tort reform. Since insurers already have established filing procedures, there is no capital investment. Insurers would have to refile rates as needed in any case. The cost of the review will vary from insurer to insurer, and many will follow advisory rates filed by the Insurance Service Organization (ISO), and the cost will be negligible for those insurers.

c. Insurance Department: The cost will be substantial. In order to implement the provisions of Chapter 220 of the Laws of 1986, including the provisions of this Part, three million dollars was appropriated to the Department and additional personnel has been allocated for hiring.

4. Paperwork.

Existing forms required for filing of rates are being replaced by new forms because flex-rating requirements differ from those for file and use. The forms will expedite the Department's flex-rating review process. The forms will include a form for tort reform refiling (which is only required once) and various forms for different types of rate and rule filings. Additional recordkeeping requirements include modification of existing statistical systems and revision of classification and statistical systems to facilitate rate filings for markets which are subject to flex-rating and those which are exempted.

5. Duplication.

There is no duplication with other State or federal requirements.

6. Alternatives.

There are no viable alternatives.

***Regulatory Flexibility Analysis***

This regulation will have no adverse economic effect on small businesses in New York since the only affirmative duties imposed are on property/casualty insurers, none of which fall within the definition of "small business" contained in Section 102(8) of the State Administrative Procedure Act.

## DEPARTMENT OF LABOR

### PROPOSED RULE MAKING NO HEARING SCHEDULED

**Minimum Wage Orders**

**I.D. No.** LAB-39-86-00017-P

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following proposed rule:
***Proposed action:*** Amendment of Parts 137, 138, 141 and 142 and repeal of Parts 135, 136, 139 and 140 of Title 12 NYCRR.
***Statutory authority:*** Labor Law, section 653, subd. 21(11)
***Subject:*** Minimum wage orders.
***Purpose:*** To incorporate into existing wage orders the order of the Commissioner of Labor upon the report and recommendation of the Minimum Wage Advisory Board.
***Text of proposed rule:*** The proposed rule makes a number of substantive and technical changes to the state's eight existing minimum wage orders. (Parts 135 through 141, Title 12 NYCRR) The substantive changes are as follows:

1. Modification of all current wage orders to require an overtime rate of one and one half times the regular hourly wage, subject to all the exemptions set forth under Sections 7 and 13 of the federal Fair Labor Standards Act of 1938, as amended, except those exemptions set forth in Sections 13(a)(2) and 13(a)(4). The proposal provides however, that an employee subject to the federal exemptions adopted in the proposal may not be paid an overtime rate of less than one and one half times the minimum hourly wage.

2. Deletion of the sub-minimum youth rate provision from all general industry minimum wage orders.

3. Addition of provisions to all general industry minimum wage orders allowing minimum wage requirements to be met through the payment of compensation to an individual employed as part of an approved rehabilitation program.

4. Deletion of sub-minimum wage rates for apprentices and learners from all general industry minimum wage orders.

5. Deletion of sub-minimum student rates from all general industry minimum wage orders.

6. Elimination of part-time minimum wage rates in existing minimum wage orders when the basic minimum wage rate for covered employees reaches or surpasses current part-time minimum wage rates.

7. Modification of all general industry minimum wage orders to allow for call-in pay of four hours or the number of hours in the regularly scheduled shift, whichever is less.

8. Deletion of the call-in pay exception for students and for an individual who is the sole employee in an establishment where the regularly scheduled shift is less than four hours.

9. Incorporation of current provisions with regard to spread of hours and split shifts into the Miscellaneous Minimum Wage Order.

10. Incorporation of a definition of "required uniform," which does not include clothing that may be worn as part of an employee's ordinary wardrobe, into all wage orders.

11. Modification of the Building Service Wage Order to (a) set the weekly unit rate for all janitors, resident or nonresident, at $2.25 regardless of the number of units in the building or method of heat; (b) eliminate the distinction between gas and electric refrigerators in the calculation of utility allowances, setting the allowance at the $9.40 per month allowance presently used for electric refrigeration; (c) increase the $2.25 unit rate and $142.50 per week wage over which unit rates would not apply, proportionate to any change in the minimum wage.

In addition to these substantive changes, existing wage orders are consolidated through the deletion of wage orders for the Laundry, Cleaning and Dyeing Industry (Part 135), the Beauty Service Industry (Part 136), the Retail and Wholesale Trade Industry (Part 139), and the Amusement and Recreation Industry (Part 140). Workers in these industries would be covered by the amended Miscellaneous Minimum Wage Order (Part 142).

The effective date of the proposed rule is January 1, 1987.

***Text of proposed rule, the regulatory impact statement and the regulatory flexibility analysis may be obtained from:*** Joseph C. Armer, Director, Division of Labor Standards, Department of Labor, State Campus, Bldg. 12, Rm. 532, Albany, NY 12240, (518) 457-2460

***Data, views or arguments may be submitted to:*** Same as above.

***Regulatory Impact Statement***

(a) Statutory Authority. The proposed rule is submitted pursuant to statutory authority granted to the Commissioner of Labor under Labor Law, Sections 21(11) and 653. These provisions give the Commissioner the authority to promulgate all rules and regulations which she deems necessary and proper governing any provision of the Labor Law, including those which will insure the adequacy of wages paid to minimum wage workers pursuant to Article 19 of the Labor Law. Such article states that if the Commissioner is of the opinion that a substantial number of persons employed in any occupation are receiving wages insufficient to provide adequate maintenance and protect their health, she may appoint a wage board to inquire into and report and recommend regulations for employees in such occupation or occupations. (Labor Law, Section 653)

(b) Needs and Benefits. Over two decades ago, in recognition of the fact that the employment of persons at insufficient rates of pay threatens the health and well-being of the people of this state and injures its economy, the State of New York enacted its first Minimum Wage Act. This act gave the Commissioner of Labor the authority to promulgate minimum wage orders setting forth rates of pay and work rules which would protect the right of all state citizens to a rate of pay sufficient to provide adequate maintenance and to protect their health.

Current minimum wage orders cover the following industries: Laundry-Cleaning and Dyeing, Beauty Service, Restaurant, Hotel, Retail and Wholesale, Amusement and Recreation, Building Service, and Miscellaneous Industries and Occupations. Although modified to some extent in 1978, these orders have been in effect since 1967. Significant economic change and changes in job responsibilities and work conditions have occurred in the last two decades. These changes warranted amendment of the existing wage orders to protect the interests of workers while easing the regulatory burden on employers.

(c) Costs. (i) It is not possible to quantify the costs of the proposal in a manner which will produce reliable estimates. Additional costs attributable to the increase in wages will depend upon many variables for which statistics are not available. These include the number of covered employees for each employer, the percentage of employees not currently paid at or above the proposed rates, the average number of hours worked per employee, the extent to which covered employers are already required to pay the higher overtime wage rate under the Fair Labor Standards Act, the extent to which wage increases are offset by tips, lodging, meals and other allowances, the extent to which employees are required to wear uniforms, the extent to which covered employers make use of learners and apprentices, handicapped workers and student employees, and other factors. In addition to these variables already present in some combination for each affected business, the proposal also contains provisions designed to minimize the proposal's impact on small businesses. These are set forth more fully in the following section. While these features will undoubtedly reduce the potential cost of the proposal for many businesses, the savings they represent cannot be realistically or reliably predicted at this time.

(ii) It is not anticipated that any additional costs will be associated with the implementation and continued administration of the rule by the Department of Labor.

(d) Paperwork. Notice, recordkeeping and wage reporting requirements are currently set forth in the state's minimum wage laws and existing orders. Minor additional recordkeeping and reporting requirements are imposed under the proposed rule snd require employers to record employees' wage rate, net wage, piece rate record and, for employees on a split shift or spread of hours of more than 10 hours, the time of each employee's arrival and departure.

(e) Duplication. The proposed rule duplicates some requirements and exemptions set forth in the federal Fair Labor Standards Act with regard to the issue of overtime wages. With the exception of two exemptions to the law not applicable to the proposed rule, these provisions apply to all covered employers in New York.

Section 7(a) of the Fair Labor Standards Act provides for overtime pay at one and one half times the regular rate after 40 hours in a week.

Section 7(b) contains a number of full or partial exemptions to this requirement. Section 13(a) contains exemptions to both minimum wage and overtime requirements and Section 13(b) contains exemptions to only the overtime requirement.

The proposed orders provide for an overtime rate of one and one half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of Sections 7 and 13 of the Federal Fair Labor Standards Act of 1938, as amended, except that Section 13(a)(2) and Section 13(a)(4) shall not be exempt from the overtime requirements. As listed in the attached, Sections 13(a)(2) and (4) pertain to small retail establishments which have a complete minimum wage and overtime exemption under the FLSA.

(f) Alternative Approaches. There are no relevant or viable alternatives to accomplish the objectives of the proposed action.

***Regulatory Flexibility Analysis***

(a) Applicability of the rule. The proposed rule will apply to all businesses employing workers covered by the Commissioner of Labor's Minimum Wage Orders. It is estimated that the proposed rule could apply to approximately 250,000 businesses in the State.

(b) Reporting and recordkeeping requirements. The proposed rule requires employers to record the following information: employees' wage rate, net wage, piece rate record and, for employees on a split shift or spread of hours of more than 10 hours, the time of each employee's arrival and departure.

(c) Costs. It is not possible to quantify the costs of the proposal in a manner which will produce reliable estimates. Additional costs attributable to the increase in wages will depend upon many variables for which statistics are not available. These include the number of covered employees for each employer, the percentage of employees not currently paid at or above the proposed rates, the average number of hours worked per employee, the extent to which covered employers are already required to pay the higher overtime wage rate under the Fair Labor Standards Act, the extent to which wage increases are offset by tips, lodging, meals and other allowances, the extent to which employees are required to wear uniforms, the extent to which covered employers make use of learners and apprentices, handicapped workers and student employees, and other factors. In addition to these variables already present in some combination for each affected business, the proposal also contains provisions

designed to minimize the proposal's impact on small businesses. These are set forth more fully in the following section. While these features will undoubtedly reduce the potential cost of the proposal for many businesses, the savings they represent cannot be realistically or reliably predicted at this time.

(d) Minimizing Impact on Small Business. Several features of the proposed rule are designed to minimize any adverse economic impact of the rule on small businesses. These are as follows:

1. The proposed rule provides that call-in pay for workers covered by minimum wage orders shall be four hours wage or the length of the employee's regular shift, whichever is less. This will allow employers to schedule shorter regular shifts and ease their call-in pay expenses, an option not available under the current regulations.

2. The weekly wage guarantee found in current wage orders has been eliminated.

3. All wage orders have been amended to contain a provision allowing for a rehabilitation program for handicapped workers.

4. All wage orders have been amended to exempt employees participating in a vocational education program from the definition of employee for minimum wage purposes.

5. The eight existing wage orders have been consolidated into four orders, providing greater ease of reference for employers.

6. Extraneous and out of date material has been deleted from the wage orders.

## OFFICE OF MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES

### NOTICE OF ADOPTION

**Additional Standards Applicable to Small On-Grounds ICF/DDs**

**I.D. No.** MRD-27-86-00015-A
**Filing No.** 2087
**Filing date:** Sept. 12, 1986
**Effective date:** Sept. 12, 1986

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following action:

***Action taken:*** Addition of sections 681.1(c)-(g) and 681.10(h)(1)-(8) to Title 14 NYCRR.

***Statutory authority:*** Mental Hygiene Law, sections 13.01, 13.07, 13.09(b) and 16.00; and Chap. 54, Laws of 1986

***Subject:*** Additional standards applicable to small on-grounds ICF/DDs.

***Purpose:*** To set forth specific requirements for Small Residential Units as identified in Chap. 54, Laws of 1986 relative to the considerations of size, separateness from existing developmental center buildings and services, siting to enhance community integration and facility separateness and use of community day services by said facilities' residents.

***Text was published*** in the notice of proposed rule making, I.D. No. MRD-27-86-00015-P, Issue of July 9, 1986.

***Final rule compared with proposed rule:*** No substantive changes.

***Text of rule and the assessment of public comment may be obtained from:*** Dr. James P. Otis, Director, Standards and Procedures Review Unit, Office of Mental Retardation and Developmental Disabilities, 44 Holland Ave., Albany, NY 12229, (518) 474-1830

***Assessment of Public Comment***

The following concerns were raised by interested parties reacting to and commenting on the proposed amendments to section 681.12 of Title 14 NYCRR Part 681. The information presented herein is a summary of the major issues raised by those who commented and no attempt has been made to identify each and every concern that was identified.

In general, it may be said that the comments regarding these proposed standards which will specifically apply to the operation of small residential units, was decidedly mixed. Those who saw the potential benefits to clients continued in their support, offering observations about how such residences will offer a more normalized environment. Others, previously opposed, continued their strong opposition with their frequent observation that no standard will make an SRU a desirable placement given that it is still on the grounds of a developmental center. Several in the later group voiced the opinion that OMRDD had violated the intent of the Chapter 54 Legislation by allowing too much discretion in how each standard might specifically affect a particular SRU. Given the unusual nature of such legislation, OMRDD is of the opinion that such discretion as existed in proposed amendments was expressly allowed for in the Chapter 54 language. Further, had the Legislature intended more explicit limitations on SRU development, siting configuration, or additional operating standards, it is more than likely they would have expressly included these as well. Thus, recommendations from various sources suggesting additional admission requirements are viewed by OMRDD as inappropriate and duplicative of existing admission requirements and have been rejected. In other circumstances, while the suggestions clearly went beyond Chapter 54's mandates, OMRDD was not adverse to including the additional requirements.

A sampling of the specific issues raised through written comment and OMRDD's commentary in response are as follows:

Issue: Many commenters felt that OMRDD's use of the designation "Chapter 54 Facility" instead of "Small Residential Unit (SRU)" was unnecessarily confusing given the discussion history surrounding such programs.

Commentary: The revised standards now only reference the designation, "Small Residential Unit (SRU)."

Issue: The observation was frequently made that the standards should provide a clearer definition of what an SRU is and what projects are specifically covered by its designation.

Commentary: The standards have been revised to provide a clearer definition and the four specific projects identified in the Chapter 54 Legislation have been listed.

Issue: Some interested parties rejected the decision to include the SRU standards as a section of Part 681—Operating Standards for ICF/DDs.

Commentary: Certification of SRU's as ICF/DDs has always been a clear intent of OMRDD. Such certification means that each facility is operated independently and is independently responsible for ensuring the appropriate level of care for its residents. This approach reinforces the Legislature's and OMRDD's intent to maintain separateness between SRUs and the developmental center. A separate regulation for the SRUs would have been unnecessarily duplicative and would have required creating a new certification class in order to achieve the goal of independent responsibility.

Issue: Since the legislation specifically called for the capacity of SRU's to be counted as "institutional" beds, some observers felt that the inclusion of such specification within the standards was mandatory.

Commentary: The counting of beds for census purposes is typically viewed as an administrative procedure not usually worthy of regulatory specification. Since OMRDD's intent was revised prior to the issuance of the proposed standards to view the SRU census as part of its DC census, the inclusion of such a requirement, while unnecessary from an enforcement perspective, is not a particular problem and has been so included.

Issue: Several comments suggested that the proposed standards as worded would allow for "clustering" of SRU's which would be in violation of the Legislature's intent.

Commentary: While the term "clustering" or the use of any reference to grouping concepts is absent from the legislative language, it is evident that the Legislature's preference is for dispersed units. OMRDD's preference is also for separate independent residences and it fully intends to foster this siting requirement. While the legislation does provide some discretion (which was paralleled in the proposed standards), the final language has been modified to clarify that siting will be in conformance with local zoning requirements in addition to mandating separateness from the developmental center and other SRU's.

Issue: Almost all commenters made an observation regarding the capacity requirements.

Commentary: The final standard has been modified to strictly limit capacity to a maximum of 12 beds for all SRUs. The intent statement regarding the desirability of promoting the development of smaller capacity SRUs, has been maintained.

# EXHIBIT "6"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEE CHASE and JUAN YARBROUGH, individually and on behalf of all other persons similarly situated who were employed by MADICORP, and/or any other entities affiliated with or controlled by MADICORP,<br><br>Plaintiffs,<br><br>-against-<br><br>MADICORP,<br><br>Defendant. | Docket No.: 6:23-CV-0436(AMN/TWD) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT**

James E. Murphy, Esq.
Michele A. Moreno, Esq.
VIRGINIA & AMBINDER, LLP
40 Broad Street, 7th Floor
New York, New York 10004
Tel: (212) 943-9080
Fax: (212) 943-9082
jmurphy@vandallp.com

Frank S. Gattuso
GATTUSO & CIOTOLI, PLLC
The White House
7030 E. Genesee Street
Fayetteville, New York 13066
(315) 314-8000
fgattuso@gclawoffice.com

*Attorneys for the Plaintiffs and the Putative Class and Collective*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ ii

PRELIMINARY STATEMENT ........................................................ 1

LEGAL STANDARD ........................................................ 4

ARGUMENT ........................................................ 5

I. THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND ........................ 5

A. Adding AAA Airporter Services, Inc. as a Defendant ........................ 5

B. Factual Amendments ........................................................ 6

C. Amendments to Plaintiffs' Fourth Cause of Action ........................ 7

D. Plaintiffs' Proposed Amendments Are Not Prejudicial, Futile, or Unduly Delayed ........................ 7

II. PLAINTIFFS' FAC SHOULD SUPERSEDE THE ORIGINAL COMPLAINT AND NOT BE DISMISSED ........................ 12

A. Plaintiffs' FAC Sufficiently Alleges a Cause of Action for Unpaid Overtime Under the FLSA and NYLL ........................ 13

B. Plaintiffs' FAC Sufficiently Alleges a Cause of Action for Failure to Pay Wages Under the NYLL ........................ 15

III. THE COURT SHOULD EXERCISE SUPPLEMENTAL JURSIDICTION OVER PLAINTIFFS' FOURTH CAUSE OF ACTION ........................ 16

CONCLUSION ........................................................ 19

TABLE OF AUTHORITIES

CASES PAGE

Anderson v. City of New York,
2017 U.S. Dist. LEXIS 8358 (S.D.N.Y. Jan. 19, 2017) ....7

Anirudh v. CitiMortgage, Inc.,
598 F. Supp. 2d 448 (S.D.N.Y. 2009) ....18

Ayala v. Looks Great Servs., Inc.,
2015 U.S. Dist. LEXIS 96790 (E.D.N.Y. July 23, 2015) ....7

Ashcroft v. Iqbal,
556 U.S. 662 (2009) ....13, 15

Arista Records, LLC v. Doe 3,
604 F.3d 110 (2d Cir. 2010) ....13

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ....12, 13, 14

Bueno v. Buzinover,
2023 U.S. Dist. LEXIS 38154 (S.D.N.Y. Mar. 7, 2023) ....18

Burns v. Scott,
2022 U.S. Dist. LEXIS 189425 (S.D.N.Y. Oct. 17, 2022) ....17

Carnegie-Mellon Univ. v. Cohill,
484 U.S. 343 (1988) ....17

Coultrip v. Pfizer, Inc.,
2011 U.S. Dist. LEXIS 34213 (S.D.N.Y. Mar. 24, 2011) ....5

Cortec Indus., Inc. v. Sum Holding L.P.,
949 F.2d 42 (2d Cir. 1991) ....8

Cromwell v. New York City Health & Hospitals Corp.,
983 F. Supp. 2d 269 (S.D.N.Y. 2013) ....16

DeJesus v. HF Mgmt. Servs.,
726 F.3d 85 (2d Cir. 2013) ....14

Donato v Serv. Experts, LLC,
2018 U.S. Dist. LEXIS 167511 (N.D.N.Y. Sep. 28, 2018) ....10

Foman v. Davis,
371 U.S. 178 (1962) ....................................................................................................4

Gregory v. Stewart's Shops Corp.,
2015 U.S. Dist. LEXIS 24412 (N.D.N.Y. March 1, 2015) ........................................................16

Hayden v. Cnty. of Nassau,
180 F.3d 42 (2d Cir.1999) ................................................................................................8

Hong v. JP White Plains, Inc.,
2021 U.S. Dist. LEXIS 62592 (S.D.N.Y. Mar. 31, 2021) ..........................................................18

IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC,
783 F.3d 383 (2d Cir. 2015) ................................................................................................9

I.C. v. Delta Galil USA,
2016 U.S. Dist. LEXIS 146873 (S.D.N.Y. Oct. 24, 2016) ..........................................................5

Inga v. Nesama Food Corp.,
2021 U.S. Dist. LEXIS 143208 (S.D.N.Y. July 30, 2021), *report and recommendation adopted*, 2021 U.S. Dist. LEXIS 153902 (S.D.N.Y. Aug. 16, 2021) ........................................................17

Kaye v. Orange Reg'l Med. Ctr.,
975 F. Supp. 2d 412 (S.D.N.Y. Sept. 30, 2013) ....................................................................12

Knife Rights, Inc. v. Vance,
802 F.3d 377 (2d Cir. 2015) ................................................................................................5

L-7 Designs, Inc. v. Old Navy, LLC,
2010 U.S. Dist. LEXIS 13929 (S.D.N.Y. Feb. 16, 2010) ..........................................................8

Litwin v. Blackstone Grp., *L.P.*,
634 F.3d 706 (2d Cir. 2011) ................................................................................................12

Lucente v. Int'l Bus. Machs. Corp.,
310 F.3d 243 (2d Cir. 2002) ................................................................................................9

Lundy v. Catholic Health Sys. of Long Island Inc.,
711 F.3d 106 (2d Cir. 2013) ..................................................................................13, 15, 16, 17

Martinich v. Ward,
2017 U.S. Dist. LEXIS 3713 (E.D.N.Y. Jan. 7, 2017) ..............................................................5

Meehan v. Vipkid,
2021 U.S. Dist. LEXIS 164291 (E.D.N.Y. Aug. 27, 2021) ........................................................18

Case 6:23-cv-06436-?-TWD Document 19-4 Filed 06/23/23 Page 15 of 25

Metcalf v. TransPerfect Translations Intl., Inc.,
2023 U.S. Dist. LEXIS 54340 (S.D.N.Y. Mar. 29, 2023) ....................17

Moon v. Kwon,
248 F. Supp. 2d 201 (S.D.N.Y. 2002) ....................10

Morales v. Rochdale Vill. Inc.,
2015 U.S. Dist. LEXIS 144382 (E.D.N.Y. Oct. 23, 2015) ....................13

Nakahata v. New York-Presbyterian Healthcare Sys.,
723 F.3d 192 (2d Cir. 2013) ....................16

Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers,
971 F.2d 347 (9th Cir. 1992) ....................10

Pettaway v. National Recovery Solutions, LLC,
955 F.3d 299 (2d Cir. 2020) ....................12

Richins v. Hofstra Univ.,
908 F. Supp. 2d 358 (E.D.N.Y. 2012) ....................18

Rui Xiang Huang v. J&A Entm't Inc.,
2012 U.S. Dist. LEXIS 184727 (E.D.N.Y. 2012) ....................9, 13

Ruotolo v. City of New York,
514 F.3d 184 (2d Cir. 2008) ....................4, 7

Selevan v. N.Y. Thruway Auth.,
584 F.3d 82 (2d Cir. 2009) ....................13

Sikiotis v. Vitesse Worldwide Chaufeeured Servs., Inc.,
147 F. Supp. 3d 39 (D. Conn. 2015) ....................11

Skidmore v. Swift & Co.,
323 U.S. 134 (1944) ....................10

Spataro v. Gov't Employers Ins. Co.,
2014 U.S. Dist. LEXIS 109068 (E.D.N.Y. Aug. 6, 2014) ....................8

Walton v. Comfort Sys. USA (Syracuse),
2019 U.S. Dist. LEXIS 169629 (N.D.N.Y. Sept. 30, 2019) .................... 11

Walton v. Comfort Sys. United States (Syracuse), Inc.,
2020 U.S. Dist. LEXIS 88610 (N.D.N.Y. May 20, 2020) ....................8

Case 2:23-cv-05436-DMJ-JMW Document 19-4 Filed 06/25/23 Page 16 of 255

Wilk v. VIP Health Care Servs., Inc.,
2012 U.S. Dist. LEXIS 21630 (E.D.N.Y. Feb. 21, 2012) ..........16

Yu G. Ke v. Saigon Grill, Inc.,
595 F. Supp. 2d 240 (S.D.N.Y. 2008) ..........10

Zhong v. August August Corp.,
498 F. Supp. 2d 625 (S.D.N.Y. 2007) ..........8

**STATUTES**

28 U.S.C. § 1367(a) ..........16

Fed. R. Civ. P. 8(a)(2) ..........13

Fed. R. Civ. P. 12(b)(6) ..........5, 9, 11, 12

Fed. R. Civ. P. 15(a) ..........4, 5

Fed. R. Civ. P. 21 ..........5

NYLL § 195(1) ..........4, 7, 16, 17, 18

NYLL § 195(3) ..........4, 7, 16, 17, 18

Class Action Fairness Act ("CAFA") ..........18

**REGULATIONS**

29 C.F.R. § 785.14 ..........2, 10

29 CFR § 785.15 ..........10, 15

29 CFR § 785.16(a) ..........10

29 C.F.R. § 778.223 ..........9

N.Y.C.R.R. § 142-2.1(b) ..........11

## PRELIMINARY STATEMENT

Named Plaintiffs Lee Chase and Juan Yarbrough, for themselves and on behalf of a proposed class of similarly situated employees (together "Plaintiffs"), by their attorneys Gattuso & Ciotoli, PLLC, and Virginia & Ambinder, LLP, submit this memorandum of law in opposition to the motion of Defendant Madicorp ("Defendant") seeking an order dismissing Plaintiffs' Complaint. As set forth below, Plaintiffs are cross-moving to amend the Complaint and have attached a proposed First Amended Complaint ("FAC") which cures any purported deficiencies. Plaintiffs' proposed FAC satisfies the minimal pleading standard for Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") violations.[1]

Defendant Madicorp is an industrial staffing agency that assembles and deploys temporary manufacturing and warehouse workforces across the United States to assist companies with ramping up production or warehouse operations. [FAC, ¶ 20; *see also* www.madicorp.com] These workers will provide whatever industrial labor is needed at the facility to which they are deployed, such as working the assembly lines and operating the relevant machinery and tools. [FAC, ¶ 58.] Madicorp conducts multi-phase interviews with its workers to ensure they can meet Madicorp's rigorous requirements, and that the workers are able to travel around the country for different projects. [FAC, ¶ 21; *see also* www.madicorp.com] Madicorp guarantees its workers a certain amount of working hours every week, typically 60, and provides them with per diem payments for necessary costs such as housing and food. [FAC, ¶ 22; *see also* www.madicorp.com] During their deployments, Madicorp requires its workers to stay at nearby hotels and travel to their worksites together in vans paid for and procured by Madicorp. [FAC, ¶¶ 62, 66.] At all locations to which it deploys a workforce, Madicorp requires its workers to arrive at the worksite approximately thirty

---

[1] A copy of Plaintiffs' proposed FAC is annexed to the Declaration of Michele A. Moreno ("Moreno Decl.") as Exhibit A. A copy of Plaintiffs' proposed FAC with tracked changes is annexed to the Moreno Decl. as Exhibit B.

minutes before the start of their shift, and to wait on the worksite premises until it is time to "clock-in." [FAC, ¶¶ 64, 66.] Because Plaintiffs are not permitted to travel independently to the worksite and are required to wait on the worksite premises during those thirty minute periods, Plaintiffs are "engaged to wait" (*see* 29 C.F.R. § 785.14), and thus unable to engage in personal activities during that time. [FAC, ¶¶ 65, 68.] Plaintiffs are not permitted to leave the worksite during this thirty-minute waiting period, nor could they, as they are dependent on the van to transport them to and from the worksite. [FAC, ¶ 69.] The thirty-minute waiting period is also too short to enable Plaintiffs to use the time effectively for their own purposes. [FAC, ¶ 70.] Plaintiffs' waiting time belongs to, and is controlled by, their employer. [FAC, ¶ 71.] Nevertheless, Madicorp does not compensate its workers for this time spent waiting, which includes overtime. [FAC, ¶ 67.] Further, Madicorp requires one of the workers to drive the van but does not compensate that individual for the time spent picking up and driving their co-workers to and from the worksites. [FAC, ¶ 73.]

Named Plaintiffs Chase and Yarbrough were employed by Madicorp and deployed to perform work at various manufacturing facilities or warehouses across the United States. [FAC, ¶¶ 16, 18, 55.] This included, but was not limited to, the Briggs and Stratton manufacturing facility in Sherill, New York, the John Deere Horicon Works manufacturing facility in Horicon, Wisconsin, the Fisher Barton manufacturing facility in Watertown, Wisconsin, and the Herff Jones manufacturing facility in Champaign, Illinois. [FAC, ¶¶ 16, 18, 55.] Regardless of which facility they were deployed to, Named Plaintiffs typically worked five to six eight-hour or twelve-hour shifts per week at whichever facility they were deployed to, for a total of anywhere from 40 to 72 hours per week, plus an additional 30 minutes per day "off-the-clock" for which they were not compensated, for a total of approximately 42.5 to 75 hours per week. [FAC, ¶ 61.] During each deployment, Named Plaintiffs were required to stay in hotels approximately 30 to 45 minutes away

from their work location. [FAC, ¶ 62.] Named Plaintiffs were further required to travel to and from the hotels to the worksite together with their co-workers in vans, and to arrive at the worksites approximately thirty minutes before the beginning of their shifts. [FAC, ¶ 66.] Named Plaintiffs were not permitted to clock-in until the top of the hour when their shift began, and were required to wait on the work site premises during that thirty minute period. [FAC, ¶ 66.] For example, when Plaintiffs performed work at Briggs & Stratton in Sherrill, New York, they were required to wait in the cafeteria. [FAC, ¶ 66.] Named Plaintiffs were not compensated for the time they spent waiting at each worksite location. [FAC, ¶ 67.] During his deployments, in addition to his regular work, Named Plaintiff Chase was also tasked with driving the van, including picking up his co-workers at different hotels and driving them to the work sites. [FAC, ¶ 73.] As the driver, Named Plaintiff Chase was also expected to drive his co-workers to the laundromat and back once or twice per week, which took approximately 45 minutes roundtrip. [FAC, ¶ 73.] Named Plaintiff Chase was not compensated for this drive time. [FAC, ¶ 73.] Named Plaintiffs and their co-workers were paid on a weekly basis and were paid at a rate of approximately $18.00 to $19.00 per hour. [FAC, ¶¶ 59, 60.] In the week ending September 18, 2022, Named Plaintiff Chase's paystubs reflected 65 hours of work, but failed to account for the time spent waiting at the work site or driving his co-workers. [FAC, ¶ 74.] Accordingly, Named Plaintiff Chase's unaccounted for time constitutes unpaid overtime. [FAC, ¶ 74.] In the week ending July 3, 2022, Named Plaintiff Yarbrough's paystubs reflected 60 hours of work, but failed to account for the time spent waiting at the work site. [FAC, ¶ 75.] Accordingly, Named Plaintiff Yarbrough's unaccounted for time constitutes unpaid overtime. [FAC, ¶ 75.] This policy and practice of failing to compensate Plaintiff for time that they were engaged to wait, or drive time in the case of Named Plaintiff Chase and other similar workers, was applied uniformly at all locations to which Defendants deployed its temporary

Case 6:23-cv-05436-AMN-TWD Document 19-4 Filed 09/13/23 Page 10 of 25

workers, in violation of the FLSA and NYLL. [FAC, ¶72.] Indeed, Named Plaintiffs experienced this policy and practice at all locations they were deployed to. [FAC, ¶¶ 61, 72.]

Further, Plaintiffs were not provided with wage notices or accurate pay statements in accordance with NYLL §§ 195(1) and (3), which impinged on their rights and ability to advocate for proper pay. [FAC, ¶ 74-75, 82, ¶115-119.]

Accordingly, Plaintiffs commenced the instant action to recover unpaid overtime wages under the FLSA and NYLL, as well as damages resulting from a failure to provide wage notices and accurate pay statements. For the reasons set forth below, Plaintiffs' motion to amend should be granted and Defendant's motion to dismiss should be denied in its entirety.

**LEGAL STANDARD**

Rule 15(a) of the Federal Rules of Civil Procedure ("FRCP") states, in pertinent part, that leave to amend a pleading should be "freely given when justice so requires." As the Supreme Court, and the Second Circuit, have frequently reiterated, leave to amend should be denied only in the face of undue delay, bad faith, undue prejudice to the non-movant, futility of amendment, or where the movant has repeatedly failed to cure deficiencies in previous amendments. Foman v. Davis, 371 U.S. 178, 182 (1962); Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) ("Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' 'Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend.') (internal citations omitted); *see also* Tao Li v. 8868 Corp., 2016 U.S. Dist. LEXIS 165550, *4 (S.D.N.Y. Nov. 30, 2016). Moreover, a party opposing a motion for leave to amend has the burden

of establishing that granting such leave would be unduly prejudicial. Martinich v. Ward, 2017 U.S. Dist. LEXIS 3713 (E.D.N.Y. Jan. 7, 2017); I.C. v. Delta Galil USA, 2016 U.S. Dist. LEXIS 146873, *8 (S.D.N.Y. Oct. 24, 2016) ("Defendants bear the burden of demonstrating prejudice" caused by the proposed amendment).

Although Rule 21 governs the propriety of adding new parties to an action, Courts generally find no difference between the standards under Rule 15(a) and Rule 21, and will grant leave to add a party under Rule 21 where a moving party satisfies the requirements under Rule 15(a). *See* Coultrip v. Pfizer, Inc., 2011 U.S. Dist. LEXIS 34213, *46-47 (S.D.N.Y. Mar. 24, 2011). Indeed, "courts apply the 'same standard of liberality afforded to motions to amend pleadings under Rule 15" so as to "'comport with the law's 'strong preference for resolving disputes on the merits.'" Tao Li, 2016 U.S. Dist. LEXIS 165550 at *4 (S.D.N.Y. Nov. 30, 2016) (quoting Knife Rights, Inc. v. Vance, 802 F.3d 377, 389 (2d Cir. 2015).

## ARGUMENT

### I. THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND

Plaintiffs are seeking leave to amend their Complaint to add more specific factual details concerning Plaintiffs' overtime claim and Defendant Madicorp's role as an employer, to add the entity AAA Airporter Services, Inc. as a Defendant, and to further clarify Plaintiffs' claims with respect to Defendants' failure to provide wage notices and accurate wage statements in violation of the NYLL. [*See generally* FAC.] These amendments cure the deficiencies articulated by Defendant in its motion to dismiss, and thus resolve the threshold matter of whether Plaintiffs' claims can withstand muster under Rule 12(b)(6).

#### A. Adding AAA Airporter Services, Inc. as a Defendant

Defendant Madicorp has identified the entity AAA Airporter Services, Inc. as Plaintiffs' employer. [Defendant's Memorandum of Law in Support of Motion to Dismiss "Def. Memo," Doc. No. 6-1, p. 1, fn. 1.] Based on this alone, Plaintiffs should be permitted to amend the Complaint to add this entity.

Plaintiffs' FAC alleges that, upon information and belief, Madicorp and AAA Airporter Services, Inc. are joint employers and/or a single integrated enterprise [FAC, ¶ 25]; that upon information and belief, Defendants share a common business purpose and maintain common control, oversight, and direction over the operations of services performed by Plaintiffs, including employment practices [FAC, ¶ 26]; and that upon information and belief, Defendants had substantial control of the working conditions of Plaintiffs and over the unlawful policies and practices alleged by Plaintiffs [FAC, ¶¶ 29, 30]. For example, Defendant Madicorp interviews and hires Plaintiffs, and corresponds with Plaintiffs regarding job assignments and requirements, scheduling, lodging, and pay rates, and Defendant AAA Airporter Services, Inc. appears on Plaintiffs' paystubs and has been identified by Defendant Madicorp as an employer of Plaintiffs. [FAC, ¶ 31.] Moreover, Joel Zimmerman is the President, Treasurer, Secretary, Director and registered agent of both Defendant Madicorp and Defendant AAA Airporter Services, Inc. and the entities share a principal place of business at 87 Crescent Road, Needham, MA 02494. [FAC, ¶¶ 19, 23, 27.]

**B. Factual Amendments**

Plaintiffs' proposed factual amendments bolster the existing causes of action for overtime and failure to pay wages, and more artfully articulate Plaintiffs' claim. Plaintiffs have provided significantly more context with respect to their hours worked, including earned but unpaid overtime, work performed, and the unlawful policy and practice for which they are suing. For

example, the FAC clarifies that this policy and practice of failing to pay for time that Plaintiffs spent engaged to wait persisted at all locations to which Plaintiffs were deployed by Defendants, and further clarifies that they were required to wait on worksite premises and were unable to engage in personal activities during that time. [FAC, ¶ 66-72, ¶ 108.]

These factual amendments directly address deficiencies pointed out by Defendant, such as that, *inter alia*, "Plaintiffs do no allege what they were hired to do," that "Plaintiffs do not allege what they did once they arrived," and that Plaintiffs' allegations fail to allege that they worked more hours than what they were paid for. [Def. Memo pp. 5-6.]

**C. Amendments to Plaintiffs' Fourth Cause of Action**

Finally, Plaintiffs seek to amend their Fourth Cause of Action under the NYLL, which previously only asserted Defendants' failure to provide wage notices in violation of NYLL 195(1), to clarify that Defendants also failed to provide accurate pay statements in violation of NYLL 195(3), due to its failure to record all time worked. [FAC, ¶¶ 82, 116.] While Plaintiffs' Complaint previously alleged that Defendant failed to record all time worked by Plaintiffs and thus implied that the pay statements were inaccurate, this relevant section of the statute was inadvertently omitted from the pleading.

**D. Plaintiffs' Proposed Amendments Are Not Prejudicial, Futile, or Unduly Delayed**

Plaintiffs' request for leave to amend should only be denied for good reasons such as undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or futility of amendment, none of which are applicable here. Ruotolo, 514 F.3d 184 at 191. Indeed, on a motion to dismiss, the usual practice is to grant plaintiff leave to amend the complaint to cure any purported deficiencies. *See* Anderson v. City of New York, 2017 U.S. Dist. LEXIS 8358, *15-16 (S.D.N.Y. Jan. 19, 2017); Ayala v. Looks Great Servs., Inc., 2015 U.S. Dist.

LEXIS 96790 (E.D.N.Y. July 23, 2015) ("With regard to the Plaintiffs' request to re-plead, ''[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead. Although leave to replead is within the discretion of the district court, refusal to grant it without any justifying reason is an abuse of discretion.''") (quoting L-7 Designs, Inc. v. Old Navy, LLC, 2010 U.S. Dist. LEXIS 13929 (S.D.N.Y. Feb. 16, 2010) (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991))); *see also* Walton v. Comfort Sys. United States (Syracuse), Inc., 2020 U.S. Dist. LEXIS 88610, at *14 (N.D.N.Y. May 20, 2020) (granting plaintiffs one final opportunity to amend their complaint, even though "the Court has provided Plaintiffs multiple opportunities to amend their complaint," because the Court is "aware of the harsh consequences to [P]laintiff[s] were [it] to dismiss [this] case based on pleading deficiencies"); (citing Hayden v. Cnty. of Nassau, 180 F.3d 42, 53 (2d Cir.1999)); Spataro v. Gov't Employers Ins. Co., 2014 U.S. Dist. LEXIS 109068, *12-13 (E.D.N.Y. Aug. 6, 2014) (granting plaintiffs leave to replead in order to cure deficiencies identified in the Order, and noting that it is the Second Circuit's practice to grant leave to amend the complaint when a motion to dismiss is granted); Zhong v. August August Corp., 498 F. Supp. 2d 625, 627 (S.D.N.Y. 2007) (Court granted plaintiff leave to amend the complaint in order to resolve any noted deficiencies).

First, Plaintiffs' proposed amendments will not cause Defendant Madicorp to undergo any change in position nor relinquish any rights or defenses in reliance upon the pleading sought to be amended, as the underlying factual allegations and causes of action remain the same, and Defendant has had knowledge that AAA Airporter Services, Inc. was a proper party to this action from the beginning of the lawsuit. Indeed, it was Defendant Madicorp that identified this entity on its motion to dismiss. Accordingly, Defendant knew, or should have known, that but for a mistake by Plaintiffs as to the identity of the proper parties, this action would have been brought against

AAA Airporter Services, Inc. from the inception of this action as well. Plaintiffs did not seek and have not obtained any tactical advantage by failing to name AAA Airporter Services, Inc. in the original complaint. Nor is proposed Defendant AAA Airporter Services, Inc. prejudiced by this amendment, as this entity was undoubtedly aware of the existence of this lawsuit and the possibility that it would be named – the two entities share a President, Treasurer, Secretary, Director, registered agent, and principal place of business. Conversely, denial of the opportunity to amend will hinder or completely preclude Plaintiffs from properly presenting their allegations and recovering unpaid wages against the proper entities.

Second, Plaintiffs' FAC sufficiently pleads meritorious claims under the FLSA and NYLL for unpaid wages, and is thus not futile. "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002); *see also* IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 389 (2d Cir. 2015) ("The standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss."). Here, the crux of Plaintiffs' complaint is compensable waiting and drive time - that Defendant maintained a policy and practice of requiring its workers to travel together to their worksites in company vans, arrive at the worksites thirty minutes early, and to wait on the worksite premises until it was time to "clock-in." [2]

This is compensable time. "Even idle time may be considered work if it is 'predominantly for the employer's benefit.'" Rui Xiang Huang v. J&A Entm't Inc., 2012 U.S. Dist. LEXIS 184727, *14-15 (E.D.N.Y. 2012) (internal citation omitted); *see also* 29 C.F.R. § 778.223 ("working time

[2] While Defendant argues that Plaintiffs' time spent commuting, waiting, changing their clothes, and walking to their workstations is not compensable (Def. Memo pp. 7-18), several of these arguments are now moot, as Plaintiffs are not alleging that they spent time changing their clothes or walking to their workstation.

is not limited to the hours spent in active productive labor, but includes time given by the employee to the employer even though part of the time may be spent in idleness"). "Whether waiting time is time worked under the FLSA is dependent on whether the "employee was engaged to wait or . . . [the employee] waited to be engaged." 29 C.F.R. § 785.14 (citing Skidmore v. Swift & Co., 323 U.S. 134, 137 (1944)). Pursuant to 29 CFR § 785.15, an employee is "engaged to wait," and therefore entitled to compensation, where "the employee is unable to use the time effectively for his own purposes. It belongs to and is controlled by the employer." "Whether the time is long enough to enable him to use the time effectively for his own purposes depends upon all of the facts and circumstances of the case." 29 CFR § 785.16(a). *See also* Donato v Serv. Experts, LLC, 2018 U.S. Dist. LEXIS 167511, at *10-12 (N.D.N.Y. Sep. 28, 2018); Yu G. Ke v. Saigon Grill, Inc., 595 F. Supp. 2d 240, 255-56 (S.D.N.Y. 2008) ("As a legal matter, an employer must pay his employees for waiting time between tasks if the employees are expected to be ready whenever performance is required."); Moon v. Kwon, 248 F. Supp. 2d 201, 229 (S.D.N.Y. 2002) ("Time that an employee spends waiting for work assignments is compensable if the waiting time is spent 'primarily for the benefit of the employer and his business.'") (quoting Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers, 971 F.2d 347, 350 (9th Cir. 1992)).

Here, because Plaintiffs were not permitted to travel independently to the worksite and were required to wait on the worksite premises during those thirty-minute periods, Plaintiffs were engaged to wait and thus unable to engage in personal activities during that time. [FAC, ¶ 68.] Plaintiffs were not permitted to leave the worksite during this thirty-minute waiting period, nor could they, as they depended on the van to transport them to and from the worksite. [FAC, ¶ 69.] The thirty-minute waiting period was also too short to enable Plaintiffs to use the time effectively for their own purposes. [FAC, ¶ 70.] Plaintiffs' waiting time belonged to, was controlled by, their

employer. [FAC, ¶ 71.] Nevertheless, Madicorp does not compensate its workers for this time spent waiting, which includes overtime. [FAC, ¶ 67.]

As for driving time, Plaintiffs are not alleging that their time spent *commuting* was compensable. Rather, Plaintiffs are alleging that those workers who were required to drive the work van and transport their co-workers to and from the jobsite after picking them up at different hotels, should have been compensated for that time. [FAC, ¶ 73–74, ¶ 108-109.] "'Under the FLSA, time spent traveling as part of an employee's typical work day is integral and indispensable and thus compensable.'" Walton v. Comfort Sys. USA (Syracuse), 2019 U.S. Dist. LEXIS 169629, *11 (N.D.N.Y. Sept. 30, 2019) (quoting Sikiotis v. Vitesse Worldwide Chaufeeured Servs., Inc., 147 F. Supp. 3d 39, 44 (D. Conn. 2015); *see also* N.Y. Comp. Codes R. & Regs. Tit. 12, § 142-2.1(b), "The minimum wage shall be paid for the time an employee is permitted to work, or is required to be available for work at a place prescribed by the employer, and shall include time spent in traveling to the extent that such traveling is part of the duties of the employee."

Accordingly, Plaintiffs' proposed FAC, which alleges a meritorious claim under the FLSA and NYLL, withstands muster under a Rule 12(b)(6) motion to dismiss and is not futile.

Finally, Plaintiffs' proposed amendments are not unduly delayed. This action is still in its earliest stages, and the parties have not yet attended an initial conference or exchanged discovery demands. Plaintiffs could have amended as of right before opposing Defendant's motion to dismiss, but due to a heavy litigation calendar and other professional conflicts, were unable to submit this opposition until after their time to amend as of right had passed. [*See* Doc. No. 14, letter from Plaintiffs' counsel requesting extension from May 30, 2023 to June 30, 2023.] Moreover, Plaintiffs recently retained co-counsel, who only appeared in this action on May 10,

2023, shortly before the deadline. [*See* Doc. Nos. 10 and 11, May 10, 2023 Notices of Appearance by James E. Murphy and Michele A. Moreno of Virginia & Ambinder, LLP.]

In light of the above, Plaintiffs respectfully request that their cross-motion to amend be granted in its entirety.

## II. PLAINTIFFS' FAC SHOULD SUPERSEDE THE ORIGINAL COMPLAINT AND NOT BE DISMISSED

Plaintiffs' cross-motion to amend should be granted, and the proposed FAC should supersede Plaintiffs' original Complaint, rendering Defendant's motion to dismiss moot. However, while, "[i]t is true that 'an amended pleading ordinarily supersedes the original and renders it of no legal effect.' . . . This rule does not, however, dictate that a pending motion to dismiss is automatically rendered moot when a complaint is amended. District courts in this Circuit have repeatedly explained that, when faced with an amended complaint, they may either deny a pending motion to dismiss as moot or consider the merits of the motion, analyzing the facts as alleged in the amended pleading." Pettaway v. National Recovery Solutions, LLC, 955 F.3d 299 (2d Cir. 2020) (internal citations omitted). Accordingly, should this Court determine that Defendant's motion to dismiss is not moot, the Court should analyze the facts set forth in Plaintiffs' proposed FAC in determining whether to grant Defendant's motion to dismiss.

When presented with a motion to dismiss under Fed. R. Civ. Pro. 12(b)(6), a Court must accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *See* Litwin v. Blackstone Grp., *L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations…" Kaye v. Orange Reg'l Med. Ctr., 975 F. Supp. 2d 412, 417 (S.D.N.Y. Sept. 30, 2013) (*quoting* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. (*quoting* Twombly, 550 U.S. at 555). Plaintiffs must

allege "only enough facts to state a claim to relief that is plausible on its face" to "nudge[] his or her claims across the line from conceivable to plausible…" Id. . (*quoting* Twombly, 550 U.S. at 570); *see also* Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (2009) (quoting Twombly, 550 U.S. at 570). The United States Court of Appeals for the Second Circuit has made clear that the Supreme Court's decisions in Twombly and Iqbal did not "heighten the pleading requirements" imposed by Rule 8(a)(2). Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010). Plaintiffs' First Amended Complaint satisfies the minimal pleading requirements set forth under Fed. R. Civ. P. 8(a)(2), which demands only a "short and plain statement of the claim showing that the pleader is entitled to relief."

Construing Plaintiffs' proposed FAC liberally, accepting all factual allegations as true, and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs have set forth sufficient factual allegations that would permit this Court to infer that Defendants violated the law. Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009). Plaintiffs' allegations are more than sufficient to give the "defendant fair notice of what the claim is and the grounds upon which it rests." Twombly, 550 U.S. at 544.

**A. Plaintiffs' FAC Sufficiently Alleges a Cause of Action for Unpaid Overtime Under the FLSA and NYLL**

"'[I]n order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours.'" Morales v. Rochdale Vill. Inc., 2015 U.S. Dist. LEXIS 144382, at *5-6 (E.D.N.Y. Oct. 23, 2015) (*quoting* Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d 106, 114 (2d Cir.

Case 6:23-cv-07036-AMN-TWD Document 19-4 Filed 09/12/23 Page 20 of 25

2013)). The standard is designed so that plaintiffs "provide some factual context that will 'nudge' their claim 'from conceivable to plausible.'" Id. (*quoting* Twombly, 550 U.S. at 570. Exactness with respect to overtime hours is not required. DeJesus v. HF Mgmt. Servs., 726 F.3d 85, 90 (2d Cir. 2013) ("this Court has not required plaintiffs to keep careful records and plead their hours with mathematical precision…").

Plaintiffs' FAC alleges that Named Plaintiffs typically worked anywhere from 40 to 72 hours per week, plus an additional 30 minutes per day "off-the-clock" for which they were not compensated, for a total of approximately 42.5 to 75 hours per week. [FAC, ¶ 61.] The FAC further alleges that Named Plaintiffs were paid on a weekly basis (¶ 59), and identifies specific weeks where overtime was worked but not paid. In the week ending September 18, 2022, Plaintiff Chase's paystubs reflected 65 hours of work, but failed to account for the time spent waiting at the work site or driving his co-workers. [FAC, ¶ 74.] Accordingly, Named Plaintiff Chase's unaccounted for time constitutes unpaid overtime. [*Id.*] In the week ending July 3, 2022, Named Plaintiff Yarbrough's paystubs reflected 60 hours of work, but failed to account for the time spent waiting at the work site. [FAC, ¶ 75.] Accordingly, Named Plaintiff Yarbrough's unaccounted for time constitutes unpaid overtime. [*Id.*]

Plaintiffs' FAC further identifies the exact policy and practice that resulted in unpaid overtime – that Plaintiffs were required to arrive at the worksite approximately 30 minutes before their shift began, were not permitted to clock-in until the top of the hour when their shift began, and were required to wait on the work site premises during this time for which they were not compensated. [FAC, ¶¶ 66, 67.] Because Plaintiffs' typically worked over 40 hours in a week, this unpaid time resulted in unpaid overtime.

As set forth above, an employee is "engaged to wait," and therefore entitled to compensation, where "the employee is unable to use the time effectively for his own purposes. It belongs to and is controlled by the employer." 29 CFR § 785.15. Plaintiffs sufficiently allege that they were engaged to wait and entitled to compensation. [FAC, ¶ 68, "Because Plaintiffs were not permitted to travel independently to the worksite and were further required by Defendants to wait on the worksite premises during those 30 minutes, Plaintiffs were engaged to wait and thus unable to engage in personal activities during that time."; ¶ 69, "Plaintiffs were not permitted to leave the worksite during this thirty-minute waiting period, nor could they, as they depended on Defendants to transport them to and from the worksite."; ¶ 70, "The thirty-minute waiting period was also too short to enable Plaintiffs to use the time effectively for their own purposes."; ¶ 71, "Plaintiffs' waiting time belonged to, was controlled by, Defendants."]

In "[d]etermining whether a plausible claim has been pled," the Court must undertake "'a context-specific task that requires [the court] to draw on its judicial experience and common sense.'" Lundy, 711 F.3d at 114 (*quoting* Iqbal, 556 U.S. at 679). Taken together and accepted as true, the factual details are clear that Plaintiffs are alleging unpaid compensable time, including weeks in which they worked in excess of forty hours but were not compensated at one- and one-half times their regular rate of pay for those hours over 40.

### B. Plaintiffs' FAC Sufficiently Alleges a Cause of Action for Failure to Pay Wages Under the NYLL

Defendant argues that Plaintiffs' Third Cause of Action for failure to pay wages should be dismissed because "waiting, changing their clothes, and walking to their worksites" is not compensable time. [Def. Memo pp. 19-21.] Plaintiffs have clarified that they are not claiming wages for time spent commuting, changing their clothes, or walking to their worksites. Further, and as set forth above, Plaintiffs sufficiently alleged that time spent waiting at the worksite under

the direction and control of Defendant constitutes compensable time. Accordingly, Plaintiffs' third cause of action should stand, as they have alleged a facially plausible NYLL "gap time" claim for waiting time in weeks in which Plaintiffs worked less than 40 hours. "Such claims, commonly referred to as a 'gap time' claims, are ones 'in which an employee has not worked 40 hours in a given week but seeks recovery of unpaid time worked, or in which an employee has worked over 40 hours in a given week but seeks recovery for unpaid work under 40 hours.'" Gregory v. Stewart's Shops Corp., 2015 U.S. Dist. LEXIS 24412, *10-11 (N.D.N.Y. March 1, 2015) (quoting Lundy, 711 F.3d at 115; *see* Nakahata v. New York-Presbyterian Healthcare Sys., 723 F.3d 192, 201 (2d Cir. 2013) (same); Cromwell v. New York City Health & Hospitals Corp., 983 F. Supp. 2d 269, 271 (S.D.N.Y. 2013) ("Back-pay for the 2.5 hours [plaintiff] needed to reach a 40—hour week is called 'gap-time' compensation"). "'Claims for gap-time compensation are cognizable under the NYLL but not under the FLSA.'" *Id.* (quoting Cromwell, 983 F. Supp. 2d at 271 (citing Nakahata, 723 F.3d at 201—02); *see also* Wilk v. VIP Health Care Servs., Inc., 2012 U.S. Dist. LEXIS 21630, fn. 3 (E.D.N.Y. Feb. 21, 2012) ("it is clear that the FLSA does not preempt common law claims for 'straight time,' i.e., non-overtime hours, for which a plaintiff was paid at least minimum wage.").

## III. THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' FOURTH CAUSE OF ACTION

Defendants request that the Court decline to exercise supplemental jurisdiction over the Plaintiffs' fourth cause of action brought pursuant to NYLL § 195(1). [Def. Memo pp. 21-23.] Pursuant to 28 U.S.C. § 1367(a), ""in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction overall other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . " The decision whether to exercise supplemental jurisdiction is within the sound

Case 1:23-cv-05436-AMD-TAW Document 19-4 Filed 09/12/23 Page 29 of 35

discretion of the district court. Lundy, 711 F.3d at 117 (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349-50 (1988)).

First, this Court has jurisdiction over Plaintiffs' NYLL §§ 195(1) and (3) claims because of their direct connection to Plaintiffs' FLSA and NYLL unpaid wage claims. Plaintiffs have alleged concrete injuries because of Defendants' failure to provide accurate information about Plaintiffs' wages paid and hours worked, in furtherance of a larger wage theft scheme. By failing to inform Plaintiffs of their regular rate of pay, and by recording less hours on the paystubs than Plaintiffs worked each week, Defendants deprived Plaintiffs of regular and overtime pay. [FAC, ¶ 117.] The inaccuracies also made it more difficult for Plaintiffs to determine whether and to what extent they were underpaid each week. [FAC, ¶ 118.] Accordingly, "plaintiffs do not claim that they faced a theoretical risk of some intangible harm; they claim that they were *in fact* routinely provided with inaccurate and misleading information . . . which prevented them from pursuing the full amount of compensation to which they were entitled." Metcalf v. TransPerfect Translations Intl., Inc., 2023 U.S. Dist. LEXIS 54340, at *17-18 (S.D.N.Y. Mar. 29, 2023). As reasoned by the Honorable Paul A. Engelmayer:

> The written notices mandated under the WTPA serve 'as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves." 2020 U.S. Dist. LEXIS 49740, [WL] at *9. Denying an employee such notices—as alleged here—can impinge on an employee's interests not only in being paid what is owed, but also in being able to advocate for the receipt of proper pay. The Court thus finds that, by alleging that they were not furnished the statutorily required notices, plaintiffs have asserted a concrete and particularized injury sufficient to confer standing for their WTPA wage notice and wage statement claims. Consistent with this, multiple courts in this District have exercised jurisdiction over such claims, without requiring a specific showing as to the downstream impact on the plaintiff of the non-provision of the required notice. *See, e.g., id.; Burns v. Scott*, No. 20 Civ. 10518 (JGK), 2022 U.S. Dist. LEXIS 189425, 2022 WL 10118491, at *5, *9 (S.D.N.Y. Oct. 17, 2022); *Inga v. Nesama Food Corp.*, No. 20 Civ. 0909 (ALC) (SLC), 2021 U.S. Dist. LEXIS 143208, 2021 WL 3624666, at *6, *10 (S.D.N.Y. July 30, 2021), *report and recommendation adopted*, 2021 U.S. Dist. LEXIS

153902, 2021 WL 3617191 (S.D.N.Y. Aug. 16, 2021); *Hong v. JP White Plains, Inc.*, No. 19 Civ. 5018 (NSR), 2021 U.S. Dist. LEXIS 62592, 2021 WL 1226566, at *8 (S.D.N.Y. Mar. 31, 2021).

Bueno v. Buzinover, 2023 U.S. Dist. LEXIS 38154, at *5-6 (S.D.N.Y. Mar. 7, 2023).

Second, the Court has original jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), which "allows for the exercise of federal diversity jurisdiction over class actions involving 100 or more class members, in which the amount in controversy exceeds the sum or value of $5,000,000 (exclusive of interest and costs), and there is minimal diversity, *i.e.*, where, *inter alia*, at least one member of the putative class and one defendant are citizens of different states." Richins v. Hofstra Univ., 908 F. Supp. 2d 358, 360 (E.D.N.Y. 2012) (quoting Anirudh v. CitiMortgage, Inc., 598 F. Supp. 2d 448, 450 (S.D.N.Y. 2009)); Meehan v. Vipkid, 2021 U.S. Dist. LEXIS 164291, at *22 (E.D.N.Y. Aug. 27, 2021). Plaintiffs allege that the class is believed to be in excess of 100 employees. [FAC ¶ 28.] Plaintiffs' NYLL § 195(1) and (3) claims, if successful, would entitle every Plaintiff to $50 for every week in which they did not receive a proper wage notice, up to $5,000, and $250 for each day in which they did receive proper pay statements, up to $5,000, for a total of $10,000.00 each. [FAC ¶ 64; NYLL § 198-1(b).] This means a plaintiff would need only work for Defendants for 100 days in order to be entitled to $10,000 in damages. The Court may therefore infer that the amount in controversy for each Plaintiff's NYLL § 195(1) and (3) claims exceed the sum or value of $10,000. Further, Plaintiffs have diversity in this action because Named Plaintiffs are residents of Florida and Texas, while Defendants principal place of business is in Massachusetts, and they are authorized to do business across the United States including in New York, Wisconsin, and Illinois. [FAC ¶¶ 15-23.]

Accordingly, even if Plaintiffs' FLSA and NYLL overtime claims are dismissed, which they should not be, the Court should exercise jurisdiction over Plaintiffs' remaining NYLL § 195 claims.

**CONCLUSION**

For the reasons set forth above, it is respectfully requested that the Court grant Plaintiffs' cross-motion to amend and deny Defendant's motion in its entirety, and grant such further relief that this Court deems necessary.

Dated: June 30, 2023

*/s/ James Emmet Murphy*
James Emmet Murphy, Esq.
Michele A. Moreno, Esq.
VIRGINIA & AMBINDER, LLP
40 Broad Street, 7th Floor
New York, New York 10004
Tel: (212) 943-9080
Fax: (212) 943-9082
jmurphy@vandallp.com

-and-

*s/ Frank S. Gattuso*
Frank S. Gattuso
GATTUSO & CIOTOLI, PLLC
The White House
7030 E. Genesee Street
Fayetteville, New York 13066
(315) 314-8000
fgattuso@gclawoffice.com

*Attorneys for the Plaintiffs and the Putative Class and Collective*

# EXHIBIT "7"

New York State Department of Labor
David A. Paterson, Governor
M. Patricia Smith, Commissioner

January 15, 2009

[redacted]

Re: Request for Opinion
Travel Pay
RO-09-0170

Dear [redacted]:

This letter is written in response to your letter dated November 24, 2009, in which you request an opinion as to the pay requirements for travel time under regulation 12 NYCRR §142-2.1. Your letter asks a number of questions relating to the requirements for travel pay under that regulation. Those questions, to the extent possible based on the limited factual information provided in your letter, are addressed individually below.

1. *Does the New York Department of Labor share the federal law's [Portal to Portal Act] approach in determining whether such travel time [that which is spent traveling after[1] non-work hours on a train, plane or bus] is compensable?*

As mentioned by you in your letter, State regulation 12 NYCRR §142-2.1 requires, in relevant part, that the minimum wage be paid for "time spent in traveling to the extent that such traveling is part of the duties of the employee." The federal Portal to Portal Act (29 USC §251 *et seq.*) is a federal law which amends the provisions of the Fair Labor Standards Act (FLSA) in relation to travel and other activities before and after the workday. (61 Stat. 84.) However, Section 18(1) of the Fair Labor Standards Act provides that nothing in that Act excuses noncompliance with any state law regarding minimum wage or overtime. (*see* 29 USC §218(a).) That provision has been interpreted so that the Fair Labor Standards Act does not "pre-empt state regulation of wages and overtime if the state's standards are more beneficial to workers." (*see, Manliguez v. Joseph*, 226 F.Supp.2d. 377, 388 (EDNY 2002).) Therefore, to the extent that the New York State Labor Law provides additional benefits to employees, i.e. deeming travel time to be time "worked," the enhanced benefit provided by the New York State Labor Law controls.

[1] Although your refer to time spent traveling "after non-work hours," it appears that you intended to say during non-work hours or after work hours.

Tel: (518) 457-4380, Fax: (518) 485-1819
W. Averell Harriman State Office Campus, Bldg. 12, Room 509, Albany, NY 12240
www.labor.ny.gov bcejjs@labor.ny.gov

With regard to travel time after work hours or during non-work hours, the New York State Department of Labor interprets the quoted language in regulation 12 NYCRR §142-2.1 in line with federal regulation 29 CFR §785.35, which provides, in full:

> An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment. This is true whether he works at a fixed location or at different job sites. Normal travel from home to work is not worktime.

While this Department follows the above regulation, without a specific factual inquiry upon which to evaluate whether the applicable provisions of the New York State Labor Law are consistent with or in line with all of the provisions and regulations of the Portal to Portal Act under all circumstances, no conclusive opinion can be made.

2. *[D]oes the phrase "to the extent that such traveling is part of the duties of the employee" apply only to employees who travel extensively within the state as part of their job duties, and, if so, what percentage of the employee's time must be spent traveling to qualify as "extensive" travel? Or, does this phrase also apply to employees who travel less frequently for their work?*

The phrase "time spent in traveling to the extent that such traveling is part of the duties of the employee" does not turn upon the extent of an employee's travel, as your question assumes; rather, the phrase "to the extent that" is used in that regulation to mean that the minimum wage must be paid for all travel time that is within the duties of the employee and not for travel time that is not part of their duties. Otherwise stated, that phrase requires that employees be paid for all travel time that is part of their duties as an employee. Therefore, in direct response to your question, the above-quoted phrase from regulation 12 NYCRR §142-2.1 applies to all employees, regardless of the extensiveness of their travel, and requires the payment of wages for any travel that is part of the duties of the employee.

3. *[W]ould the New York Department of Labor consider traveling as part of the employee's duties if the employee, who is assigned to the employer's main office in New York, travels only once per year to an in-state seminar at the request of the employer?*

Federal regulation 29 CFR §785.27 provides as follows:

> § 785.27 General.
> Attendance at lectures, meetings, training programs and similar activities need not be counted as working time if the following four criteria are met:
> (a) Attendance is outside of the employee's regular working hours;

(b) Attendance is in fact voluntary;
(c) The course, lecture, or meeting is not directly related to the employee's job; and
(d) The employee does not perform any productive work during such attendance.

Unfortunately, the question posed in your letter does not provide a basis upon which to evaluate whether the four criteria contained in the above regulation are met. (*see also,* 29 CFR §785 subpart C.) However, based on the fact that your letter states that the travel was "at the request of the employer," it appears that the criterion which requires that attendance be voluntary was not met. It is worth further noting, as stated above, the State is not preempted from enacting provisions more protective of employees than those contained in the FLSA and its regulations, it is not necessary to determine whether regulation 12 NYCRR §142-2.1 provides such further protection since an evaluation of whether the baseline federal standard has been met cannot be rendered under the limited facts provided. If after a review of the above-quoted regulation and those within Subpart C of 29 CFR §785 you require further clarification, please do not hesitate to respond to this letter with any further questions you may have.

4. *Would the analysis change if the employee traveled out of state for the seminar at the employer's request?*

Since the above analysis is substantively limited to the provisions and regulations of the FLSA, a federal law, the above analysis is unaffected by the additional fact that the employee traveled out of state for the seminar.

This opinion is based on the information provided in your letter dated December 3, 2009. A different opinion might result if the circumstances stated therein change, if the facts provided were not accurate, or if any other relevant fact was not provided. If you have any further questions, please do not hesitate to contact me.

Very truly yours,

Maria L. Colavito, Counsel

By: [signature]
Jeffery G. Shapiro
Associate Attorney

JGS:mp
cc: Carmine Ruberto

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHAWNICE BETTIS, BOYSING SAMUEL, JR., LAURA PINCAY, CHRISTOPHER MONTEAGUDO, and KEANNA KOVOS, *on behalf of themselves and all others similarly situated*,

Plaintiffs,

v.

AMAZON.COM SERVICES LLC, *f/k/a AMAZON SERVICES.COM, INC.*,

Defendant.

**MEMORANDUM AND ORDER**

24-cv-07563-LDH-JAM

LASHANN DEARCY HALL, United States District Judge:

Shawnice Bettis, Boysing Samuel, Jr., Laura Pincay, Christopher Monteagudo, and Keanna Kovos (together, "Plaintiffs"), on behalf of themselves and all other similarly situated, bring the instant action against Amazon.com Services LLC ("Amazon" or "Defendant"), pursuant to the New York Labor Law ("NYLL"). Specifically, Plaintiffs assert claims for unpaid minimum wages and overtime wages,[1] as well as a claim for failure to furnish the correct wage

[1] Plaintiffs expressly bring, as their first claim for relief, a claim for "unpaid wages" and "overtime wages" under Sections 198 and 663 of the NYLL. However, the complaint references "minimum wage[s]" in the allegations included as support for its first claim of relief. (*See, e.g.*, Second Am. Compl. ("Compl.") ¶ 72, ECF No. 22.) Moreover, as support for their first claim of relief, Plaintiffs cite to Section 142-2.1 of Title 12 of the New York Compilation of Codes, Rules & Regulations ("12 NYCRR §142-2.1"). Pursuant to 12 NYCRR §142-2.1(b):

> [t]he minimum wage shall be paid for the time an employee is permitted to work, or is required to be available for work at a place prescribed by the employer, and shall include time spent in traveling to the extent that such traveling is part of the duties of the employee.

Considering that the Second Amended Complaint (the "Complaint"): (1) references minimum wages in allegations regarding Plaintiffs' unpaid wages; and (2) cites to 12 NYCRR §142-2.1(b) and NYLL § 663, both of which, as discussed, *infra*, relate to minimum wages, the Court construes Plaintiffs' claim for "unpaid wages" as a claim for unpaid minimum wages.

statements. Defendant moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's Second Amended Complaint (the "Complaint") in its entirety.

**BACKGROUND**[2]

Amazon, a company incorporated in Delaware with its principal place of business in the State of Washington, is an "e-commerce" provider that sells goods on its website and delivers them to retail consumers. (Second Am. Compl. ("Compl.") ¶¶ 6, 21, ECF No. 22.) According to the Complaint, Amazon has created a network of "very large" fulfillment centers, sortation centers, and delivery stations (together, "Warehouses") where workers—called "associates"—are employed in various positions, including as "loaders, packers, pickers, diverters, stowers, line leaders, water spiders, and problem solvers." (*Id.* ¶¶ 13, 23.) According to the Complaint, associates at fulfillment centers fulfilled customers' orders by packaging them into boxes and sorting the boxes for delivery. (*Id.* ¶ 22.) Thereafter, the packages were transferred to sortation centers. (*Id.*) At sortation centers, associates were tasked with sorting packages to be sent to delivery stations located closer to each consumer. (*Id.*) From there, packages were sorted for local delivery by drivers employed by Amazon's delivery service partners. (*Id.*)

Plaintiffs allege that Amazon employed thousands of workers at each of its Warehouses. (*Id.* ¶¶ 12, 23.) Specifically, according to the Complaint, Amazon employed over 6,000 individuals as associates at each of its JFK8 and DNJ-3 warehouses located in Staten Island and the Bronx. (*Id.* ¶ 12.) This included Plaintiffs. (*Id.* ¶¶ 14-18.) Plaintiff Samuel, a New York resident, was employed as an associate at Amazon's JFK8 warehouse from February 2021 through September 2022, at a regular hourly rate of between $15.00 and $19.00 an hour. (*Id.* ¶ 14.) Plaintiff Bettis, a New York resident, was employed as an associate at Amazon's JFK8

[2] The following facts are taken from the Complaint and are assumed to be true for the purpose of deciding the instant motion.

warehouse from August 2023 through February 2024, at a regular hourly rate of between $15.00 to $19.00 an hour. (*Id.* ¶ 15.) Plaintiff Pincay, a New York resident, was employed as an associate at Amazon's JFK8 warehouse from November or December 2018 through December 2024, at a regular hourly rate of between $15.00 and $19.00 an hour. (*Id.* ¶ 17.) Plaintiff Kovos, a New Jersey resident, was employed as an associate at Amazon's JFK8 warehouse from September 2020 through December 2022, at a regularly hourly rate between $15.00 and $20.00 per hour. (*Id.* ¶ 18.) Plaintiff Monteagudo, a New York resident, was employed at Amazon's DNJ-3 warehouse from December 2019 through July 2020, at a regular hourly rate of between $17.50 to $19.00 an hour. (*Id.* ¶ 16.)

Next, according to the Complaint, Amazon used centralized electronic security, productivity, and time-keeping systems to monitor the activities of its associates, including Plaintiffs. (*Id.* ¶¶ 24, 29.) To that end, Amazon provided Plaintiffs with identification badges containing a magnetic stripe and other electronic information to be used while working at Amazon's Warehouses. (*See id.* ¶ 24.) Plaintiffs were required to swipe these identification badges to enter the Warehouses before the start of their shift and when clocking out after their shift to leave the Warehouses. (*Id.* ¶ 25.) Plaintiffs allege that Amazon's security systems registered each associate's swipe at the time of his or her entry into and exit from the Warehouses. (*Id.*) According to the Complaint, to maximize the productivity of associates, Amazon closely monitored the time that each associate, including Plaintiffs, clocked in at the beginning of his or her shift and clocked out for unpaid meal breaks or at the end of his or her shift each day. (*Id.* ¶ 26; *see id.* ¶ 30.) Associates were provided with two options by which to clock in and out—that is, record their work time. (*Id.* at 30.) Associates could record their time by using a physical time clock located within Amazon's Warehouses. (*Id.*) Alternatively, if they

possessed a cell phone, associates could record their time via a phone application called Amazon A to Z (the "A to Z App"). (*Id.*) Plaintiffs, however, allege that use of the A to Z App was limited by occasional technical issues and its design, which limited function to certain time periods or certain locations. (*Id.*)

Moreover, in furtherance of its goal of maximizing productivity, Amazon also implemented a "[thirteen-]point discipline scale." (*Id.* ¶ 27.) Under this scale, if an associate accrued thirteen disciplinary points on his or her personnel file, he or she would be terminated. (*Id.*) Plaintiff alleges that, under this scale, associates could incur a point for accumulating too much "time-off task[s]." (*Id.* at 28.) According to the Complaint, a "time-off task" is an activity performed during the working day that did not involve "production work" and involved time spent away from an associate's workstation, but was, nonetheless, conducted "on the clock." (*Id.*) Similarly, associates could incur disciplinary points for clocking in to start their shifts more than five minutes after the shift was scheduled to commence. (*Id.*) Plaintiffs allege that, despite penalizing associates for clocking in more than five minutes after the start of their respective shift, Amazon prohibited associates from clocking in more than five minutes prior to the start of their scheduled shifts. (*Id.* at 31.) And, Amazon paid wages only for the time it considered and recorded as working time in its timekeeping system. (*Id.* at 32.) According to the Complaint, if an associate performed work during periods not considered working time by Amazon, the time was not recorded in Amazon's timekeeping system, and the associate was not paid for that time. (*Id.*) Plaintiffs allege that Amazon required Plaintiffs to work at their assigned Warehouses for shifts that began and ended at times specified by Amazon. (*Id.* ¶ 33.) Plaintiffs further allege that these shifts were typically eight to ten hours in length each workday. (*Id.*) According to the Complaint, Plaintiffs were typically required to work a schedule dictated by Amazon and

consisting of at least forty hours of work per week. (*Id.*) During Amazon's "prime season," which is September through February of the next year, Plaintiffs were required to work more hours per week. (*Id.*)

Plaintiffs next allege that, as the first task of each working day, Amazon required associates to swipe in or show their badge to security prior to entering the Warehouses to work. (*Id.* ¶ 34.) In addition, from 2020 through 2022, during the Covid-19 pandemic, Amazon also required associates to queue in a single line and submit to a body temperature or fever screening before entering the Warehouses (together, "Start-of-Shift Activities"). (*Id.* ¶ 36.) Plaintiffs were permitted to clock in, commencing the recording of compensable time that day, after completing the Start-of-Shift Activities and entering the Warehouses. (*Id.* ¶ 37.) Plaintiffs allege that Amazon imposed procedures, policies, and circumstances that made it "impossible" for, or infrequent" that, associates would clock in immediately upon entering the Warehouses. (*Id.* ¶ 38.) For example, Amazon: (1) positioned time clocks a significant distance from the Amazon's Warehouses' entrances, increasing the time it took to clock in; (2) allowed numerous physical time clocks to fall into disrepair for prolonged periods of time; (3) required associates to secure a workstation assignment from their "superior" prior to being allowed to clock in; (4) limited the use and function of the A to Z App; and (5) imposed a thirteen-point scale that "coerced" associates into being present at Amazon's Warehouses more than five minutes before the start of their shift. (*Id.*) Plaintiffs allege that the amount of time that elapsed between the commencement of the Start-of-Shift Activities and clocking in totaled five to ten minutes each workday. (*Id.* ¶ 39.) During the Covid-19 pandemic, such time totaled up to thirty minutes each workday. (*Id.*)

According to the Complaint, Amazon also required associates, including Plaintiffs, to undergo a security screening at the end of each workday before leaving the Warehouses. (*Id.* ¶ 41.) During this screening Plaintiffs were required to queue in a single line and proceed through metal detectors and turnstiles, at which Plaintiffs swiped their identification badge (the "End-of-Shift Activities"). (*See id.* ¶ 43.) Plaintiffs were allowed to commence the End-of-Shift Activities only after clocking out. (*Id.* ¶ 42.) Plaintiffs were, thus, not compensated for the time spent undergoing the End-of-Shift Activities. (*Id.*) According to the Complaint, it typically took between five and ten minutes to undergo the End-of-Shift Activities. (*Id.* ¶ 44.) However, during the Covid19 pandemic, the time spent completing the End-of-Shift Activities ranged, "on average," from ten to twenty minutes. (*Id.*) Plaintiffs allege further that, occasionally, they and other associates would be selected by security guards for closer inspection of their bags, as required by Amazon, resulting in additional time spent completing the End-of-Shift Activities. (*Id.* ¶ 45.) Plaintiffs were, similarly, not compensated for time spent during any enhanced inspection. (*Id.*)

Finally, Plaintiffs allege that Amazon failed to provide them with correct wage statements and wage notices that "reflect[ed] all the time the NYLL recognizes as work." (*Id.* ¶¶ 48, 52.) Plaintiffs further allege that, because of this failure, Amazon was able to conceal its wrongdoing from associates. (*Id.* ¶ 52.) According to the Complaint, Amazon's "failure to provide NYLL notices" has also resulted in ongoing delayed payment of wages owed to Plaintiffs. (*Id.*)

**STANDARD OF REVIEW**

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court deciding whether to grant a motion to dismiss must "draw all reasonable inferences in [the plaintiff's] favor, assume all 'well-pleaded factual allegations' to be true, and 'determine whether they plausibly give rise to an entitlement to relief.'" *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)) (internal citation omitted). "[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Further, a court is not obligated to accept a plaintiff's "conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber*, 648 F.3d at 104 (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008)).

## DISCUSSION

### I. Unpaid Overtime and Unpaid Minimum Wage

The Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (the "FLSA"), requires the payment to all covered employees of a certain minimum wage, together with overtime compensation for employment in excess of forty hours. *See Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 31 (2014) ("[T]he FLSA established a [national] minimum wage and overtime compensation for each hour worked in excess of [forty] hours in each workweek." (citation omitted). The purpose of the FLSA, passed in 1938, was to ensure that employees receive a "'fair day's pay for a fair day's work.'" *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578 (1942) (quoting 81 Cong. Rec. 4983 (1937) (message of President Franklin D. Roosevelt)), *superseded by statute*, Portal–to–Portal Act, 61 Stat. 86–87, *as recognized* in *Trans World Airlines v. Thurston*, 469 U.S. 111, 128 n. 22 (1985). Stated differently, the FLSA's objective

was to "guarantee[] compensation for all work or employment engaged in by employees covered by the Act." *Tennessee Coal, Iron & R. Co. v. Muscoda Loc. No. 123*, 321 U.S. 590, 602 (1944). To that end, an employer who fails to compensate an employe for work covered under the Act can "be held civilly liable for backpay, liquidated damages, and attorney's fees" by establishing civil liability for an employer who violates the Act. *See Busk*, 574 U.S. at 31.

Similar to the FLSA, the NYLL is designed to ensure the wages of workers in the State of New York. *Cohan v. Columbia Sussex Mgmt., LLC*, No. CV 12-3203, 2018 WL 4861391, *4 (E.D.N.Y. Sept. 28, 2018) (citing *A.H. Phillips v. Walling,* 324 U.S. 490, 493 (1945)); *see also Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 472 (S.D.N.Y. 2015) ("The FLSA and the NYLL both 'guarantee[ ] compensation for all work . . . engaged in by [covered] employees." (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 359 (2d Cir. 2011))). That is, the NYLL "is the state analogue to the federal [Fair Labor Standards Act ("FLSA")] . . . [and] mirrors the FLSA in compensation provisions regarding minimum hourly wages and overtime . . . . " *Santillan v. Henao*, 822 F. Supp. 2d 284, 292 (E.D.N.Y. 2011). Specifically, under § 198 of the NYLL, employees are entitled to recover "full wages" for any unpaid wages, including minimum wages and overtime wages. *See id.* ("All employees shall have the right to recover full wages . . . accrued during the six years previous to the commencing of [any civil] action . . . . " (quoting N.Y. Lab. Law § 198(3)). Likewise, § 663 of the NYLL provides that "[i]f any employee is paid by his or her employer less than the wage to which he or she is entitled under the provisions of [Article 19], he or she shall [be entitled to] recover in a civil action the amount of any such underpayments . . . ." N.Y. Lab. Law § 663. Pursuant to § 652 of the NYLL, a provision of Article 19, minimum wages constitute wages to which an employee is entitled. N.Y. Lab. Law § 652 (establishing that "every employer shall pay each of its employees for each hour worked a

[minimum] wage" set forth in the section). Moreover, NYLL § 663 entitles employees to wages established by regulations promulgated by the New York State Department of Labor ("NYDOL") under Article 19.[3] Section 142-2.2 of Title 12 of the New York Compilation of Codes, Rules and Regulations ("12 NYCRR § 142-2.2") is a regulation issued by the NYDOL, pursuant to Article 19.[4] *Wimbush*, No. 16CIV5363, 2018 WL 3388296, at *3 (first citing *Rocha v. Bakhter Afghan Halal Kababs, Inc.*, 44 F. Supp. 3d 337 (E.D.N.Y. 2014); and then citing *Diaz v. Elecs. Boutique of Am., Inc.*, No. 04-CV-0840E, 2005 WL 2654270, at *1 (W.D.N.Y. Oct. 17, 2005)). Under § 142-2.2, "[a]n employer shall pay an employee for overtime . . . in the manner and methods provided in and subject to the exemptions of [the FLSA], as amended."[5] 12 N.Y. Comp.Codes R. & Regs. § 142–2.2 ("12 NYCRR § 142-2.2"). It, therefore, follows that unpaid

---

[3] *See Wimbush v. L.I.C. Pet Transp. Inc.*, No. 16CIV5363, 2018 WL 3388296, at *3 (S.D.N.Y. July 12, 2018) (explaining that the NYLL § 633 "extends to wage under-payments in violation of regulatory obligations," because "[u]nder [the NYLL § 2(17)], '[a]ll references to labor law, chapter, article, or section shall be deemed to include any rule, *regulation*, or order promulgated thereunder or related thereto.'"); *Eschmann v. White Plains Crane Serv., Inc.*, No. 11-CV-5881, 2014 WL 1224247, at *12 (E.D.N.Y. Mar. 24, 2014) ("Indeed, the NYLL itself was broadened to include commissioner orders." (citation omitted)); N.Y. Lab. Law § 2(17).

[4] Of relevance here, the regulation codified at 12 NYCRR § 142-2.1 was also issued by the NYDOL under Article 19. As discussed, *supra*, § 142-2.1 establishes the obligations of an employer with respect to minimum wage. 12 N.Y. Comp. Codes R. & Regs. § 142–2.1 ("12 NYCRR § 142-2.1"). That is, the implementing regulation codified at § 142-2.1 further establishes that minimum wages constitute wages to which an employee is entitled under Article 19.

[5] Plaintiffs contend that, although 12 NYCRR § 142-2.2 references the FLSA, "as amended," the Portal-to-Portal Act is not incorporated into 12 NYCRR § 142-2.2 nor the NYLL. (*See* Pl.'s Mem. L Opp'n Def.'s Mot. Dismiss ("Pl.'s Mem.") at 11-13, 16-17, ECF No. 29-6.) This is so, according to Plaintiffs, because of the structure of the two sentences comprising § 142-2.2. (*See id.* at 12-13, 16-17.) Specifically, as Plaintiffs' argument goes, the first sentence of § 142-2.2, which references the FLSA, as amended, mandates only how the wage rate for overtime is to be calculated. (*Id.* at 12; *see id.* at 16-17.) Plaintiff argues that, on the contrary, the second sentence, which does not refer to the FLSA, mandates only what constitutes overtime. (*Id.* at 12; *see id.* at 16-17.) At bottom, Plaintiffs argue that, because the second sentence does not refer to the FLSA, the NYLL does not adopt the FLSA for the purpose of determining what work is compensable at the overtime rate. (*See id.* at 12, 16-17.) Plaintiffs' argument is illogical. As an initial matter, and as discussed, *supra*, it is well established in this Circuit that 12 NYCRR § 142-2.2, in its entirety, incorporates the FLSA, as amended by the Portal-to-Portal Act. In addition, a plain reading of the statute suggests that although separate, the two sentences are not, as Plaintiffs argue, divorced: Indeed, the second sentence serves to clarify "overtime" for the purposes of wage calculations, which are made in accordance with the federal regulations of FLSA. *See* 12 NYCRR § 142-2.2. That is, the second sentence expounds on the meaning of "overtime" as introduced in the first sentence, such that the FLSA is incorporated in both sentences—that is, the entire provision. *See id.* To hold otherwise would fly in the face of elementary principles of the construction of statutes, as well as general syntax.

overtime wages constitute those wages to which an employee is entitled under § 663. *See id.*; *Wimbush*, 2018 WL 3388296, at *3.

Against this backdrop, Amazon contends that the NYLL "tracks" the FLSA. (Def.'s Mem. L. Supp. Mot. Dismiss ("Def.'s Mem.") at 10, ECF No. 29-1.) And, as Amazon's argument goes, because the time spent by Plaintiffs completing the Start-of-Shift and End-of-Shift Activities is not compensable under the FLSA, the time spent with respect to these activities is, likewise, not compensable under the NYLL. (*Id.*) Therefore, Amazon argues, Plaintiffs' claims for unpaid overtime wages and unpaid minimum wages are ripe for dismissal. (*Id.*) The Court agrees.

Having long recognized that "[t]he NYLL 'applies the same exemptions [to overtime pay] as the FLSA,'" *Shang Shing Chang v. Wang*, No. 15-CV-4385, 2018 WL 1258801, at *4 (E.D.N.Y. Mar. 12, 2018) (quoting *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101 (2d Cir. 2010), *abrogated on other grounds by Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219 (2d Cir. 2018)), courts in the Second Circuit analyze NYLL overtime claims under the same standards governing claims for overtime under the FLSA.[6] "[T]o state a plausible FLSA overtime claim, . . . plaintiff[s] must sufficiently allege 40 hours of work in a given workweek," *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013), and "provide sufficient detail about the length and frequency of their unpaid work to support a reasonable

[6] *See, e.g., Chase v. MADICORP*, No. 623CV00436, 2024 WL 841266, at *5 (N.D.N.Y. Feb. 28, 2024) (finding that "the NYLL overtime claim . . . is co-extensive with the claim for unpaid overtime under the FLSA" and dismissing the overtime claim based on its analysis of the FLSA overtime claim); *Rilloraza v. Rhodes*, No. 21-CV-3305, 2023 WL 7686699, at *7 (E.D.N.Y. Sept. 8, 2023) ("The NYLL incorporates and restates the FLSA's requirements, and the analysis of overtime claims under the NYLL is generally the same as under the FLSA."); *Bronx Conservatory of Music, Inc. v. Kwoka*, No. 21CIV1732, 2022 WL 4096069, at *2 (S.D.N.Y. Sept. 7, 2022) ("Claims for overtime pay under the NYLL are evaluated under the same standards as claims under the FLSA."); *see also Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012) ("Like the FLSA, the NYLL 'mandates overtime pay and applies the same exemptions as the FLSA.' [The Circuit] therefore discuss only the FLSA, and do[es] not engage in a separate analysis of plaintiffs' NYLL claims." (internal citation omitted)).

inference that they worked more than forty hours in a given week," *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013); *see also Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 89 (2d Cir. 2013) (finding that a party's claims failed because "[s]he did not estimate her hours in any or all weeks or provide any other factual context"). That said, it is axiomatic that to sufficiently plead a claim for unpaid overtime under the NYLL, a plaintiff must allege that they, first, engaged in work that is compensable under the FLSA, and therefore by extension the NYLL. Of relevance here, under the FLSA, as amended by the Portal-to-Portal Act, 29 U.S.C. §§ 251–262,[7] "activities performed either before[, i.e., preliminary activities] or after the regular work shift[, i.e., postliminary activities] . . . are compensable . . . if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed." *Gorman*, 488 F.3d 586, 590 (2d Cir. 2007) (citation omitted). "[A]n activity is integral and indispensable to the principal activities that an employee is employed to perform . . . if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Busk*, 574 U.S. at 37.

---

[7] The Portal-to-Portal Act, which amended the FLSA in 1947, represented an attempt by Congress to delineate certain activities which did not constitute work, and therefore did not require compensation, in the face of Supreme Court holdings interpreting the meaning of "work" broadly. To that end, the Portal-to-Portal Act created two exemptions from FLSA-mandated compensation, the latter of which is relevant here:

> (1) Walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform; and
>
> (2) Activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any workday at which such employee commences, or subsequent to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

*Gorman*, 488 F.3d at 590 (quoting 29 U.S.C. § 254(a)).

There can be no legitimate question that the Start-of-Shift and End-of-Shift Activities are properly classified as "preliminary" and "postliminary" activities. As explained by the implementing regulations of the FLSA, "preliminary" and "postliminary" activities include, *inter alia*, "checking in and out and waiting in line to do so . . . ." *Busk*, 574 U.S. at 34 (internal quotation marks omitted) (quoting 29 C.F.R. § 790.7(g)). At bottom, these are the very activities that comprise the Start-of-Shift and End-of-Shift Activities for which Plaintiffs now seek overtime pay. (*See* Compl. ¶¶ 34, 36, 41.) It is also plain that the Start-of-Shift and End-of-Shift Activities were not "integral and indispensable to the principal activities" of Plaintiffs' employment.

Here, Plaintiffs allege that Amazon employed associates, including Plaintiffs, as "loaders, packers, pickers, diverters, stowers, line leaders, water spiders, and problem solvers." (*Id.* ¶ 13.) Although the Complaint fails to specify Plaintiffs' roles at Amazon, Plaintiffs allege that, fundamentally, associates at Amazon's Warehouses were hired for the purpose of packaging a customer's order or sorting packages containing a customer's order for delivery to the customer. (*Id.* ¶ 22.) Stated plainly, Plaintiffs concede that the only "principal activities" for which they were "employed to perform" were packaging and sorting customer orders. (*See id.*) *Busk*, 574 U.S. at 37. Certainly, neither the Start-of-Shift Activities nor the End-of-Shift Activities are "intrinsic element[s]" of—that is, necessary to effectuate—Plaintiffs' principal activities. *Busk*, 574 U.S. at 37 (finding that "the employees' time spent waiting to undergo and undergoing [the defendant's] security screenings [did] not meet the[] criteria" of the integral and indispensable test); *see, e.g.*, *IBP, Inc. v. Alvarez*, 564 U.S. 21, 41-42 (2005) (concluding that time spent by employees waiting to put on protective clothing was not "integral and indispensable" to their "principal activit[ies,]" and therefore not compensable); *Gorman*, 488 F.3d at 594 (2d Cir. 2007)

(explaining that donning and doffing of "helmet, safety glasses, and steel-toed boots may be indispensable to plaintiffs' principal activities without being integral"); *Chase*, 2024 WL 841266, at *4-5 (finding that time "pre-shift waiting time" and "driving time" was not compensable); *Stewart v. Hudson Hall LLC*, No. 20-CV-885, 2021 WL 1750368, at *10 (S.D.N.Y. May 4, 2021) (finding that time spent waiting for locker to store tools for work not compensable). Indeed, the only allegation contained in the Complaint connecting the Start-of-Shift and End-of-Shift Activities to the successful execution of the principal activities is the allegation that the Start-of-Shift and End-of-Shift Activities were required by Amazon each workday. (Compl. ¶¶ 34, 36, 41.) However, "the fact that an employer required an activity" does not, without more, satisfy the integral and indispensable test. *Busk*, 574 U.S. at 36. As made clear by the Supreme Court, "[i]f the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities' the very activities that the Portal–to–Portal Act was designed to address" when amending the FLSA. *Id*. As such, the Start-of-Shift and End-of-Shift Activities are not compensable for overtime purposes. Accordingly, Plaintiffs' claim for unpaid overtime must necessarily fail.

To avoid this conclusion, Plaintiffs argue that, in light of the Second Circuit decision in *Del Rio v. Amazon.com.dec LLC*, 132 F. 4th 172 (2d Cir. 2025), the Court must "conduct a thorough examination of the NYLL's text, purpose, administrative interpretations, and legislative history and intent." (Pl.'s Mem. L. Opp'n Def.'s Mot. Dismiss ("Pl.'s Mem.") at 3-4, ECF No. 29-6.) Not so. In *Del Rio*, like here, the plaintiffs filed a complaint alleging that the defendant violated Connecticut's wage laws by failing to compensate employees for the time spent undergoing mandatory screening. 132 F. 4th 172, 174-76 (2d Cir. 2025). However, following the district court's grant of the defendant's motion for summary judgment, the plaintiffs filed a

motion to certify a question as to whether such time was compensable under Connecticut's wage laws. *Id.* at 176. To determine whether certification to the Connecticut Supreme Court was proper, the Circuit considered three factors, the first of which is relevant to Plaintiffs' argument here. *Id.* at 176-81. Under the first factor, the Circuit assessed whether any Connecticut state court decision provided an authoritative answer. *Id.* at 177. Finding that no such decision existed, the Circuit engaged in statutory analysis to deduce whether mandatory screening was compensable under the Connecticut wage laws. *Id.* at 177-79. Ultimately, the Circuit concluded that, because it was left without any clear authority, the first prong weighed in favor of certification. *Id.* at 179. *Del Rio* is inapposite. This Court is not entertaining a motion to certify any question before the state court, nor would it. Moreover, in *Del Rio*, the court concluded that certification of the question was necessary because of the absence of case law or statutory authority on the subject. *Id.* at 177-79. That is not the case here. As discussed, *supra*, there are ample cases within this circuit interpreting the NYLL as applying the same exceptions as FLSA within the context of overtime wages.[8] Moreover, as discussed previously, the statute expressly incorporates by reference the exemptions included in the FLSA at § 142-2.2. 12 NYCRR § 142-2.2. In other words, the Court has all the information that it needs to conclude that, under the NYLL, consistent with the FLSA, the Start-of -Shift Activities and End-of Shift Activities and not compensable as overtime. Plaintiffs' claims for overtime wages must, therefore, be dismissed.

Plaintiffs' claims for unpaid wages fare no better. As with a claim for overtime wages, to plead a claim for unpaid minimum wages claim here, Plaintiff must establish that the Start-of Shift Activities and End-of Shift Activities is compensable. For the reasons discussed *supra*,

[8] *Supra* note 6.

they are not. This conclusion is buttressed by the NYDOL's interpretation of 12 NYCRR § 142-2.1, which pertains to minimum wage. As outlined by the state court in *Henix v. Liveonny, Inc.*, in August 2010, the NYDOL opined on an employer's rights and obligations to pursuant to 12 NYCRR § 142-2.1(b). No. 158222/2016, 2021 WL 127046, at *5 (N.Y. Sup. Ct. Jan. 13, 2021). Specifically, the court explained that the NYDOL "interprets the language of [12 NYCRR § 142-2.1] in line with the federal regulations . . . under the [FLSA] . . . ." *Id.* (internal quotation marks and citations omitted). Relying on the NYDOL's interpretation, the state court utilized the standard set forth in the FLSA to decide whether Plaintiffs' time traveling was compensable under the NYLL, concluding that it was not. *Id.* at *5-6. As Plaintiffs' aptly noted, "[a]s a general rule, courts must defer to an administrative agency's[, like the NYDOL,] rational interpretation of its own regulation." *Andryeyeva v. New York Health Care, Inc.*, 33 N.Y.3d 152, 174 (2019). Notably, the NYDOL's interpretation of 12 NYCRR § 142-2.1(b) is in line with the FLSA and it is neither irrational, unreasonable, nor contrary to the plain meaning of the 12 NYCRR § 142-2.1(b), as would be required for this Court to entertain an interpretation outside that of the NYDOL. *See Henix*, No. 158222/2016, 2021 WL 127046, at *5 (N.Y. Sup. Ct. Jan. 13, 2021) (finding that a court is not required to accept "an administrative agency's interpretation of its regulations" when the interpretation is "irrational and unreasonable") (quoting *Andryeyeva*, 33 N.Y.3d 152, 174). Indeed, the language of 12 NYCRR § 142-2.1(b) is, as Amazon argues, "materially indistinguishable" from the federal regulations under the FLSA, thus supporting the NYDOL's interpretation of the regulation.[9] Applying the standards set forth in the FLSA, it is,

---

[9] *Compare* 12 NYCRR § 142-2.1 ("The minimum wage shall be paid for the time an employee is permitted to work, or is required to be available for work at a place prescribed by the employer, and shall include time spent in traveling to the extent that such traveling is part of the duties of the employee."), *with* 29 C.F.R. § 785.38 ("Time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked."), *and with* 29 C.F.R. § 785.14 ("Whether waiting time is time worked under the Act depends upon particular circumstances . . . . 'Facts may show that the employee was engaged to wait or they may show that he waited to be engaged.'" (quoting *Skidmore v. Swift*, 323 U.S. 134 (1944)).

plain that under the NYLL Start-of-Shift Activities and End-of-Shift Activities are not compensable for minimum wage purposes.

Indeed, any conclusion to the contrary would lead to an absurd result. To illustrate, consider two hypothetical associates at Amazon, Jayden and Rachael. In a particular week, Jayden records forty hours on the time clock, whereas Rachael records only thirty hours. Moreover, during the week, Jayden and Rachael each spend ten minutes completing the Start-of-Shift Activities prior to clocking in, and ten minutes completing the End-of-Shift Activities after clocking out. That is, in total, Jayden and Rachael each allocate twenty minutes per day completing the Start-of-Shift and End-of-Shift Activities. Because Jayden already recorded forty hours during the week, any NYLL claim for unpaid wages brought with respect to the Start-of-Shift and End-of-Shift Activities would constitute overtime wages. *See Lundy*, 711 F.3d at 114. At the same time, any NYLL claim for unpaid wages brought by Rachael—whose total worked hours do not trigger overtime—would be for minimum wages. *See* N.Y. Lab. Law § 663; 12 NYCRR § 142-2.1. But if a court were to refuse to extend the application of the FLSA standards to Rachael's minimum wage claims, as the law plainly requires of Jayden's overtime wages, inconsistent outcomes would necessarily result: On the one hand, the time allocated by Rachael to the Start-of-Shift and End-of-Shift Activities would be compensable under the NYLL as unpaid minimum wages. On the other hand, the overtime spent by Jayden on the Start-of-Shift and End-of-Shift Activities would not be compensable under the NYLL. To put a finer point on it, Plaintiff's argument would require the Court to carve out different compensation frameworks for overtime and minimum wages in the NYLL, where no such distinction is supported. The Court declines to do so.

The NYLL follows the standard set forth in the FLSA, as amended, with respect to minimum wage and overtime. The Start-of-Shift and End-of-Shift Activities, therefore, are not compensable under the NYLL, and Plaintiffs' claims for unpaid minimum wage and overtime wages, pursuant to the NYLL, are dismissed, accordingly.

## II. Failure to Furnish Correct Wage Statements

Plaintiffs complain that Amazon failed to provide them with wage statements reflecting the time spent on Start-of Shift Activities or End-of Shift Activities. (*Id.* ¶ 48.) In seeking dismissal of Plaintiffs' wage statement claim, Amazon argues that Plaintiffs lack standing. (Def.'s Mem. at 18-20.) The Court agrees.

"Article III, Section 2 of the [United States] Constitution limits the subject-matter jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) (citing *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). The standing doctrine is borne out of Article III as a means of "'ensur[ing] that federal courts do not exceed their authority as it has been traditionally understood.'" *SM Kids*, 963 F.3d 206, 211 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). To prove constitutional standing, "a plaintiff must adequately establish: [](1) an injury in fact (*i.e.,* a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (*i.e.,* a '"fairly ... trace[able]"' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.,* it is '"likely"' and not 'merely "speculative"' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008) (quoting *Defenders of Wildlife*, 504 U.S. at 560-61).

In the context of wage and notice claims under NYLL § 195(3), to have standing in federal court "a plaintiff cannot rely on [only] 'technical violations' of the [NYLL] but must allege 'actual injuries suffered as a result of the alleged . . . wage notice and wage statement violations.'" *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 305, 306 n.1 (2d Cir. 2024) (collecting cases). That is, "an important difference exists" between: (1) "a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law"; and (2) "a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* (internal quotation marks omitted) (quoting *Ramirez*, 594 U.S. at 426-27). "[O]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court. *Id.* at 306 (emphasis in original) (quoting *Ramirez*, 594 U.S. at 427). Here, Plaintiffs allege they were harmed because, according to the Complaint, Amazon's failure to provide a wage and notice statement that included the Start of Shift Activities and End-of-Shift Activities delayed minimum wage and overtime payment to Plaintiffs. (Compl. ¶ 52.) However, this allegation does not establish the requisite concrete harm. This is so because, as discussed, *supra*, Plaintiffs were not entitled to be paid for these activities in the first place. Plaintiffs lack standing to assert a wage-statement claim, and the claim is dismissed accordingly.[10]

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED, and Plaintiffs' Second Amended Complaint is DISMISSED.

[10] In addition, because Plaintiffs are former employees of Amazon, (*id.* ¶¶ 14-18), Plaintiffs lack standing to seek the requested injunctive and declaratory relief. *Smalls v. Amazon.com Servs. LLC*, No. 20CV5492, 2022 WL 356432, at *5 (E.D.N.Y. Feb. 7, 2022) (internal quotation marks omitted) ("[Plaintiffs] lack[] standing to seek injunctive or declaratory relief against [their] former employer." (quoting *Kassman v. KPMG LLP* 925 F. Supp. 2d 453, 465-66 (S.D.N.Y. 2013)) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 364 (2011))), *aff'd*, No. 22-615, 2022 WL 17491259 (2d Cir. Dec. 8, 2022).

SO ORDERED.

Dated: Brooklyn, New York
March 31, 2026

/s/ LDH
LASHANN DEARCY HALL
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

SHAWNICE BETTIS, BOYSING SAMUEL, JR., LAURA PINCAY, CHRISTOPHER MONTEAGUDO, and KEANNA KOVOS*, on behalf of themselves and all others similarly situated,*

Plaintiffs,

v.

AMAZON.COM SERVICES LLC, f/k/a AMAZON SERVICES.COM, INC.,

Defendant.

---------------------------------------------------------- X

JUDGMENT
24 CV 7563 LDH-JAM

A Memorandum and Order of the Honorable LaShann DeArcy Hall, United States District Judge having been filed on March 31, 2026, granting the Defendant's motion to dismiss; and dismissing the Plaintiff's Second Amended Complaint; it is

ORDERED AND ADJUDGED that the Defendant's motion to dismiss is granted; and that the Plaintiff's Second Amended Complaint is dismissed.

Dated: Brooklyn, NY
March 31, 2026

Brenna B. Mahoney
Clerk of Court

By: *<u>/s/Christina Frunzi</u>*
Deputy Clerk

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**---------------------------------------------------------------X**
**SHAWNICE BETTIS, BOYSING SAMUEL, JR., CHRISTOPHER MONTEAGUDO, LAURA PINCAY and KEANNA KOVOS, Individually and on behalf of all others similarly situated,**

**Docket No. 24-cv-7563-LDH-JAM**

**Plaintiffs,**

**-against-**

**AMAZON.COM SERVICES LLC.,**
**f/k/a AMAZON SERVICES.COM, INC.**

**Defendant.**
**-----------------------------------------------------X**

**DECLARATION OF ROBERT WISNIEWSKI, ESQ.**

ROBERT WISNIEWSKI, ESQ., hereby declares, under the penalties of perjury pursuant to 28 U.S.C. § 1746 the following to be true:

1. I am the attorney of record and co-counsel for Plaintiffs in this matter. I am fully familiar with the facts and circumstances of this case as set forth herein.

2. I submit this declaration in support of Plaintiff's motion under Fed. R. Civ. P. Rules 59(e) and 60(b)(2) to reopen the case and vacate the judgment of the Court, dated March 31, 2026 (Doc. 35) and to reconsider its Memorandum and Order, dated March 31, 2026 (Doc. 34) under Rule 6.3 based on the newly discovered evidence that was unavailable to counsel until April 7, 2026.

3. On March 31, 2026, this Court entered its Memorandum and Order (Doc. 34) granting defendant's motion to dismiss pursuant to FRCP Rule 12(b)(6)(**Ex. 1**) Final judgment was entered the same day (Doc. 35)(**Ex. 2**) on March 31, 2026, and the Court also replaced the originally filed Memorandum and Order on April

7, 2026, making a slight non-substantive text change.

4. From April 7, 2026 through April 9, 2026 I conducted an in-person review of the records at the New York Department of Labor ("NYDOL") in Building 12 in Albany, NY. The records were provided pursuant to a Freedom of Information Law request filed in or about May 14, 2025 by my co-counsel, Leon Greenberg, Esq. NYDOL responded to the FOIL Request on or about March 11, 2026 but, owing to the massive number of documents and scheduling issues involving the need to have a NYDOL minder oversee my review of the records, the in person review took place between April 7, 2026 and April 9, 2026.

5. The FOIL request filed by counsel sought among others, relevant NYDOL opinion letters on labor standards. During the review, I inquired of a senior NYDOL Law Department attorney whether there was a collection of such opinion letters and informed her that my co-counsel and I had made prodigious efforts to locate such opinion letters but could only find them as exhibits to affidavits in various state cases. This lack of availability of any opinion letters on the NYDOL website caused us to file a FOIL request.

6. In response, the Senior Attorney provided access to 267 pages of NYDOL's opinion letters via a special link, which required numerous steps to be taken in order to find and review such opinion letters. Neither my co-counsel nor I were able to find this link, or the opinion letters, when we searched NYDOL's database in the Spring of 2025. The search of NYDOL's database allowed counsel to obtain two opinion letters highly relevant to the issues raised by Plaintiffs in this lawsuit.

7. Attached as **Exhibit 3** is the September 9, 1997 opinion letter regarding the need to pay employees for time between reporting to work and clocking in.

8. Attached as **Exhibit 4** is the August 10, 2020 letter RO-09-0190 regarding travel time and mentioned in the *Hynix v. Liveonny, Inc*. state court decision relied on by this Court.

9. I assure the Court that had my co-counsel and I had these opinion letters whilst drafting our opposition or at any time thereafter prior to this Court's March 31, 2026 decision, we would have obviously provided them to this Court.

10. As more fully set forth in the attached Memorandum of Law, these opinion letters represent a rational interpretation of the NYLL and the relevant Wage Order and, if they had been available to the Court previously, they would have compelled a different analysis and a different result than the one set forth in the Memorandum and Order.

11. I declare that the foregoing is true and correct to the best of my knowledge and belief and am aware that if any of the foregoing is materially false, I may be subject to penalty that may include jail.

WHEREFORE, Plaintiffs respectfully request that this Court reopen the case, vacate the March 31, 2026 Judgment (Doc. 35) and reconsider its Memorandum and Order of March 31, 2026 (Doc. 34) as argued in Plaintiffs' Memorandum of Law.

Dated: New York, NY
April 13, 2026

Respectfully submitted,

*/s/Robert Wisniewski*
Robert Wisniewski, Esq.
Robert Wisniewski P.C.

17 State Street - Suite 820
New York, NY 10004
(212) 267-2101

STATE OF NEW YORK
DEPARTMENT OF LABOR
COUNSEL'S OFFICE
345 Hudson Street - Room 8001
New York, NY 10014-0673
(212) 352-6561

September 9 , 1997

Mr. Daniel Calabro
Organizer
Local 100, Hotel Employees &
Restaurant Employees
International Union, AFL-CIO
321 West 44th Street, 5th Floor
New York, New York 10036

Re: Request for Opinion
Compensation for Period Between
Reporting Time and "Clocking"
Time

Dear Mr. Calabro:

Your July 31, 1997 letter requests an opinion regarding the legality of a practice applied by Volume Services to your members whom it employs at Yankee Stadium. According to your letter, your members are required to report to work at a specified time, dressed in uniform and ready to work; however, before they are "clocked in," they must report to management at one location, receive their work assignments, and report to the manager at their work location, a process which can take up to 20 minutes, which time is not compensated. Further, you state that these employees have no way of knowing when they are "clocked" in or out because there are no physical time cards and they are not provided with receipts indicating this information.

Section 652(1) of the Labor Law requires that employees be paid at least the minimum wage for "each hour worked." Section 2(7) of the Labor Law defines "employed" as including "permitted or suffered to work." Once an employer has directed an employee to report to work at a specified time, that employee is "employed" and "working" within the meaning of the Labor Law, and must be paid at least the minimum wage for all time during which such employee is required to remain on the employer's premises while waiting to report to such employee's actual work location. Please note that an employer is not required to pay employees for such time at their agreed rate of pay unless the employment agreement so provides.

I trust that the foregoing is responsive to your inquiry. If you have any further questions, you may contact me at (212) 352-6655.

Very truly yours,

Robert Ambaras
Senior Attorney

[redacted]

**New York State Department of Labor**
**David A. Paterson**, *Governor*
**Colleen C. Gardner**, *Commissioner*

August 10, 2010

Ms. Elena Paraskevas-Thadani
Littler Mendelson, P.C.
900 Third Avenue
New York, NY 10022-3298

Re: Request for Opinion
Travel Time – 12 NYRR 142.2(b)
RO-09-0190

Dear Ms. Paraskevas-Thadani:

I have been asked to respond to your letter of December 31, 2009 in which you ask three questions regarding the rights and obligations of employers to pay traveling employees pursuant to regulation 12 NYCRR §142-2.1(b). The questions posed in your letter are addressed specifically below.

As background for addressing these questions, please be advised that subsection 2.1(b) of the Minimum Wage Order for Miscellaneous Industries (12 NYCRR §142-2.1(b)) states, in relevant part, that the minimum wage shall be paid for "time spent in traveling to the extent that such traveling is part of the duties of the employee." Additionally, Section 191 of the Labor Law requires the payment of wages at an employee's agreed rate of pay for all hours worked within a specified time period. In determining whether the time spent traveling is counted as time worked, the time must be considered part of the "duties of the employee" as stated above in 12 NYCRR §142-2.1(b). This Department has previously held that where an employee is not completely relieved from duty and cannot effectively use the time for his own purposes without restrictions, such time must be considered part of the "duties of the employee." Accordingly, the wage rate for time traveled must be determined in the scope of whether it constitutes part of the "duties of the employee" and then compensation is to be based upon the agreed rate of pay.

Generally, so long as the activity is "an integral part of and indispensable to the various *** activities for which they were principally employed" the activity is considered within the scope of the duties of the employee. (*Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 718. (C.A.2 (N.Y.), 2001, quoting *Mitchell v. King Packing Co.*, 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956) internal quotations omitted).) Furthermore, the Department

Tel: (518) 457-4380, Fax: (518) 485-1819
W. Averell Harriman State Office Campus, Bldg. 12, Room 509, Albany, NY 12240

www.labor.ny.gov bcejjs@labor.ny.gov

interprets the language of 12 NYCRR §142-2.1 in line with the federal regulations regarding travel time under the Fair Labor Standards Act. (29 CFR §785.33 et seq.)

In this context, the answers to your questions are as follows:

1) *Does this regulation [12 NYCRR §142-2.1] mean that, when the employer sends the employee on a trip to another store outside of the employee's usual location, the employee must be compensated at the minimum wage for all hours of travel to and from the airport and while traveling on the plane, car, bus or train?*

The answer to this question depends upon the nature and length of the travel, which you do not provide. The regulation provides that employees must be paid not less than the minimum wage rate for time worked or time spent within the scope of work, such as traveling. So long as the time is within the scope of the employee's duties and is required for the proper performance of those duties, the employer must compensate for that time. Unfortunately, since your letter does not describe the nature and length of the travel, no definitive answer to this question can be provided. I suggest you consult federal regulations 29 CFR §785.33 *et seq.* for more information in this regard.

2) *Since these employees are paid $30 per hour, well-above the minimum wage, the employee is in almost each instance earning well-above the minimum wage for all hours worked, even including travel time. Is this regulation satisfied if the employee is earning more than minimum wage for each hour worked including travel, or must [may] the employer pay for example, $7.50 for travel time, on top of $30 per hour for all of the employee's other hours?*

This question proposes having a different rate of pay for all time the employee spends traveling from that of regular hours worked. Section 195(1) of the Labor Law provides, in relevant part, that "[e]very employer shall . . . notify his or her employees, in writing, at the time of hiring of the rate of pay and of the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article, and obtain a written acknowledgment from each employee of receipt of this notice." Labor Law §195(2) provides that "[e]very employer shall . . . notify his employees of any changes in the pay days prior to the time of such changes." The Department interprets these provisions to require employers to provide employees with clear and effective advance notification of any change in pay before such changes are implemented. Furthermore, the Department also interprets the statute as prohibiting any retroactive reductions in pay. Therefore, so long as the "travel pay rate" is clearly and effectively communicated to the employee in compliance with Labor Law §195, does not impose retroactive reductions in pay already earned, nothing in the Labor Law prohibits an employer from paying its employees in the manner in which you describe.

3) *The overtime regulation provides "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate." See 12 NYCRR 142-2.2. If the traveling hours are overtime hours, can the employer pay time-and-a-half of the minimum wage for the overtime hours which consists of traveling?*

No. All overtime must be paid at a rate not less than one-and-one half the employee's regular rate of pay. The language you quote in Section 142-2.2 requires overtime to be based on an employee's "regular rate." The term "regular rate" is defined as the amount that the employee is regularly paid for each hour of work. Since the employees described in your letter are paid a regular hourly rate of thirty dollars per hour, their overtime rate of pay is one and one-half times that, or forty-five dollars per hour. It is also worth noting that Section 142-2.2 provides that employees who are exempt from the overtime requirements of the Federal Fair Labor Standards Act are required to be paid overtime at a rate not less than one and one half times the minimum wage rate for all overtime hours worked. Employees exempt from the overtime requirements of the Fair Labor Standards Act may be paid, in accordance with your question, at one and one half times the minimum wage for overtime hours that consist of traveling.

This opinion is based exclusively on the facts and circumstances described in your facsimile request letter dated December 31, 2009 and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. This opinion cannot be used in connection with any pending private litigation concerning the issue addressed herein. If you have any further questions, please do not hesitate to contact me.

Very truly yours,

Maria L. Colavito, Counsel

By: Jeffrey G. Shapiro
Associate Attorney

[redacted]

Robert Wisniewski, Esq.
Robert Wisniewski, P.C.
17 State Street - Suite 820
New York, New York 10004
(212) 267-2101
rw@rwapc.com
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

SHAWNICE BETTS, BOYSING SAMUEL, JR., CHRISTOPHER MONTEAGUDO, LAURA PINCAY, and KEANNA KOVOS, Individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

**Docket No: 24-cv-7563-LDH-JAM**

AMAZON.COM SERVICES LLC.,
f/k/a AMAZON SERVICES.COM, INC.

Defendant.

------------------------------------------------------------X

**NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs Shawnice Bettis ("Bettis"), Boysing Samuel, Jr. ("Samuel"), Christopher Monteagudo ("Monteagudo"), Laura Pincay ("Pincay") and Keanna Kovos ("Kovos"), the plaintiffs in the above-named Action, hereby appeal to the United States Court of Appeals for the Second Circuit from the final memorandum and order by the Hon. LaShann DeArcy Hall, entered on March 31, 2026, granting Defendant's Motion to Dismiss

[no more text on this page]

Plaintiffs' Second Amended Complaint (DE: 34) and from the Judgment Dismissing the Action, entered on March 31, 2026, (DE: 35).

Dated: New York, NY
April 27, 2026

Respectfully submitted,

*/s/Robert Wisniewski*

Robert Wisniewski, Esq.
Robert Wisniewski P.C.
17 State Street - Suite 820
New York, NY 10004
(212) 267-2101
rw@rwapc.com
Attorney for Plaintiffs

TO: All Counsel of Record via ECF

**From:** ecf_bounces@nyed.uscourts.gov
**To:** nobody@nyed.uscourts.gov
**Subject:** Activity in Case 1:24-cv-07563-LDH-JAM Bettis et al v. Amazon.com Services LLC Order on Motion to Vacate
**Date:** Tuesday, April 28, 2026 10:17:50 AM

---

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mailbox is unattended.**

*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Eastern District of New York**

## Notice of Electronic Filing

The following transaction was entered on 4/28/2026 at 1:16 PM EDT and filed on 4/28/2026
**Case Name:** Bettis et al v. Amazon.com Services LLC
**Case Number:** 1:24-cv-07563-LDH-JAM
**Filer:**
**WARNING: CASE CLOSED on 03/31/2026**
**Document Number:** No document attached

**Docket Text:**
**ORDER: The Court is in receipt of Plaintiffs' motion [36] for reconsideration, in which Plaintiffs urge the Court to reconsider its Memorandum and Order [34], dismissing the claims against Defendant for failure to state a claim. The Court may grant a motion for reconsideration where there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal citation and quotation marks omitted). In moving the Court to reconsider its decision, Plaintiffs pointed to no change in the controlling law, new evidence, nor a need to correct clear error or prevent manifest injustice. Accordingly, Plaintiffs' motion [36] for reconsideration is DENIED. Ordered by Judge LaShann DeArcy Hall on 4/28/2026. (CG)**

**1:24-cv-07563-LDH-JAM Notice has been electronically mailed to:**

Leon Greenberg leongreenberg@overtimelaw.com, ranni@overtimelaw.com, wagelaw@hotmail.com

Robert Wisniewski rw@rwapc.com, bl@rwapc.com, hc@rwapc.com, la@rwapc.com, office@rwapc.com, rf@rwapc.com

Harris Michael Mufson HMufson@gibsondunn.com, AKilberg@gibsondunn.com, AWebb@gibsondunn.com, BHamburger@gibsondunn.com, GCarozzaCipollone@gibsondunn.com, Ghart@gibsondunn.com, NDygert@gibsondunn.com, harris-m-mufson-2450@ecf.pacerpro.com, mao@gibsondunn.com

Jason Craig Schwartz jschwartz@gibsondunn.com, jason-c-schwartz-7835@ecf.pacerpro.com

Grace Elizabeth Hart ghart@gibsondunn.com, grace-e-hart-3863@ecf.pacerpro.com

**1:24-cv-07563-LDH-JAM Notice will not be electronically mailed to:**

Robert Wisniewski, Esq.
Robert Wisniewski P.C.
17 State Street - Suite 820
New York, New York 10004
(212) 267-2101
rw@rwapc.com
Co-counsel for Plaintiffs

Leon Greenberg, Esq.
The Law Office of Leon Greenberg
1811 S. Rainbow Blvd. - Suite 210
Las Vegas, Nevada 89145
(702) 383-6085
leongreenberg@overtimelaw.com
Co-counsel for Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

SHAWNICE BETTS, BOYSING SAMUEL, JR., CHRISTOPHER MONTEAGUDO, LAURA PINCAY, and KEANNA KOVOS, Individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

**Docket No: 24-cv-7563-LDH-JAM**

AMAZON.COM SERVICES LLC.,
f/k/a AMAZON SERVICES.COM, INC.

Defendant.

-------------------------------------------------------X

**AMENDED NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs Shawnice Bettis ("Bettis"), Boysing Samuel, Jr. ("Samuel"), Christopher Monteagudo ("Monteagudo"), Laura Pincay ("Pincay") and Keanna Kovos ("Kovos"), the plaintiffs in the above-named Action, hereby appeal to the United States Court of Appeals for the Second Circuit from the final memorandum and order by the Hon. LaShann DeArcy Hall, entered on March 31, 2026, granting Defendant's Motion to Dismiss

[no more text on this page]

Plaintiffs' Second Amended Complaint (DE: 34), the Judgment Dismissing the Action, entered on March 31, 2026, (DE: 35), and from the Order dated April 28, 2026 dismissing Plaintiffs' Motion to Vacate Judgement under Fed. R. Civ.P. 59 and 60.

Dated: New York, NY
May 11, 2026

Respectfully submitted,

*/s/Robert Wisniewski*
Robert Wisniewski, Esq.
Robert Wisniewski P.C.
17 State Street - Suite 820
New York, NY 10004
(212) 267-2101
rw@rwapc.com
*Co-counsel for Plaintiffs*

Leon Greenberg, Esq.
The Law Office of Leon Greenberg
1811 S. Rainbow Blvd. - Suite 210
Las Vegas, Nevada 89145
(702) 383-6085
leongreenberg@overtimelaw.com
*Co-counsel for Plaintiffs*

TO: All Counsel of Record via ECF